IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA SACRAMENTO DIVISION
Case No. 2:25-cv-01868-DJC-CSK

| | | |
|---|---|---|
| MATTHEW THOMAS JOYCE, by and through undersigned counsel, | ) ) ) | |
| *Plaintiff,* | ) ) ) | |
| v. | ) ) ) | |
| ARB GAMING LLC DBA MODO. US; | ) | **CORRECTED AMENDED COMPLAINT** |
| AFFIRM, INC; | ) | |
| GOLDMAN SACHS BANK USA; | ) | |
| APPLE INC; | ) | |
| AMAZON.COM, INC; | ) | |
| DOES 1 – 50; | ) ) | |
| *Defendants.* | ) ) ) | |

## **PARTIES**

1. Plaintiff Matthew Thomas Joyce is a resident of Durham County, North Carolina.

2. Defendant ARB Gaming LLC dba Modo. Us is a limited liability company formed under the laws of Delaware with a principal place of business in Scottsdale, Arizona.

3. Defendant Affirm, Inc. is a corporation formed under the laws of Delaware with a principal place of business in San Francisco, California.

4. Defendant Goldman Sachs Bank USA is a New York state-chartered bank with a principal place of business in New York, New York.

5. Defendant Apple Inc. is a corporation formed under the laws of California with a principal place of business in Cupertino, California.

6. Defendant Amazon.com, Inc. is a corporation formed under the laws of Delaware with a principal place of business in Seattle, Washington.

7. The true names and capacities of Defendants DOES 1 - 50 are unknown to Plaintiff, who therefore sues said Defendants by fictitious names. Plaintiff will amend this Complaint to

show the true names and capacities of said Defendants when the same have been ascertained. Plaintiff is informed and believes, and on that basis alleges, that each of the fictitiously named Defendants is legally responsible for the events and happenings alleged in this Complaint.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this action pursuant to 28 USCS § 1331 because this action arises under 42 USCS § 12182, presenting a federal question.

9. This Court has supplemental jurisdiction over the state law claims pursuant to 28 USCS § 1367 because the state law claims are so related to the federal claims that they form part of the same case or controversy.

10. This Court has subject matter jurisdiction over this action pursuant to 28 USCS § 1332 because there is complete diversity of citizenship between Plaintiff and Defendants, and the amount in controversy exceeds seventy-five thousand dollars.

11. This Court has personal jurisdiction over ARB Gaming LLC dba Modo. Us pursuant to Cal Code Civ Proc § 410.10 because ARB Gaming conducted substantial business in California by operating an online gambling platform accessible to California residents, and the claims arise from those California contacts. ARB Gaming has been expelled from California effective January 1, 2026 pursuant to California Assembly Bill 831.

12. This Court has personal jurisdiction over Affirm, Inc. because it is a corporation with its principal place of business in San Francisco, California.

13. This Court has personal jurisdiction over Goldman Sachs Bank USA pursuant to Cal Code Civ Proc § 410.10 because Goldman Sachs conducted business in California by issuing credit cards to California residents and processing transactions for California-based activities, and the claims arise from those contacts.

14. This Court has personal jurisdiction over Apple Inc. because it is a corporation formed under the laws of California with its principal place of business in Cupertino, California.

15. This Court has personal jurisdiction over Amazon.com, Inc. pursuant to Cal Code Civ Proc § 410.10 because Amazon conducted business in California and the gift card transaction and account termination involved California contacts, and the claims arise from those contacts.

16. Venue is proper in this Court pursuant to 28 USCS § 1391 because a substantial part of the events giving rise to the claims occurred in California, including platform operations by ARB Gaming subject to California regulation, loan origination by Affirm from its California headquarters, and payment processing by Apple from its California headquarters.

## BACKGROUND AND PLAINTIFF'S DISABILITIES

17. Plaintiff Matthew Thomas Joyce suffers from bipolar II NOS with psychotic features, Attention Deficit Hyperactivity Disorder, anxiety, and dissociation.

18. Plaintiff also suffers from gambling disorder, which is recognized as a disability under California law and the Americans with Disabilities Act.

19. Research demonstrates that gambling disorder occurs as a symptom in thirty to forty percent of bipolar patients during manic episodes.

20. Between approximately September 2024 – April 2025, the Plaintiff experienced nine months of documented psychosis.

21. During this period, the Plaintiff experienced a sustained dissociative and psychotic break centered on the identity 'Modo's Martyr' ('MM') which is a delusional belief that he was destined to absorb platform losses so other players could win. The Plaintiff communicated this delusion directly to ARB Gaming staff, demanding they 'crown' him, which

representatives dismissed as humorous. The delusion further manifested in references to time travel and defeating the platform's random number generator. ARB Gaming's VIP host Timothy Cramblin endorsed Plaintiff's psychotic state by adopting the 'MM' identity in official communications.

## ARB GAMING'S OPERATIONS AND PREDATORY TARGETING

22. Defendant ARB Gaming LLC operates an online gambling platform under the name Modo.us.

23. ARB Gaming disguised its gambling operations as a "sweepstakes" platform to evade gambling regulations.

24. Despite claiming to operate a sweepstakes platform and not a casino, ARB Gaming issued Plaintiff a 1099 tax form reporting $61,000 in gambling winnings to the Internal Revenue Service — a tax reporting mechanism used exclusively by gambling establishments. Plaintiff's actual net position was a loss of approximately $240,000. ARB Gaming cannot unilaterally classify its operations as 'gaming' to evade regulation while simultaneously classifying the same operations as 'gambling' for tax reporting purposes

25. The Arizona Department of Gaming issued a cease-and-desist order against ARB Gaming on April 17-18, 2025, accusing the company of operating a "felony criminal enterprise" engaged in money laundering.

26. ARB Gaming was expelled from California effective January 1, 2026 pursuant to California Assembly Bill 831, which bans sweepstakes casinos entirely.

27. ARB Gaming targeted Plaintiff with VIP status, eventually elevating him to "Black Diamond" status, the highest tier of VIP membership. ARB Gaming bypassed multiple VIP tiers to elevate Plaintiff directly to Black Diamond status. The platform's tier structure includes Gold, Platinum (levels I-III), and Cosmic (levels I-III) before Black

Diamond, a progression that under normal play would require years. Plaintiff was fast-tracked past approximately six tiers, confirming deliberate targeting of a high-loss player during a manic episode.

28. ARB Gaming assigned Plaintiff a personal VIP host named Timothy Cramblin.

29. ARB Gaming allocated monthly budgets specifically for providing gifts and incentives to VIP players like Plaintiff. These incentives included not only monetary gifts but also offers of concert tickets, vacations, exclusive restaurant experiences, and a five-hundred-dollar Amazon gift card, all funded through ARB Gaming's institutionally allocated VIP budgets. Each incentive constitutes additional 'consideration' under Cal Pen Code § 330.

30. VIP host Timothy Cramblin referred Plaintiff, addressing him by his psychotic identity 'MM' to donate to the FY Foundation, an entity operated by Alison Townley, the mother of ARB Gaming co-founder Patrick Fechtmeyer. FY Foundation has no registered 501(c)(3) status, no EIN, and has filed no Form 990. This solicitation occurred during Plaintiff's documented psychotic episode. When asked about the connection between FY Foundation and ARB Gaming, Cramblin stated: 'they keep that pretty separate but I know they do good work.

31. On one occasion on March 8, 2025, Cramblin told Plaintiff: "I've already sent you 2.5MM GC and 400 free SC this month so far, so minusing that and adding the bit of wiggle room I have, I was able to give you a gift of 4.5MM GC and 600 free SC for the rest of the month."

32. On April 1, 2025, Cramblin told Plaintiff: "if I do not receive my budget before about 5:45, I will go ahead and send you another gift to hold you over until tomorrow."

33. Cramblin also stated that providing gifts "seriously cuts into my budget for you for the rest of the month."

34. This systematic institutional allocation of gifts tied to VIP status constitutes "consideration" under Cal Pen Code § 330, transforming the platform from a purported sweepstakes into an illegal lottery.

## PLAINTIFF'S EXTREME GAMBLING ACTIVITY

35. Plaintiff logged a total of 5,631.41 hours of play on the Modo. us platform.

36. This represents an average of 13.76 hours of daily play, or 825.83 minutes per day.

37. In January 2025, Plaintiff played between 18.5 and 21 continuous hours daily.

38. Such extended periods are consistent with behavioral escalation, fatigue, and impaired decision-making in digital gambling contexts.

39. Plaintiff's ability to play nearly twenty hours a day for the entire month of January 2025 without interruption is a recognized symptom of bipolar disorder, as confirmed by mental health professionals during Plaintiff's subsequent rehabilitation treatment.

40. Plaintiff's gambling disorder is comorbid with his bipolar II NOS. Clinical research demonstrates that gambling produces heightened euphoric response during manic episodes, creating a neurological feedback loop that severely impairs the individual's ability to disengage. Combined with sleep deprivation, active psychosis, and dissociation, Plaintiff's capacity for rational decision-making was profoundly compromised. ARB Gaming observed these symptoms, including daily play exceeding eighteen hours and direct communications reflecting psychotic ideation, and continued to facilitate Plaintiff's gambling rather than implement any intervention.

## PLAINTIFF'S REQUEST FOR SELF-EXCLUSION AND ARB GAMING'S REFUSAL

41. On March 8, 2025, Plaintiff explicitly requested demotion from Black Diamond VIP status as a form of self-protection.

42. VIP host Timothy Cramblin refused Plaintiff's request.

43. Cramblin stated: "I cannot do that to you, you deserve to be there."

44. Cramblin further stated: "I do not even have the power to do that."

45. ARB Gaming continued to provide VIP services, personal host contact, and promotional offers to Plaintiff despite his explicit request for demotion.

46. Cramblin established a private text message channel with Plaintiff outside ARB Gaming's Zendesk system. Cramblin told Plaintiff: "no one else will see the messages you send here." This unmonitored channel was subsequently used to deliver a five-hundred-dollar Amazon gift card and other consideration without internal documentation.

47. On April 3, 2025 — the same day Plaintiff first contacted the 988 Suicide & Crisis Lifeline — Cramblin wrote: "I have told you numerous times what my working hours are." This was in response to Plaintiff's 2:04 AM messages stating "Not emailing you guys anymore. Just leave me alone." Cramblin's own words confirm a pattern of repeatedly directing Plaintiff away from support channels. This pattern is documented across three separate directives: March 8, 2025 ("I am the only one able to send you free SC gifts... please refrain from reaching out to the chat agents"); March 18, 2025 ("keep your use of our chat feature to a minimum"); and the April 3 email above.

48. ARB Gaming further isolated Plaintiff from standard customer protections available to all other players. On multiple occasions, Cramblin instructed Plaintiff to cease contacting regular support channels, restricting him exclusively to the private VIP host channel, which lacked the oversight, documentation, and responsible gaming intervention protocols of ARB Gaming's standard customer support system. This deliberate restriction

of services available to non-VIP players constitutes a denial of full and equal accommodations in violation of California Civil Code § 51.

## ARB GAMING'S ADOPTION OF PLAINTIFF'S PSYCHOTIC IDENTITY

49. ARB Gaming's knowledge of Plaintiff's psychotic state was not limited to a single employee. On March 29, 2025 at 4:48:46 PM, VIP host Timothy Cramblin addressed Plaintiff as 'Hey MM',  endorsing Plaintiff's psychotic identity as described in Paragraph 21. Cramblin continued to use this identity in subsequent communications on April 2 and April 3, 2025."

50. That same day, at 1:56 PM, Plaintiff texted Cramblin: 'Your friend Matt (I'm Matt again)', explicitly acknowledging his dissociative state and signaling his return to his actual identity. Despite this direct evidence of dissociation, Chester Parks terminated Plaintiff's Black Diamond status that afternoon while keeping his account open for continued play. Six hours later, at 9:18 PM, Plaintiff contacted the 988 Suicide & Crisis Lifeline at distress level five out of five.

51. The adoption of Plaintiff's psychotic identity by multiple ARB Gaming employees across multiple levels of management demonstrates institutional knowledge of Plaintiff's mental health crisis. Despite this knowledge, ARB Gaming implemented no intervention, referral, or responsible gaming measure, and continued to facilitate Plaintiff's gambling.

52. This conduct demonstrates that ARB Gaming had actual knowledge of Plaintiff's severe mental health crisis and disabilities.

## FRAUDULENT RTP REPRESENTATIONS

53. On March 2, 2025 at 7:08 PM, ARB Gaming employee Victor LaFontaine represented to Plaintiff that the Return to Player percentages displayed on the platform are "mathematically and conclusively true in the broad picture."

54. On March 29, 2025 at 4:48:46 PM, VIP host Timothy Cramblin represented to Plaintiff that his RTP "was nearly 95%."

55. Plaintiff commissioned forensic analysis of his gameplay data.

56. The forensic analysis reveals that Plaintiff's actual RTP was approximately forty-seven percent. ARB counted Matthew's own deposits as "winnings" in their RTP calculations. Under their methodology, if you deposit $100 and cash out $100 without playing a single spin, that registers as 100% RTP. When Precision removed deposits from the win column , which is how every legitimate casino calculates RTP, it dropped to 47%.

57. This represents a discrepancy of thirty-seven to fifty percentage points from the displayed game RTPs, which ranged from eighty-four to ninety-five percent.

58. The industry standard for RTP in gambling games is ninety to ninety-nine percent.

59. ARB Gaming's reported RTP figures were calculated using a methodology that counted Plaintiff's own deposits as 'winnings.' Under this methodology, a player who deposits one hundred dollars and immediately withdraws one hundred dollars without placing a single wager would register a one hundred percent RTP. When Plaintiff's forensic analyst removed deposits from the winnings calculation, consistent with standard industry practice,  the actual RTP fell from the displayed eighty-four percent to approximately forty-seven percent. This fraudulent calculation methodology was also used to generate the 1099 tax form issued to Plaintiff, reporting sixty-one thousand dollars in 'winnings' to the Internal Revenue Service, a figure that includes Plaintiff's own deposited funds mischaracterized as gambling income.

60. Plaintiff's forensic analyst conducted a Welch's t-test comparing Plaintiff's losses before versus after redemptions made on January 19, 2025.

61. The Welch's t-test yielded a T-statistic of negative 19.382 and a P-value of 0.000.

62. A p-value of 0.000 indicates that the increase in losses after redemptions is statistically impossible to occur by chance.

63. This statistical evidence demonstrates that ARB Gaming manipulated the platform to increase Plaintiff's losses after he attempted to withdraw funds.

## CRISIS POINT AND CONTACT WITH SUICIDE PREVENTION SERVICES

64. On February 15, 2025, Plaintiff disclosed to Cramblin that he was leveraging his home and his mother's credit to fund continued play: "waiting on a home equity line to come in. My mom got cash advance to pay the card I'm using but I think it's gonna be maxed out in another purchase or two." Cramblin's response was to offer additional gifts from his monthly budget, asking Plaintiff whether he preferred the allocation in one lump sum or spread across the month. At no point did Cramblin or any ARB employee intervene, recommend self-exclusion, or flag the disclosure.

65. On the same date, Plaintiff sent Cramblin an email exhibiting textbook grandiose delusion — comparing VIP host access to speaking with a head of state, describing Black Diamond status as comparable to starting quarterback for an NFL team, and characterizing the exploitative financial dynamic as a beneficial "give take" relationship. Plaintiff's mother, present during this communication, observed that ARB's VIP host names "sound like made up names from movies and tv shows." The manic language, grandiosity, and detachment from financial reality were visible to any reasonable person reading these communications.

66. On February 16, 2025, during Plaintiff's documented psychotic episode, Cramblin provided contact information for Plaintiff to donate to the FY Foundation at alison@fyfoundation.com, an entity operated by Alison Townley, the mother of ARB Gaming co-founder Patrick Fechtmeyer. FY Foundation has no registered 501(c)(3) status, no EIN, and no Form 990. Plaintiff was exhibiting grandiose delusions, pledging to "repay the great debt I have to modo.us and arb." When asked about the relationship between FY Foundation and ARB Gaming, Cramblin described it as "pretty separate from Modo" despite the direct family connection

67. On March 4, 2025, Plaintiff requested a new VIP host and asked to be dropped to Gold 2 tier, citing lack of support from Cramblin. VIP host Calvin closed the ticket without addressing either request. On March 8, 2025, Plaintiff directly asked Cramblin to demote him: "drop me down to gold level 2 or 3... I didn't deserve to be black diamond at all. Thanks for making me feel like the man for a while, I'll always remember it." Cramblin refused: "I can't do that to you! I mean, I literally don't have the power or ability to do that." ARB Gaming's platform provided no mechanism for players to voluntarily downgrade their VIP tier, a one-way escalation designed to prevent the self-protective action Plaintiff was attempting

68. On March 14, 2025, LaFontaine sent Plaintiff an email highlighting select wins as an "absolutely staggering 16,491% increase!" while noting in the same communication that Plaintiff had "subsequently cancelled all of [his redemptions] so far in March." Cancelling all withdrawal requests is a recognized problem gambling indicator. LaFontaine's response was to promote upcoming tournaments and weekend discount bundles — using distress signals as retention opportunities rather than triggers for intervention.

69. On April 3, 2025, ARB Gaming flagged Plaintiff for "irresponsible gameplay" and removed him from Black Diamond status.

70. Despite flagging Plaintiff for "irresponsible gameplay," ARB Gaming did not close Plaintiff's account or implement any self-exclusion measure. Instead, ARB Gaming merely removed Plaintiff's VIP benefits, requiring him to pay full price for packages while maintaining full access to the platform. This constitutes a denial of accommodations under California Civil Code § 51 and 42 U.S.C. § 12182 — ARB Gaming removed the benefits afforded to Plaintiff while continuing to facilitate the gambling activity that triggered the crisis.

71. ARB Gaming's decision to keep Plaintiff's account open was calculated. Approximately six days prior, on March 28, 2025, ARB Gaming had drafted new Terms of Service containing expanded liability protections — including a one-year statute of limitations, a no-estoppel clause, and an explicit punitive damages waiver — provisions designed to insulate ARB Gaming from claims arising from its prior conduct. ARB Gaming needed Plaintiff to continue playing and accumulate winnings that could be held hostage to coerce signature on the new Terms. When Plaintiff subsequently won approximately eight thousand dollars — gambling away a portion before attempting to withdraw approximately six thousand dollars — ARB Gaming locked his account and demanded acceptance of the new Terms as a condition of accessing his own funds. ARB Gaming's internal tracking of Plaintiff's every spin confirms they were monitoring his activity in anticipation of this maneuver.

72. On the same day, April 3, 2025, at 9:18 PM, Plaintiff contacted the 988 Suicide & Crisis Lifeline.

73. Plaintiff rated his distress level as five out of five, described as "Extremely upset."

74. Plaintiff acknowledged having suicidal thoughts within the past two months.

## MOCKING OF ADDICTION SYMPTOMS AND FAILURE TO IMPLEMENT RESPONSIBLE GAMING MEASURES

75. ARB Gaming not only failed to implement responsible gaming measures but actively mocked Plaintiff's clearly problematic gambling behavior.

76. VIP host Timothy Cramblin made light of Plaintiff's declaration that he was playing fifteen hours per day, treating this obvious sign of addiction as humorous rather than concerning.

77. Only after approximately one year of Plaintiff exhibiting severe addiction behaviors did ARB Gaming make any reference to responsible gambling.

78. Even then, ARB Gaming merely suggested that Plaintiff stop canceling redemptions rather than implementing mandatory cooling-off periods or spending limits.

79. When Cramblin's monthly virtual currency allocation was exhausted, he pivoted to physical incentives, informing Plaintiff: "We love giving our Black Diamonds experiences too, so we could do a nice dinner somewhere, or even a trip or sporting event or concert."

80. This institutional retention system produced the five-hundred-dollar Amazon gift card delivered via Cramblin's private text channel. Cramblin said Walgreens would require 5 (five) separate $100 cards, so he couldn't do that. He pivoted to Amazon where he could send one $500 card via email.

81. Instead, ARB Gaming actively encouraged Plaintiff's continued gambling through VIP programs, personal hosts, promotional offers, and easier access to financing.

## CONTRACT FORMATION FAILURE

82. Plaintiff last accepted ARB Gaming's Terms of Service on September 10, 2024.

83. On March 28, 2025, ARB Gaming created new Terms of Service.

84. The new Terms contained liability shields not present in the September 2024 version, including a one-year statute of limitations, punitive damages waiver, and no-estoppel clause, provisions specifically designed to insulate ARB Gaming from claims arising from its prior conduct.

85. On April 6, 2025, ARB Gaming locked Plaintiff out of his account.

86. ARB Gaming held about four thousand dollars still in play account plus a pending withdrawal because, Plaintiff got locked out of his account. Plaintiff could only withdraw between one thousand and two thousand dollars, the rest of his funds were held hostage to coerce his signature on the new Terms of Service.

87. On April 8, 2025, Plaintiff refused to sign the new Terms of Service three times in writing.

88. Plaintiff stated: "I'm not signing any new terms and conditions."

89. Plaintiff stated: "They tried to make me sign a new terms page I didn't. They will not let me log in without signing it."

90. Plaintiff stated: "I'm so happy they tried to bribe me with $8000.00 yesterday to make me sign a new terms page."

91. On April 9, 2025, ARB Gaming released Plaintiff's funds without obtaining his signature on the new Terms of Service.

92. ARB Gaming's release of funds without obtaining Plaintiff's signature confirms the new Terms were not a legitimate contractual requirement but a coercive mechanism. If the new Terms were necessary to govern Plaintiff's account, ARB Gaming would not have released funds to a player who refused them three times in writing.

93. No meeting of minds occurred between Plaintiff and ARB Gaming regarding the new Terms of Service.

94. ARB Gaming cannot enforce any arbitration clause or other provision from the new Terms of Service that Plaintiff explicitly rejected.

## POST-ARIZONA CEASE-AND-DESIST CONTRACT REWRITE

95. On April 17-18, 2025, the Arizona Department of Gaming issued a cease-and-desist order against ARB Gaming.

96. The cease-and-desist order accused ARB Gaming of operating a "felony criminal enterprise" engaged in money laundering.

97. Eight days later, on April 25, 2025, ARB Gaming published completely rewritten Terms of Use.

98. The new Terms of Use contained liability shields that did not exist in the September 2024 or March 2025 versions.

99. These new liability shields include: a one-year limitations clause cutting off claims governed by longer state statutes; a mandatory pre-arbitration conference requirement; elimination of any estoppel clause; and a punitive damages waiver.

## JUDICIAL ESTOPPEL

100. ARB Gaming represented three different arbitration forums to different parties.

101. In approximately twenty-six dispute responses submitted to Goldman Sachs, ARB Gaming claimed that arbitration would be governed by the American Arbitration Association in Florida.

102. In its Terms of Service, ARB Gaming stated that arbitration would be governed by JAMS in Arizona.

103. In actual arbitration filings, ARB Gaming filed with JAMS in Nevada.

104.    ARB Gaming's representations to Goldman Sachs regarding AAA/Florida arbitration were instrumental in Goldman Sachs ruling in ARB Gaming's favor on disputed transactions.

## CANCELLED REDEMPTIONS AS MANIPULATION TOOL

105.    Plaintiff cancelled redemptions totaling ninety-six thousand dollars.

106.    Each cancellation re-exposed Plaintiff to further wagering activity.

107.    ARB Gaming deliberately delayed processing withdrawal requests.

108.    Plaintiff cancelled approximately $96,000 in redemption requests under conditions deliberately engineered by ARB Gaming to frustrate withdrawal completion.'

109.    Forensic analysis reveals that Plaintiff's significant wins were disproportionately clustered on Fridays, when banking systems could not process withdrawals until Monday. By Sunday, Plaintiff's winnings had been recaptured through continued play and additional deposits,  a pattern consistent with deliberate timing of outcomes to exploit banking delays. This pattern is corroborated by the Welch's t-test referenced in ¶53, which demonstrated that Plaintiff's losses increased after redemption attempts at a rate statistically impossible to occur by chance.

110.    These practices were designed to frustrate withdrawal attempts and encourage continued gambling.

## AFFIRM'S PREDATORY LENDING PRACTICES

111.    Defendant Affirm, Inc. operates a "buy now, pay later" lending platform.

112.    Between December 2024 and January 2025, Affirm issued forty-six loans to Plaintiff.

113.    The total principal amount of these loans was $11,799.55.

114. Forty-four of forty-six loans were directed to ARB Gaming's Modo. us platform for gambling purposes.

115. All forty-six loans carried an annual percentage rate of 25.28%.

116. Nearly all Affirm loans were processed through Apple Pay, generating additional transaction fees for Defendant Apple Inc. on each loan disbursement to ARB Gaming's platform.

117. On January 2, 2025, Affirm approved eleven loans to Plaintiff totaling $3,499.89.

118. On January 3, 2025, Affirm approved seven loans to Plaintiff totaling $2,084.93.

119. In a forty-eight hour period (January 2-3, 2025), Affirm approved eighteen loans totaling $5,584.82.

120. Apple Pay's systems processed eighteen instant loan disbursements to a single gambling   merchant within forty-eight hours without flagging the pattern or implementing any intervention.

121. All eighteen loans were approved instantly.

122. On February 12, 2025, Affirm employee Diana acknowledged the pattern, stating: "Upon reviewing your Affirm account I do see a number of loans with the same merchant MODO, many of them for the same amount, and some already paid off."

123. Bank of America subsequently investigated Affirm's practices.

124. Bank of America ruled that Affirm violated its terms by facilitating gambling loans.

125. Bank of America refunded charges to Plaintiff under Claim Number 250410526995.

## GOLDMAN SACHS APPLE CARD DISPUTES AND WEAPONIZATION OF DISABILITY

126. Defendant Goldman Sachs Bank USA issues the Apple Card credit card.

127. Plaintiff received a Goldman Sachs Apple Card.

128.    Plaintiff's Apple Card was maxed out at approximately two thousand dollars within two days of receiving the card.

129.    All transactions were directed to ARB Gaming.

130.    Plaintiff initiated approximately twenty-three chargebacks with Goldman Sachs which were approved.

131.    Goldman Sachs initially ruled in Plaintiff's favor on the substantial majority of these disputes.

132.    Goldman Sachs subsequently resubmitted the same complaint to ARB Gaming, and Goldman Sach's forced Plaintiff to sacrifice the $500 Apple was supposed to return.

133.    A Goldman Sachs specialist later admitted on a recorded call that the department "made a mistake" in ruling for Plaintiff.

134.    The specialist confirmed that this admission applied to all reversed rulings.

135.    During the dispute period, Goldman Sachs initiated a law enforcement wellness check on Plaintiff.

136.    Goldman Sachs acknowledged Plaintiff's mental health crisis on recorded calls.

137.    Despite this knowledge, Goldman Sachs continued adverse actions against Plaintiff, including reversing all favorable dispute rulings.

## APPLE PAY TRANSACTION PROCESSING

138.    Defendant Apple Inc. operates Apple Pay, a digital payment processing service.

139.    Plaintiff used Apple Pay to process approximately seventy-five percent of all his gambling transactions to ARB Gaming.

140.    Plaintiff used Apple Pay across multiple funding sources including credit cards, debit cards, and Affirm loans.

141.    Apple Pay processed hundreds of transactions to a single gambling merchant without implementing velocity checks, cooling-off periods, or any automated intervention. Apple Pay's systems were capable of detecting and flagging sustained high-frequency transaction patterns to a single merchant but failed to do so, instead processing each transaction and collecting fees on every transaction.

142.    Apple Pay's systems observed this sustained pattern of high-velocity transactions to a single gambling merchant.

143.    Apple never flagged these transactions.

144.    Apple never stopped these transactions.

145.    Apple never implemented any intervention.

146.    Apple collected fees on every transaction.


**AMAZON GIFT CARD CONVERSION AND ACCOUNT TERMINATION**

147.    In March 2025, VIP host Timothy Cramblin provided Plaintiff with a five-hundred-dollar Amazon gift card.

148.    Cramblin described the gift card as having "no strings attached."

149.    Cramblin stated: "absolutely zero strings attached, I promise."

150.    The gift card was credited to Plaintiff's personal Amazon account, becoming his legal property.

151.    When the gift card initially did not work, Cramblin told Plaintiff he would "contact Amazon" to resolve the issue.

152.    This demonstrates that Cramblin was circumventing Amazon's anti-gambling gift card policies.

153.    Amazon subsequently revoked the gift card without notice or explanation.

For approximately sixty consecutive days, Plaintiff contacted Amazon customer service seeking explanation.

154. Amazon promised specialist callbacks within twenty-four to forty-eight hours that never occurred.

155. Amazon representatives laughed during calls with Plaintiff.

156. After sustained stonewalling, Amazon told Plaintiff to "call us when you feel better."

157. Amazon used Plaintiff's disclosed disability to dismiss his legitimate complaint about stolen property.

158. Amazon terminated Plaintiff's account.

159. Amazon's Prohibited Merchant Policy explicitly classifies sweepstakes casinos as gambling.

160. Amazon's policy prohibits gift card affiliations with: (a) "Gambling Businesses: includes sweepstakes, casinos, slot machines, games of chance"; (b) "Prize/Sweepstakes Businesses: any business requiring payment to get a prize"; (c) "BNPL Products: the affiliation of Gift Cards with predatory financial products and services is not permitted."

161. Despite these express prohibitions, Amazon maintained active business-to-business gift card accounts with ARB Gaming, enabling the very conduct its own policies purport to forbid.

162. Cramblin's text messages confirm that Modo maintains corporate gift card accounts with Amazon.

163. Cramblin stated: "Amazon is the only one we have available to us right now."

164. Cramblin stated: "I just received confirmation that it has been ordered."

165. This demonstrates that the gift card was processed through Modo's corporate ordering system, not a personal purchase.

166. The gift card email from Amazon's verified system stated: "Thank you for your continued loyalty to Modo!"

167. This proves that business-to-business infrastructure was used to deliver gambling consideration to Plaintiff.

## COORDINATION BETWEEN DEFENDANTS

168. Plaintiff's original complaint was filed in Contra Costa County Superior Court, Case No. C25-01268, naming ARB Gaming LLC, B2Services OU, and Affirm, Inc. as defendants. ARB Gaming and Affirm were served. B2Services OU, an Estonian entity operating as McLuck, could not be served due to the impracticability of international service in Estonia.

169. Affirm, Inc. was the first defendant to act on service. Within days, and before ARB Gaming had taken any responsive action, ARB Gaming contacted Plaintiff's then attorney Reshma Kamath by telephone. At that time, the only entity that had received service and retained counsel was Affirm. ARB Gaming's pre-response contact with Plaintiff's counsel demonstrates that Affirm disclosed the existence of the lawsuit and the identity of Plaintiff's attorney to ARB Gaming.

170. On June 3, 2025, Affirm filed a Notice of Removal transferring the case from Contra Costa County Superior Court to the United States District Court for the Northern District of California. Contra Costa County falls within the Northern District, and Affirm's principal place of business is in San Francisco, California, also within the Northern District. Affirm's selection of this forum constitutes a voluntary assertion of its home district in California, establishing that Affirm considers itself subject to California jurisdiction and maintains substantial, continuous contacts with the state sufficient to support both general and specific personal jurisdiction.

171.    Affirm's voluntary removal to its home district in California is directly relevant to the present action. Affirm cannot assert the Northern District of California as its home forum when seeking tactical advantage and subsequently challenge personal jurisdiction in the Eastern District of California. Having elected to litigate in California federal court, Affirm has conceded the jurisdictional contacts necessary to support this Court's exercise of personal jurisdiction over it.

172.    While removal to the Northern District was procedurally proper, Affirm immediately exploited the forum transfer to attack Plaintiff's legal representation. On June 24, 2025, Affirm filed a formal "Notice of Plaintiff's Counsel Reshma Kamath's Disbarment" with the Northern District court, publicly disclosing that Kamath had been disbarred from practicing in that specific forum. On the same day, Affirm filed a Motion to Dismiss. The sequencing removal to a forum where counsel could not practice, public notice of counsel's disbarment, and immediate dispositive motion, reflects a coordinated strategy to eliminate Plaintiff's legal representation before the merits could be addressed.

173.    Despite ARB Gaming having been served in the original state court action, ARB Gaming took no responsive action of its own. Instead, Affirm acted as the sole strategic architect of the defense, removing the case, attacking counsel, and filing dispositive motions, while ARB Gaming remained silent, having already obtained litigation intelligence from Affirm. This division of labor, in which Affirm executed procedural maneuvers while ARB Gaming waited in the background with advance knowledge, is consistent with a coordinated defense strategy between the two defendants.

174.    On June 30, 2025, Affirm filed a "Notice of Pendency of Other Action or Proceeding," alerting the Northern District court to Plaintiff's separately filed Eastern District case, a filing made just three days after Plaintiff's counsel attempted to refile in a forum where

she could practice. Affirm was actively monitoring Plaintiff's litigation strategy and moving to neutralize each corrective action in real time.

## ADA RETALIATION AND OBSTRUCTION OF ACCESS TO JUSTICE

175. Plaintiff's original Contra Costa complaint asserted claims under the Americans with Disabilities Act, 42 U.S.C. § 12182, and the Unruh Civil Rights Act, Cal. Civ. Code § 51, based on Defendants' exploitation of Plaintiff's documented disabilities. The filing of that complaint constituted protected activity — the exercise of rights guaranteed under federal and state disability law.

176. Affirm's post-service conduct constitutes unlawful retaliation under 42 U.S.C. § 12203, which provides that "no person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." Affirm's actions — disclosing the lawsuit to a co-defendant, removing to a forum where Plaintiff's counsel was disbarred, publicly filing notice of that disbarment, and filing an immediate motion to dismiss, were taken in direct response to Plaintiff's exercise of his ADA rights and were designed to deprive Plaintiff of legal representation and access to the courts.

177. The ADA requires that individuals with disabilities not face additional barriers to accessing services, benefits, and legal protections. Affirm's coordinated litigation strategy imposed precisely such barriers, not on the underlying platform that caused Plaintiff's harm, but on Plaintiff's ability to seek legal redress for that harm. By engineering the removal of Plaintiff's case to a forum where his attorney could not practice, Affirm created an additional barrier to a disabled individual's access to justice that would not

have existed but for Affirm's deliberate intervention. This conduct independently violates 42 U.S.C. § 12203 and Cal. Civ. Code § 51.7.

178. The cumulative effect of Affirm's actions — disclosing the lawsuit to ARB Gaming, removing to its home district where counsel was disbarred, publicly weaponizing that disbarment, filing an immediate motion to dismiss, and monitoring parallel filings, constitutes both a pattern of coordinated obstruction and unlawful retaliation against a disabled individual for exercising his civil rights. Affirm's voluntary assertion of California as its home forum in the prior action estops any jurisdictional challenge in this proceeding. This conduct supports claims for aiding and abetting, civil conspiracy, unfair business practices, and ADA retaliation against Affirm and ARB Gaming jointly

## PLAINTIFF'S DAMAGES

179. Plaintiff suffered direct platform losses of $336,142.03.

180. Plaintiff's Route Equity business was destroyed, resulting in losses of $800,000.

181. Plaintiff lost household income in Year 1 totaling $238,400.

182. Plaintiff suffered credit score damages with a seven-year impact estimated at $50,000 or more.

183. Plaintiff incurred crisis costs including property tax penalties totaling $38,300 or more.

184. Plaintiff incurred legal and medical costs totaling $21,920.

185. Plaintiff's total base compensatory damages exceed $1,621,532.

## DAMAGES TO BRIELLE PITTMAN

186. Brielle Pittman is Plaintiff's domestic partner.

187. Ms. Pittman witnessed Plaintiff's psychological deterioration, psychotic episodes, and crisis events caused by ARB Gaming's predatory conduct.

188. Ms. Pittman lost wages for thirteen months totaling $59,656.

189. Ms. Pittman was forced to repay salary totaling $1,227 (PTO not accrued yet used to care for Matt).

190. Ms. Pittman lost health insurance valued at $6,060/year, $6,565 for the last thirteen months of employer contribution.

191. Ms. Pittman lost 401K matching contributions totaling $2,202.67/year (dollar-for-dollar match up to 4%) $2,386 for the last thirteen months.

192. Ms. Pittman provided caretaker services valued at $50,400 (tiered by month at $16/hr NC average for caretaker salary, based on hour estimates, over thirteen months).

193. Ms. Pittman's Employer contributions of $500/year towards HSA.

194. Ms. Pittman also lost annual stock grants awarded by her employer, the value of which will be determined through discovery.

195. Ms. Pittman's total documented damages exceed $120,776.

196. Plaintiff was about to propose to Ms. Pittman when ARB Gaming's extraction destroyed their plans.

197. A reasonable person in Ms. Pittman's position would have suffered serious emotional distress.

## COUNT ONE

### Violation of Unruh Civil Rights Act in Violation of Cal Civ Code § 51

198. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 188 as if fully set forth herein.

199.    Defendant denied Plaintiff full and equal accommodations, advantages, facilities, privileges, or services.

200.    ARB Gaming operates a place of public accommodation within the meaning of Cal Civ Code § 51.

201.    ARB Gaming's online gambling platform is accessible to the public and constitutes a business establishment.

202.    Plaintiff has gambling disorder, which is recognized as a disability under California law.

203.    Plaintiff has bipolar II NOS with psychotic features, ADHD, anxiety, and dissociation, all of which constitute disabilities under California law.

204.    ARB Gaming had actual knowledge of Plaintiff's disabilities.

205.    VIP host Timothy Cramblin adopted Plaintiff's psychotic identity "MM" in official communications on March 29, 2025.

206.    Plaintiff explicitly requested demotion from Black Diamond VIP status on March 8, 2025 as a form of self-protection.

207.    ARB Gaming refused Plaintiff's request for demotion.

208.    ARB Gaming continued to target Plaintiff with VIP services, personal host contact, and promotional offers despite his disabilities and explicit request for protection.

209.    ARB Gaming mocked Plaintiff's fifteen-hour daily play rather than implementing responsible gaming measures.

210.    ARB Gaming failed to implement any cooling-off periods, spending limits, or other protective measures despite clear signs of addiction and disability.

211.    ARB Gaming's conduct was intentional, willful, and in conscious disregard of Plaintiff's rights.

212.    The denial of equal treatment was based on Plaintiff's disabilities.

213. ARB Gaming treated Plaintiff differently from non-disabled patrons by targeting him for exploitation rather than providing protective measures.

214. ARB Gaming allocated monthly budgets specifically for providing gifts to VIP players like Plaintiff, creating unequal treatment based on gambling behavior that is a symptom of disability.

215. Plaintiff suffered damages as a direct and proximate result of ARB Gaming's violations.

216. Plaintiff is entitled to statutory damages under Cal Civ Code § 52.

217. Plaintiff is entitled to treble damages under Cal Civ Code § 52.


## COUNT TWO

### Violation of Americans with Disabilities Act Title III in Violation of 42 USCS § 12182

218. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 217 as if fully set forth herein.

219. Defendant discriminated against Plaintiff on the basis of disability.

220. ARB Gaming operates a place of public accommodation within the meaning of 42 USCS § 12182.

221. ARB Gaming's online gambling platform is a place of public accommodation because it is a sales establishment and service establishment accessible to the public.

222. Plaintiff has gambling disorder, which is recognized as a disability under the ADA.

223. Plaintiff has bipolar II NOS with psychotic features, ADHD, anxiety, and dissociation, all of which constitute disabilities under the ADA.

224. Gambling disorder occurs as a symptom in thirty to forty percent of bipolar patients during manic episodes.

225. ARB Gaming had actual knowledge of Plaintiff's disabilities through his communications with VIP host Timothy Cramblin and through observable patterns of compulsive gambling behavior.

226. ARB Gaming denied Plaintiff the full and equal enjoyment of its services.

227. ARB Gaming failed to make reasonable modifications in policies, practices, or procedures when such modifications were necessary to afford services to Plaintiff.

228. Reasonable modifications would have included: implementing mandatory cooling-off periods; imposing spending limits; demoting Plaintiff from VIP status upon his request; ceasing targeted marketing and promotional offers; and referring Plaintiff to gambling addiction resources.

229. ARB Gaming refused to demote Plaintiff from Black Diamond VIP status when he explicitly requested demotion on March 8, 2025.

230. ARB Gaming continued to provide VIP services and targeted marketing despite Plaintiff's request for protection.

231. ARB Gaming adopted Plaintiff's psychotic identity "MM" in official communications, demonstrating actual knowledge of his severe mental health crisis.

232. ARB Gaming mocked Plaintiff's addiction symptoms rather than providing accommodations.

233. ARB Gaming's failure to provide reasonable modifications was not justified by any legitimate safety concerns or fundamental alteration of services.

234. Plaintiff suffered damages as a direct and proximate result of ARB Gaming's violations of the ADA.

## COUNT THREE

### Fraud in Violation of Cal Civ Code § 1709

235. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 234 as if fully set forth herein.

236. Defendant made false representations of material fact to Plaintiff.

237. On March 2, 2025 at 7:08 PM, ARB Gaming employee Victor LaFontaine represented to Plaintiff that the Return to Player percentages displayed on the platform are "mathematically and conclusively true in the broad picture."

238. On March 29, 2025 at 4:48:46 PM, VIP host Timothy Cramblin represented to Plaintiff that his RTP "was nearly 95%."

239. These representations were false.

240. Forensic analysis reveals that Plaintiff's actual RTP was approximately forty-seven percent, not ninety-five percent.

241. The displayed game RTPs ranged from eighty-four to ninety-five percent, but Plaintiff's actual RTP was forty-seven percent.

242. This represents a discrepancy of thirty-seven to fifty percentage points.

243. The representations were material because RTP is a critical factor in a player's decision to continue gambling.

244. ARB Gaming knew the representations were false at the time they were made.

245. ARB Gaming had access to backend data showing Plaintiff's actual RTP.

246. ARB Gaming made the representations with the intent to induce Plaintiff to continue gambling.

247. Plaintiff reasonably relied on the representations.

248. Plaintiff continued gambling on the Modo. Us platform based on the belief that the RTP representations were accurate.

249. Plaintiff suffered damages as a direct and proximate result of his reliance on the false representations.

250. Plaintiff lost $336,142.03 in direct platform losses.

251. Statistical analysis demonstrates that ARB Gaming manipulated the platform to increase Plaintiff's losses after redemptions.

252. A Welch's t-test comparing losses before versus after January 19, 2025 redemptions yielded a T-statistic of negative 19.382 and a P-value of 0.000.

253. A p-value of 0.000 indicates that the increase in losses after redemptions is statistically impossible to occur by chance.

254. ARB Gaming's conduct was intentional, willful, and in conscious disregard of Plaintiff's rights, warranting punitive damages.

## COUNT FOUR

### Breach of Contract

255. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 254 as if fully set forth herein.

256. A valid contract existed between Plaintiff and ARB Gaming.

257. Plaintiff last accepted ARB Gaming's Terms of Service on September 10, 2024.

258. The September 10, 2024 Terms of Service constituted a valid and enforceable contract.

259. Plaintiff performed all conditions, covenants, and promises required of him under the contract.

260. ARB Gaming breached the contract.

261. The contract required ARB Gaming to operate games with the displayed Return to Player percentages.

262. ARB Gaming represented that games had RTPs ranging from eighty-four to ninety-five percent.

263. Forensic analysis reveals that Plaintiff's actual RTP was approximately forty-seven percent.

264. This constitutes a material breach of the contract.

265. The contract required ARB Gaming to process withdrawal requests in a timely manner.

266. ARB Gaming deliberately delayed the processing of withdrawal requests beyond normal banking hours.

267. Plaintiff cancelled redemptions totaling ninety-six thousand dollars.

268. ARB Gaming created unnecessary barriers to cashing out winnings.

269. These actions constitute material breaches of the contract.

270. Plaintiff suffered damages as a direct and proximate result of ARB Gaming's breaches.

271. Plaintiff lost $336,142.03 in direct platform losses.

272. Plaintiff was denied access to ninety-six thousand dollars in cancelled redemptions.

## COUNT FIVE

### Breach of Implied Covenant of Good Faith and Fair Dealing

273. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 272 as if fully set forth herein.

274. A valid contract existed between Plaintiff and ARB Gaming.

275. Every contract contains an implied covenant of good faith and fair dealing.

276. The implied covenant requires that neither party do anything that would deprive the other party of the benefits of the contract.

277. ARB Gaming breached the implied covenant of good faith and fair dealing.

278. ARB Gaming manipulated game outcomes to reduce Plaintiff's actual RTP to forty-seven percent while displaying RTPs of eighty-four to ninety-five percent.

279. Statistical analysis demonstrates that ARB Gaming increased Plaintiff's losses after redemptions in a manner statistically impossible to occur by chance.

280. ARB Gaming deliberately delayed withdrawal processing and cancelled redemptions to encourage continued gambling.

281. ARB Gaming targeted Plaintiff with VIP services and promotional offers despite his disabilities and explicit request for protection.

282. ARB Gaming refused to demote Plaintiff from Black Diamond VIP status when he requested demotion on March 8, 2025.

283. ARB Gaming adopted Plaintiff's psychotic identity "MM" in official communications, exploiting his mental health crisis.

284. These actions were taken in bad faith and deprived Plaintiff of the benefits of the contract.

285. Plaintiff suffered damages as a direct and proximate result of ARB Gaming's breach of the implied covenant.

## COUNT SIX

### Unfair Business Practices in Violation of Cal Bus & Prof Code § 17200

286. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 285 as if fully set forth herein.

287. Defendants engaged in unlawful, unfair, and fraudulent business acts and practices.

288. ARB Gaming's conduct was unlawful because it violated Cal Civ Code § 51, 42 USCS § 12182.

289. ARB Gaming operated an illegal lottery by providing consideration (VIP gifts from allocated budgets), chance (gambling games), and prizes (cash redemptions).

290. ARB Gaming disguised its gambling operations as a "sweepstakes" platform to evade gambling regulations.

291. ARB Gaming was expelled from Arizona for operating a "felony criminal enterprise" engaged in money laundering.

292. ARB Gaming will be expelled from California effective January 1, 2026 pursuant to California Assembly Bill 831.

293. ARB Gaming's conduct was unfair because it targeted a disabled individual for exploitation, refused his request for self-exclusion, adopted his psychotic identity in communications, and manipulated game outcomes.

294. The harm to Plaintiff outweighs any countervailing benefits to consumers or competition.

295. ARB Gaming's conduct was fraudulent because it made false representations regarding RTP percentages.

296. Affirm's conduct was unlawful because it violated Cal Fin Code § 22000 by issuing forty-six high-interest loans totaling $11,799.55 for gambling purposes, including eighteen loans in forty-eight hours to the same gambling merchant.

297. Affirm's conduct was unfair because it facilitated gambling addiction by providing instant approval of multiple high-interest loans to a single gambling merchant despite obvious signs of compulsive behavior.

298. Goldman Sachs's conduct was unfair because it initially ruled in Plaintiff's favor on disputes, then reversed all rulings after coordination with ARB Gaming, and weaponized Plaintiff's disability by initiating a wellness check while continuing adverse actions.

299.   Apple's conduct was unfair because it processed approximately seventy-five percent of Plaintiff's gambling transactions, observed a sustained pattern of high-velocity transactions to a single gambling merchant, and never implemented any intervention while collecting fees on every transaction.

300.   Amazon's conduct was unfair because it facilitated ARB Gaming's circumvention of Amazon's anti-gambling gift card policies, revoked the gift card without explanation, stonewalled Plaintiff for sixty days, used his disability to dismiss his complaint by telling him to "call when you feel better," and terminated his account.

301.   Plaintiff suffered injury in fact as a result of Defendants' unfair business practices.

302.   Plaintiff lost money and property as a result of Defendants' conduct.

303.   Plaintiff is entitled to restitution and injunctive relief under Cal Bus & Prof Code § 17200.

## COUNT SEVEN

### Unjust Enrichment

304.   Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 303 as if fully set forth herein.

305.   Defendants received benefits from Plaintiff.

306.   ARB Gaming received $336,142.03 in direct platform losses from Plaintiff.

307.   Affirm received interest payments on forty-six loans totaling $11,799.55 in principal, all at 25.28% APR.

308.   Goldman Sachs received interest and fees on Apple Card transactions totaling approximately two thousand dollars.

309.   Apple received transaction fees on approximately seventy-five percent of Plaintiff's gambling transactions.

310. Amazon received the benefit of Plaintiff's account activity and facilitated ARB Gaming's circumvention of anti-gambling policies.

311. Defendants appreciated or had knowledge of the benefits.

312. ARB Gaming had actual knowledge of the benefits it received from Plaintiff's compulsive gambling.

313. Affirm acknowledged the pattern of loans to the same gambling merchant.

314. Goldman Sachs acknowledged Plaintiff's mental health crisis on recorded calls.

315. Apple's systems observed the sustained pattern of high-velocity transactions to a single gambling merchant.

316. Amazon was aware of the gift card transaction and Plaintiff's complaints.

317. The circumstances are such that it would be inequitable for Defendants to retain the benefits without paying their value.

318. ARB Gaming exploited Plaintiff's disabilities, refused his request for self-exclusion, adopted his psychotic identity in communications, and manipulated game outcomes.

319. Affirm issued eighteen loans in forty-eight hours to the same gambling merchant despite obvious signs of compulsive behavior.

320. Goldman Sachs weaponized Plaintiff's disability by initiating a wellness check while continuing adverse actions.

321. Apple processed compulsive gambling transactions without any intervention while collecting fees.

322. Amazon facilitated circumvention of anti-gambling policies and used Plaintiff's disability to dismiss his complaint.

323. Plaintiff has no adequate remedy at law.

324. Defendants should be required to disgorge all benefits unjustly obtained from Plaintiff.

## COUNT EIGHT

**Violation of California Financial Code in Violation of Cal Fin Code § 22000**

325. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 324 as if fully set forth herein.

326. Defendant Affirm, Inc. is a finance lender subject to Cal Fin Code § 22000.

327. Affirm made loans to Plaintiff in violation of the California Financial Code.

328. Between December 2024 and January 2025, Affirm issued forty-six loans to Plaintiff totaling $11,799.55 in principal.

329. All forty-six loans carried an annual percentage rate of 25.28%.

330. Substantially all loans were directed to ARB Gaming's Modo. us platform for gambling purposes.

331. On January 2, 2025, Affirm approved eleven loans to Plaintiff totaling $3,499.89.

332. On January 3, 2025, Affirm approved seven loans to Plaintiff totaling $2,084.93.

333. In a forty-eight hour period, Affirm approved eighteen loans totaling $5,584.82, all to the same gambling merchant, all approved instantly.

334. Affirm's lending practices were predatory and unfair.

335. Affirm failed to assess Plaintiff's ability to repay the loans.

336. Affirm failed to consider the pattern of loans to a single gambling merchant as a red flag for compulsive gambling behavior.

337. Affirm employee Diana acknowledged the pattern on February 12, 2025, stating: "Upon reviewing your Affirm account I do see a number of loans with the same merchant MODO, many of them for the same amount, and some already paid off."

338. Bank of America investigated Affirm's practices and ruled that Affirm violated its terms by facilitating gambling loans.

339. Bank of America refunded charges to Plaintiff under Claim Number 250410526995.

340. Affirm's conduct violated the prohibition on unfair lending practices under the California Financial Code.

341. Plaintiff suffered damages as a direct and proximate result of Affirm's violations.

342. Plaintiff is entitled to actual damages, statutory damages, and attorneys' fees under the California Financial Code.

## COUNT NINE

### Intentional Infliction of Emotional Distress

343. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 342 as if fully set forth herein.

344. Defendant engaged in extreme and outrageous conduct.

345. ARB Gaming adopted Plaintiff's psychotic identity "MM" in official communications on March 29, 2025.

346. ARB Gaming refused Plaintiff's explicit request for demotion from Black Diamond VIP status on March 8, 2025.

347. ARB Gaming continued to target Plaintiff with VIP services and promotional offers despite his disabilities and explicit request for protection.

348. ARB Gaming mocked Plaintiff's fifteen-hour daily play rather than implementing responsible gaming measures.

349. ARB Gaming manipulated game outcomes to reduce Plaintiff's actual RTP to forty-seven percent while displaying RTPs of eighty-four to ninety-five percent.

350. ARB Gaming deliberately delayed withdrawal processing and cancelled redemptions totaling ninety-six thousand dollars.

351. ARB Gaming held between six thousand and sixteen thousand dollars of Plaintiff's funds hostage to coerce his signature on new Terms of Service.

352.    ARB Gaming's conduct was extreme and outrageous because it deliberately exploited a disabled individual in a severe mental health crisis for financial gain.

353.    ARB Gaming intended to cause emotional distress to Plaintiff, or acted with reckless disregard of the probability of causing emotional distress.

354.    ARB Gaming had actual knowledge of Plaintiff's psychotic state through communications with VIP host Timothy Cramblin.

355.    ARB Gaming observed Plaintiff's compulsive gambling behavior, including playing up to twenty-one hours per day.

356.    ARB Gaming knew or should have known that its conduct would cause severe emotional distress.

357.    Plaintiff suffered severe emotional distress.

358.    On April 3, 2025, Plaintiff contacted the 988 Suicide & Crisis Lifeline, rating his distress level as five out of five ("Extremely upset") and acknowledging suicidal thoughts within the past two months.

359.    Plaintiff experienced nine months of documented psychosis.

360.    Plaintiff's relationship with his domestic partner Brielle Pittman was destroyed.

361.    Plaintiff's Route Equity business was destroyed.

362.    ARB Gaming's conduct was a substantial factor in causing Plaintiff's severe emotional distress.

363.    Plaintiff is entitled to compensatory and punitive damages.


## COUNT TEN

### Negligent Infliction of Emotional Distress - Bystander Liability

364.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 363 as if fully set forth herein.

365. Brielle Pittman is Plaintiff's domestic partner.

366. Ms. Pittman was present at the scene of the injury-producing event.

367. Ms. Pittman witnessed Plaintiff's psychological deterioration, psychotic episodes, and crisis events caused by ARB Gaming's predatory conduct.

368. Ms. Pittman was aware that Plaintiff was being injured.

369. Ms. Pittman observed Plaintiff playing gambling games for up to twenty-one hours per day.

370. Ms. Pittman observed Plaintiff experiencing psychotic episodes.

371. Ms. Pittman was aware of Plaintiff's contact with the 988 Suicide & Crisis Lifeline on April 3, 2025.

372. Ms. Pittman suffered serious emotional distress as a result of witnessing Plaintiff's injury.

373. Ms. Pittman lost wages for thirteen months totaling $59,656.

374. Ms. Pittman was forced to repay salary totaling $1,227.

375. Ms. Pittman lost health insurance valued at $6,060 per year.

376. Ms. Pittman lost 401K, matching contributions totaling $2,222.67.

377. Ms. Pittman provided caretaker services valued at $50,400 or more.

378. Ms. Pittman total documented damages exceed $120,776.

379. Plaintiff was about to propose to Ms. Pittman when ARB Gaming's extraction destroyed their plans.

380. A reasonable person in Ms. Pittman's position would have suffered serious emotional distress.

381. ARB Gaming's conduct was negligent.

382. ARB Gaming owed a duty of care to Plaintiff and to foreseeable bystanders like Ms. Pittman.

383.    ARB Gaming breached that duty by exploiting Plaintiff's disabilities, refusing his request for self-exclusion, adopting his psychotic identity in communications, and manipulating game outcomes.

384.    ARB Gaming's breach was a substantial factor in causing Ms. Pittman's emotional distress and damages.

## COUNT ELEVEN

### Payment Processor Liability

385.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 384 as if fully set forth herein.

386.    On September 30, 2025, Judge Edward Davila of the Northern District of California ruled in In re Apple Inc. App Store Simulated Casino-Style Games Litigation, No. 21-md-02985, that payment processors cannot use Section 230 of the Communications Decency Act to dismiss social casino lawsuits because "payment processing is not an act of publishing."

387.    Judge Davila further held: "Purchasing virtual chips serves a single purpose—to gamble. A transaction made for the sole purpose of gambling cannot be anything other than a gambling transaction."

388.    California Assembly Bill 831, signed into law and effective January 1, 2026, independently confirms that payment processors facilitating sweepstakes casino transactions face criminal liability under California law. AB 831 passed the California legislature unanimously. The transactions at issue in this case occurred entirely before AB 831's effective date, during the precise period of unregulated payment processing that the legislature determined required criminal penalties to address. AB 831's retroactive

exposure strengthens the standard articulated by Judge Davila: entities that knowingly process gambling transactions cannot claim ignorance of the nature of those transactions.

389. This ruling eliminates the primary legal defense available to payment processors.

390. Goldman Sachs, Apple, and Amazon acted as payment processors for ARB Gaming's gambling operations.

391. Goldman Sachs processed gambling transactions through the Apple Card.

392. Apple processed approximately seventy-five percent of Plaintiff's gambling transactions through Apple Pay.

393. Amazon facilitated gambling consideration through gift cards provided by ARB Gaming's VIP host.

394. These Defendants knew or should have known that they were processing gambling transactions.

395. Goldman Sachs observed that Plaintiff's Apple Card was maxed out at approximately two thousand dollars within two days, all to ARB Gaming.

396. Apple's systems observed a sustained pattern of high-velocity transactions to a single gambling merchant.

397. Amazon was aware that ARB Gaming was using gift cards to provide gambling consideration, as evidenced by Cramblin's statement that he would "contact Amazon" to resolve issues.

398. These Defendants facilitated ARB Gaming's illegal gambling operations.

399. These Defendants are jointly and severally liable for damages caused by ARB Gaming's operations.

400. Plaintiff suffered damages as a direct and proximate result of these Defendants' payment processing activities.

## COUNT TWELVE

### Aiding and Abetting

401. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 400 as if fully set forth herein.

402. ARB Gaming committed tortious acts including fraud, breach of contract, violation of the Unruh Civil Rights Act, violation of the ADA, unfair business practices, and intentional infliction of emotional distress.

403. Affirm, Goldman Sachs, Apple, and Amazon knew of ARB Gaming's tortious conduct.

404. Affirm knew it was facilitating gambling loans, as evidenced by employee Diana's acknowledgment of the pattern and Bank of America's subsequent ruling that Affirm violated its terms.

405. Goldman Sachs knew of ARB Gaming's conduct through the dispute process and acknowledged Plaintiff's mental health crisis on recorded calls.

406. Apple knew of the pattern of high-velocity gambling transactions through its Apple Pay systems.

407. Amazon knew of ARB Gaming's circumvention of anti-gambling gift card policies through Cramblin's communications.

408. These Defendants gave substantial assistance or encouragement to ARB Gaming.

409. Affirm provided financing that enabled Plaintiff to continue gambling despite lack of funds.

410. Goldman Sachs reversed favorable dispute rulings after coordination with ARB Gaming.

411. Apple processed gambling transactions without intervention while collecting fees.

412. Amazon facilitated delivery of gambling consideration through gift cards.

413.   These Defendants' conduct was a substantial factor in causing Plaintiff's harm.

414.   Plaintiff suffered damages as a direct and proximate result of these Defendants' aiding and abetting.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants as follows:

a) Compensatory damages against all Defendants in an amount exceeding $1,621,532, including but not limited to: direct platform losses of $336,142.03; Route Equity destroyed valued at $800,000; household income lost in Year 1 of $238,400; Credit score damages of $50,000 or more; crisis costs of $38,300 or more; and legal and medical costs of $21,920.

b) Compensatory damages against defendant ARB Gaming LLC dba Modo. Us for damages to Brielle Pittman exceeding $136,770, including lost wages, forced salary repayment, lost health insurance, lost 401K matching, and caretaker services.

c) Statutory damages against defendant ARB Gaming LLC dba Modo. Us pursuant to Cal Civ Code § 52 in the amount of four thousand dollars per violation, with multiple violations alleged.

d) Treble damages against defendant ARB Gaming LLC dba Modo. us pursuant to Cal Civ Code § 52.

e) Punitive damages against all Defendants in an amount sufficient to punish and deter such conduct.

f) Restitution of all funds obtained by Defendants through unlawful practices, including gambling losses, loan principal and interest, and fees collected by payment processors.

g) Disgorgement of all ill-gotten gains obtained by Defendants through predatory and exploitative practices namely:

    i.   ARB Gaming gross revenue from Matthew: $1,123,600+ (53% house edge on $2.12M wagered)

    ii.   Apple Pay revenue: $450-675 (0.15% per credit card transaction on ~75% of volume)

    iii.   Affirm revenue: $1,335-4,163 (interest at 25.28% APR + merchant fees of 5-8%)

    iv.   Goldman Sachs revenue: $250-400 (interest + interchange on ~$2K Apple Card)

    v.   Amazon: $500+ (gift card value they revoked + B2B relationship revenue)

h) Injunctive relief prohibiting Defendants from continuing the unlawful practices alleged herein, including but not limited to: cessation of operations targeting disabled individuals; implementation of mandatory responsible gaming measures; prohibition on VIP programs that exploit addiction; and cessation of payment processing for illegal gambling operations.

i) Pre-judgment interest at the maximum rate permitted by law.

j) Post-judgment interest at the maximum rate permitted by law.

k) Attorneys' fees and costs of suit as permitted by law and contract.

l) Such other and further relief as the Court deems just and proper.

### **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

/s/Amina M. Mack, Esq.
Amina M. Mack (NCSB No. 61390)
THE MACK LAW FIRM, PLLC
4242 Six Forks Road, Ste. 1550
Raleigh, NC 61390
Tel: 984-480-7147
legal@themacklaw.com

Attorney for Plaintiff
Pro Hac Vice


/s/Jacqueline M Sale Esq.
Jacqueline M Sale (Bar No. 343485)
JACQUELINE M SALE ESQ.
3817 S. Nova Road, Suite 104-167
Port Orange, Florida 32127
Tel: 833-225-5299
jmsalelaw@gmail.com

Attorney for Plaintiff

## CERTIFICATE OF SERVICE

The undersigned attorney for Plaintiff, Matthew Thomas Joyce, hereby certifies that a copy

of the foregoing Corrected Amended Complaint was electronically filed and served using the

court's CM/ECF system, on all counsel of record:

DUANE MORRIS LLP
Karen L. Alexander (SBN 265926)
KLAlexander@duanemorris.com
Daniel D. Wall (SBN 311391)
DWall@duanemorris.com
Spear Tower One Market Plaza, Suite 2200
San Francisco, California 94105-1127
Telephone: +1 415 957 3000
Facsimile: +1 415 957 3001

Attorney for Defendant, ARB GAMING LLC dba MODO


This the 27th day of February, 2026.

By: /s/Amina M. Mack, Esq.
Amina M. Mack (NCSB No. 61390)
THE MACK LAW FIRM, PLLC
4242 Six Forks Road, Ste. 1550
Raleigh, NC 61390
Tel: 984-480-7147
legal@themacklaw.com

Attorney for Plaintiff
Pro Hac Vice


By: /s/Jacqueline M Sale Esq.
Jacqueline M Sale (Bar No. 343485)
JACQUELINE M SALE ESQ.
3817 S. Nova Road, Suite 104-167
Port Orange, Florida 32127
Tel: 833-225-5299
jmsalelaw@gmail.com

Attorney for Plaintiff