Matthew Joyce
Plaintiff, Pro Se
600 Market Grove Dr #100
Wake Forest, NC 27587-7345
Phone: (919) 259-4661
Email: m.joyce07@proton.me

FILED
AUG 17 2026
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY DEPUTY CLERK

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**SACRAMENTO DIVISION**

| | |
|---|---|
| MATTHEW JOYCE, an individual,<br>Plaintiff,<br>v.<br>ARB GAMING LLC dba MODO.US; AFFIRM, INC.; GOLDMAN SACHS BANK USA; APPLE INC.; AMAZON.COM, INC.; and DOES 1-50,<br><br>Defendants. | Case No. 2:25-cv-01868-DJC-CSK (PS)<br><br>**PLAINTIFF'S RENEWED REQUEST FOR JUDICIAL NOTICE (FED. R. EVID. 201)** |

August 25, 2026, 10:00 a.m. — by Zoom — Hon. Chi Soo Kim

Plaintiff Matthew Joyce respectfully requests, under Federal Rule of Evidence 201, that the Court take judicial notice of the existence and content of the court records identified below.

This request is renewed. Plaintiff submitted a request for judicial notice on August 3, 2026, together with a proposed supplemental brief. (ECF 102.) On August 5, 2026, the Court denied the request "WITHOUT PREJUDICE to renewal after Defendant ARB Gaming LLC has submitted its reply brief, should such a renewal be necessary," and disregarded the proposed supplemental brief and request for judicial notice. (ECF 104.) ARB filed its reply on August 10, 2026. (ECF 106.) Plaintiff renews the request

accordingly, and renews it alone: this document contains no supplemental brief, no additional argument on the motion, and no request for leave.

Rule 201 supplies the authority directly. A fact is judicially noticeable if it is "not subject to reasonable dispute" because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Where a party requests it and the court is supplied with the necessary information, the court "must take judicial notice." Fed. R. Evid. 201(c)(2). The court "may take judicial notice at any stage of the proceeding." Fed. R. Evid. 201(d). Each record identified below is a document filed on the public docket of a United States District Court; its existence, and the fact of what it states on its face, are readily determinable from that docket.

**SCOPE AND LIMITATION**

Plaintiff requests notice for a limited purpose, and states its limits plainly.

A court may notice the existence and content of a filing in another federal proceeding, but not the truth of the facts recited within it. *Lee v. City of Los Angeles*, 250 F.3d 668, 689–90 (9th Cir. 2001); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018). **Plaintiff does not ask the Court to accept as true any assertion by ARB or by any other party within these records.** He asks the Court to notice only that each document was filed, and what each document states. Where a record contains a statement by ARB or by one of its officers, that statement is offered not for its truth but as the statement of a party opponent. Fed. R. Evid. 801(d)(2).

**Plaintiff does not ask this Court to review or disturb any ruling of any other court,** and does not rely on the reasoning or the outcome of any case identified below. He asks the Court to notice no court's decision. Whether ARB's representations across these proceedings can be reconciled is a question for this Court alone, on this record.

Plaintiff does not request judicial notice of any published decision cited in his papers. Published decisions are cited as authority and require no notice.

**THE RECORDS**

**A. *Kowalok v. ARB Gaming, LLC*, No. 4:25-cv-02161 (N.D. Ohio)**

Exhibit A — ECF No. 16, ARB's Motion to Compel Individual Arbitration and Memorandum of Law in Support, reproducing Figure 1 at page 7 and citing the Declaration of William Colello, ECF No. 17.

Exhibit B — ECF No. 17-1, Terms of Use dated August 4, 2025, the version ARB submitted as operative in that case, including Section 3.4, "Restricted Territories."

**B. *Anderson v. ARB Gaming, LLC*, No. 6:25-cv-02069 (D. Or.)**

Exhibit C — ECF No. 25, Declaration of William Colello in Support of ARB's Motion to Compel Arbitration.

**C. *Walker v. ARB Gaming, LLC*, No. 2:25-cv-00991 (D. Utah)**

Exhibit D — ECF No. 16, ARB's Motion to Compel Arbitration and Memorandum of Law in Support, with the Declaration of William Colello and Figure 1 reproduced at page 9.

**D. *Dinslage v. ARB Gaming, LLC*, No. 3:25-cv-02562 (N.D. Cal.)**

Exhibit E — ECF No. 18-4, Declaration of Patrick Fechtmeyer in Support of ARB's Opposition to Plaintiff's Motion to Remand.

**RELEVANCE**

ARB's reply states that Plaintiff accepted its Terms during account registration, and rests that showing on the registration screen attached to the declaration of its Chief Executive Officer. (ECF 106; ECF 56-9, Ex. A.) Each exhibit above is a filing in which ARB depicted its own registration screen to another United States District Court, for accounts opened in the same period. Plaintiff offers them so that the Court may see what ARB has depicted, and draws no conclusion beyond what appears on the face of each document. Each document identified above is a court filing whose existence and content are readily verifiable from the public docket identified. Plaintiff respectfully requests that the Court take judicial notice of them under Rule 201(b)(2), for the limited purpose stated above.

Dated: August 17, 2026

Respectfully submitted,

Signed by:
Matthew Joyce
07B601B840D34AB...

**Matthew Joyce**

Plaintiff, Pro Se
600 Market Grove Dr #100
Wake Forest, NC 27587-7345
Phone: (919) 259-4661
Email: m.joyce07@proton.me

Matthew Joyce
Plaintiff, Pro Se
600 Market Grove Dr #100
Wake Forest, NC 27587-7345
Phone: (919) 259-4661
Email: m.joyce07@proton.me

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**SACRAMENTO DIVISION**

| | |
|---|---|
| MATTHEW JOYCE, an individual,<br>Plaintiff,<br>v.<br>ARB GAMING LLC dba MODO.US; AFFIRM, INC.; GOLDMAN SACHS BANK USA; APPLE INC.; AMAZON.COM, INC.; and DOES 1-50,<br><br>Defendants. | Case No. 2:25-cv-01868-DJC-CSK (PS)<br><br>**PLAINTIFF'S INDEX OF EXHIBITS TO RENEWED REQUEST FOR JUDICIAL NOTICE** |

August 25, 2026, 10:00 a.m. — by Zoom — Hon. Chi Soo Kim

Exhibits lodged in support of Plaintiff's Renewed Request for Judicial Notice. Each is a document filed on the public docket of a United States District Court. Each exhibit is separately tabbed and internally paginated, restarting at page 1.


| Exhibit | Filed | Document | Page |
|---|---|---|---|
| A | 11/24/2025 | *Kowalok v. ARB Gaming, LLC*, No. 4:25-cv-02161 (N.D. Ohio), ECF No. 16 — Defendant ARB's Motion to Compel Individual Arbitration and Memorandum of Law in Support, reproducing Figure 1 at page 7 | 1 |
| B | 11/25/2025 | *Kowalok v. ARB Gaming, LLC*, No. 4:25-cv-02161 (N.D. Ohio), ECF No. 17-1 — Terms of Use dated August 4, 2025, including Section 3.4, "Restricted Territories" | 21 |
| C | 1/9/2026 | *Anderson v. ARB Gaming, LLC*, No. 6:25-cv- | 47 |

| | | | |
|---|---|---|---|
| | | 02069 (D. Or.), ECF No. 25 — Declaration of William Colello in Support of Defendant ARB's Motion to Compel Arbitration | |
| D | 3/6/2026 | *Walker v. ARB Gaming, LLC*, No. 2:25-cv-00991 (D. Utah), ECF No. 16 — Defendant ARB's Motion to Compel Arbitration and Memorandum of Law in Support, reproducing Figure 1 at page 9 | 57 |
| E | 4/14/2025 | *Dinslage v. ARB Gaming, LLC*, No. 3:25-cv-02562 (N.D. Cal.), ECF No. 18-4 — Declaration of Patrick Fechtmeyer in Support of Defendant ARB's Opposition to Plaintiff's Motion to Remand | 80 |

Dated: August 17, 2026

Respectfully submitted,

Signed by:
Matthew Joyce
07B601B840D34AB...

**Matthew Joyce**

Plaintiff, Pro Se
600 Market Grove Dr #100
Wake Forest, NC 27587-7345
Phone: (919) 259-4661
Email: m.joyce07@proton.me

Matthew Joyce
Plaintiff, Pro Se
600 Market Grove Dr #100
Wake Forest, NC 27587-7345
Phone: (919) 259-4661
Email: m.joyce07@proton.me

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**SACRAMENTO DIVISION**

| | |
|---|---|
| MATTHEW JOYCE, an individual,<br>Plaintiff,<br>v.<br>ARB GAMING LLC dba MODO.US; AFFIRM, INC.; GOLDMAN SACHS BANK USA; APPLE INC.; AMAZON.COM, INC.; and DOES 1-50,<br><br>Defendants. | Case No. 2:25-cv-01868-DJC-CSK (PS)<br><br>**PLAINTIFF'S OBJECTION TO EVIDENCE SUBMITTED FOR THE FIRST TIME WITH DEFENDANT ARB GAMING LLC'S REPLY (L.R. 230(m)(1))** |

August 25, 2026, 10:00 a.m. — by Zoom — Hon. Chi Soo Kim

**PRELIMINARY STATEMENT**

Plaintiff submits this Objection under Local Rule 230(m)(1) to evidence submitted for the first time with Defendant ARB Gaming LLC's reply in support of its motion to compel arbitration, filed August 10, 2026 (ECF 106, with ECF 106-1 and ECF 106-2). Consistent with Local Rule 230(m)(1), this filing states objections to the new evidence only and contains no further argument on the motion. Plaintiff files concurrently a renewed request for leave to file a supplemental brief. The Court denied Plaintiff's original request without prejudice to renewal after ARB submitted its reply brief. (ECF 104.) Matters bearing on the motion itself are addressed in that request and are not raised here. Plaintiff also files concurrently a separate objection to the evidence submitted for the first

time with Defendant Goldman Sachs Bank USA's reply (ECF 107; ECF 107-1; ECF 107-2). Each objection is directed only to the evidence submitted with the reply it names.

**The materials are new, and this is where each first appears.** ARB's opening motion (ECF 56) was filed with a Request for Judicial Notice (ECF 56-2) and a declaration of Patrick Fechtmeyer (ECF 56-9). The Supplemental Request for Judicial Notice (ECF 106-1), with Exhibits A and B, and the Supplemental Declaration of Patrick Fechtmeyer with its notifications-log exhibit (ECF 106-2) were each filed for the first time with the reply. No notifications log, no version identifier, and neither exhibit to ECF 106-1 appears anywhere in ECF 56 or its exhibits.

**ARB's own authority draws the distinction between new argument and new evidence.** ARB's reply cites two cases in a single footnote, with a separate parenthetical for each: "New material on reply is proper when it responds to a position the opponent raised for the first time in its opposition. *El Pollo Loco, Inc. v. Hashim*, 316 F.3d 1032, 1040 (9th Cir. 2003) (new responsive argument is proper on reply); *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 559 n.87 (C.D. Cal. 2014) (new responsive evidence is proper on reply)." (ECF 106 at 3 n.2.)

The cited page of *El Pollo Loco* addresses argument and does not reach evidence. The cited footnote of *In re ConAgra* is the evidence authority, and it states the general rule that a court will not consider evidence submitted for the first time in reply without affording the opposing party an opportunity to respond, while recognizing that evidence offered "in direct response to evidence raised in the opposition" is not new. *See also Edwards v. Toys "R" Us*, 527 F. Supp. 2d 1197, 1205–06 n.31 (C.D. Cal. 2007). The court in *In re ConAgra* applied both halves: it considered the portion of a reply declaration that responded directly to evidence the opposing party had adduced, and declined to consider the remainder.

**The materials submitted here are not directed to evidence adduced in the opposition.** Plaintiff's opposition (ECF 96) submitted one declaration, his own. The notifications-log exhibit is a record generated from ARB's own account management system, offered in the

first instance with the reply. The two exhibits to the Supplemental Request for Judicial Notice are filings from the JAMS arbitration between Plaintiff and ARB, in which ARB was the respondent: the declaration attached as Exhibit A was executed September 5, 2025, and Exhibit B is described by ARB as the November 6 JAMS Reply. Both predate ARB's motion, filed May 29, 2026.

**I. OBJECTIONS TO THE SUPPLEMENTAL FECHTMEYER DECLARATION AND ITS EXHIBIT A (ECF 106-2)**

**Objection 1 — Evidence submitted for the first time with a reply.** The supplemental declaration and its exhibit — described as a screenshot of certain entries in a notifications log generated from ARB's account management system — appear for the first time with the reply, after briefing closed. *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 559 n.87 (C.D. Cal. 2014) (considering the portion of a reply declaration that responded directly to evidence adduced in the opposition, and declining to consider the remainder, offered for the first time in reply); *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) (a district court should not consider new evidence presented in a reply without giving the opposing party an opportunity to respond).

**Objection 2 — Foundation; scope of personal knowledge (Fed. R. Evid. 602).** The supplemental declaration rests on the declarant's prior declaration. (ECF 106-2 ¶¶ 1–2.) That declaration states the declarant's familiarity as: "(a) the services offered through Modo's online social gaming platform located at www.modo.us (the 'Platform'); (b) the procedures by which users create accounts and access the Platform; (c) Modo's Terms of Use ('Terms'); (d) the arbitration provisions contained within the Terms; and (e) Modo's business records concerning user registration and acceptance of the Terms." (ECF 56-9 ¶ 2.)

The exhibit is not confined to registration or Terms-acceptance records. Its entries include account bans and reinstatements, a change to a user's VIP rank, manual credits to a user wallet, an address-verification change, and administrative edits to the user's first and last name — several attributed to an administrator at a domain other than the defendant's

(gabriela@arbinteractive.com). The supplemental declaration does not state the declarant's basis of knowledge as to those records, does not identify that domain or its relationship to ARB Gaming LLC, and does not state who generated the exhibit, from what system, on what date, or by what method of export. The declaration further attests that its contents are true and correct "to the best of my knowledge and ability" (ECF 106-2 at 2), and does not identify which of the matters stated rest on the declarant's own knowledge.

**Objection 3 — Authentication (Fed. R. Evid. 901(a)).** The exhibit is described by the declaration itself as a screenshot of "certain entries." (ECF 106-2 ¶ 2.) The declaration does not state who captured the image, when, from what interface, or by what method; no export metadata, generation date, or custody information appears on the face of the exhibit or in the declaration.

**Objection 4 — Hearsay; business-records foundation not established (Fed. R. Evid. 802, 803(6)).** The declaration recites the language of Rule 803(6) but identifies no custodian or other qualified witness, no regular practice of making the record, and no basis for the timing recitals. The declaration states that the entries "are recorded by ARB's systems at or near the time the corresponding events occur." (ECF 106-2 ¶ 2.) The exhibit's own descriptions identify entries generated by named individuals taking administrative actions on the account, rather than events captured automatically by a system. The declaration does not distinguish between the two and establishes no regular practice as to either. A screenshot of selected entries, prepared for this filing, is not itself a record made in the regular course of business.

**Objection 5 — Incompleteness (Fed. R. Evid. 106).** The exhibit is an excerpt on its own face. Its first visible row is truncated mid-description, and a vertical scroll indicator appears at the right edge of the image. The visible entries span August 2, 2024 through January 7, 2025; entries preceding and following that range are not produced. No account-creation entry appears, although the declaration states that ARB "maintains business records concerning user account creation." (ECF 106-2 ¶ 2.)

The declaration further states that the log reflects acceptance of a Terms and Conditions version identified as "Version 13" (ECF 106-2 ¶ 3(a)) and of a version identified as "Version 14" (*id.* ¶ 3(b)). No document bearing either identifier has been filed. The only Terms document in the record is the copy attached to the original declaration, which identifies itself as "Last Updated: September 10, 2024" and carries no version number of any kind. (ECF 56-9, Ex. B.) Plaintiff objects to consideration of the selected entries without the balance of the record from which they were drawn, and to consideration of the entries as evidence of the contents of documents not produced.

**Objection 6 — The declaration's characterization is not supported by the row it describes.** Paragraph 3(b) states that the exhibit reflects that Plaintiff "accepted" Terms and Conditions Version 14 on September 10, 2024. The description field of the corresponding row reads "Terms and conditions version V14." The description field of the Version 13 row, by contrast, reads "Terms and conditions version V13 accepted." The declaration describes the two entries identically and does not address the difference between them. The declaration does not state what the description field records, how the field is generated, or why the description of the Version 14 entry differs from the description of the Version 13 entry. Plaintiff objects to the characterization of the Version 14 entry as stating more than the row's description states. Plaintiff notes that the exhibit's event-type column bears the same label on both rows; this objection is directed to the description field, which differs.

## II. OBJECTIONS TO THE SUPPLEMENTAL REQUEST FOR JUDICIAL NOTICE, EXHIBITS A AND B (ECF 106-1)

**Objection 7 — Evidence submitted for the first time with a reply.** Both exhibits are arbitration-record documents offered for the first time with the reply, and neither responds to evidence submitted with Plaintiff's opposition. *In re ConAgra*, 302 F.R.D. at 559 n.87; *Provenz*, 102 F.3d at 1483.

**Objection 8 — Judicial notice does not extend to the truth of matters asserted within a noticed document.** A court may notice the existence of a filing; it may not take as true

disputed facts stated within it. *Lee v. City of Los Angeles*, 250 F.3d 668, 689–90 (9th Cir. 2001), overruled on other grounds by *Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018); *see also M/V Am. Queen v. San Diego Marine Constr. Corp.*, 708 F.2d 1483, 1491 (9th Cir. 1983) (a court may not take judicial notice of records in another cause "so as to supply, without formal introduction of evidence, facts essential to support a contention in a cause then before it"); *Wyatt v. Terhune*, 315 F.3d 1108, 1114 & n.5 (9th Cir. 2003) ("Factual findings in one case ordinarily are not admissible for their truth in another case through judicial notice."), overruled on other grounds by *Albino v. Baca*, 747 F.3d 1162 (9th Cir. 2014) (en banc). The request asks the Court to notice not that the documents exist, but that specified sentences within them are Plaintiff's positions. (ECF 106-1 at 3.) Plaintiff does not contend that a court may never take judicial notice of a filing made in another proceeding. The line is between the existence and content of such a filing — including the fact that a party made a particular statement in it — and the truth of a disputed fact asserted within it. ARB's request falls on the far side of that line.

**Objection 9 — Incompleteness as to Exhibit A (Fed. R. Evid. 106).** The request designates the first sentence of ¶ 2. The paragraph reads in full: "During the registration process, I was required to click a box to agree to the Terms of Use to access the games. The document was extremely long, and I did not read it in its entirety, nor did any representative of MODO bring the arbitration clause or its specific terms to my attention." The request designates the first sentence of ¶ 4. That paragraph likewise continues: "Moreover, I was not provided with a copy of the terms after accepting them. I first became aware of the full scope of the arbitration clause, including the prohibitions on class actions and certain damages, after I retained counsel following significant financial losses." Plaintiff objects to consideration of the designated sentences without the balance of the paragraphs in which they appear.

**Objection 10 — Selective designation within a single document (Fed. R. Evid. 106).** The declaration attached as Exhibit A comprises seven numbered paragraphs. The request

designates sentences from ¶¶ 2 and 4 and does not designate ¶¶ 1, 3, 5, 6, or 7. Among the paragraphs not designated: "At no point was I aware of a process to opt out of arbitration, and I certainly did not know I had to send a letter to an address in Arizona within 30 days to preserve my right to a court proceeding." (Exh. A ¶ 5.) And: "The VIP hosts who regularly contacted me to encourage more play never discussed dispute resolution; their sole focus was on promoting my continued gambling activity." (Exh. A ¶ 6.) And: "I believe the terms were designed to be complex and overwhelming for a user in my condition, ensuring I would not understand the rights I was waiving." (Exh. A ¶ 7.) Plaintiff objects to consideration of the designated sentences apart from the document as a whole.

**Objection 11 — Exhibit B is legal argument in a brief signed by counsel in a different proceeding, offered as a statement of the party.** The request asks the Court to notice that "in the November 6 JAMS Reply filed through counsel, Joyce took the position that" the quoted sentence states. (ECF 106-1 at 3.) The request thus identifies on its face that the document is counsel's filing; the signature block of Exhibit B reads LAW OFFICE OF RESHMA KAMATH.

Plaintiff objects on the following grounds. **First**, whether a statement in a brief may be treated as an admission is committed to the discretion of the district court. *See Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 227 (9th Cir. 1988). The designated sentence is a characterization advanced within argument. More than four months before Exhibit B was filed, a federal court found the attorney whose name appears on its signature block disbarred in that court's district and "not permitted to practice," and ordered her to show cause why she should not be removed as counsel. *Joyce v. Affirm, Inc.*, No. 4:25-cv-04677-KAW, Dkt. 15 (N.D. Cal. June 26, 2025). ARB asks this Court to treat the resulting brief as Plaintiff's own statement.

**Second**, the sentence is offered through Fed. R. Evid. 201, and judicial notice does not establish the truth of disputed matters asserted within a noticed document. *Khoja*, 899 F.3d at 999.

**Third**, under Rule 106 the designated sentence is objectionable apart from the passage in which it appears. The sentence ARB quotes is the third sentence of a paragraph whose first two sentences state the opposite. Exhibit B at 4 reads, in full and in order: "The Declaration, offered to create a veneer of factual support, instead demonstrates the unconscionable nature of the 'agreement' and fails to address the core issue: that the contract is void ab initio for illegality. To compel binding arbitration under these circumstances would be to enforce an agreement that is, from its inception, a legal nullity, procured through a process that lacked meaningful consent. The Respondent had forced Claimant Joyce to sign the contract not of his own volition, and now seek to introduce the unconscionable, duress-signed voidable contract as evidence." (ECF 106-1 at 11 of 13.)

**Fourth**, Exhibit B reproduces four pages of a filing that runs, by its own table of contents, to at least page 17. The four pages reproduced are the caption page, the table of contents, the table of authorities, and the first page of the memorandum. (ECF 106-1 at 8–11 of 13.) Sections I through V — the Introduction, Statement of Facts, Legal Standards, Legal Arguments, and Conclusion, spanning pages 4 through 17 of the underlying filing — are not reproduced, nor is the signature page. ARB's request describes Exhibit B as "a true and correct excerpted copy of the relevant pages of this Reply." (ECF 106-1 at 3.)

ARB's new exhibits have one thing in common. Each is an excerpt, and each excerpt stops where the document turns against it. ARB's quotation from Exhibit B ends at a comma, mid-sentence, beneath a period that appears nowhere in the original. ARB asks the Court to notice that Plaintiff took the position that "[t]he Respondent had forced Claimant Joyce to sign the contract not of his own volition." (ECF 106-1 at 3.) The sentence in the document ARB filed reads: "The Respondent had forced Claimant Joyce to sign the contract not of his own volition, and now seek to introduce the unconscionable, duress-signed voidable contract as evidence." (ECF 106-1 at 11 of 13.) Elsewhere in the same reply, ARB tells this Court that Plaintiff "mischaracterizes the exhibit and adds facts that do not appear in it." (ECF 106 at 9.)

Paragraph 2 of Exhibit A has two sentences; ARB takes the first. Paragraph 4 has two sentences; ARB takes the first. The declaration has seven paragraphs; ARB takes two, and four of the five it skips answer them. Exhibit B is four pages of a filing whose own table of contents runs to page 17. The log is a screenshot of nine rows lifted from a scrolling record, the top row cut mid-description.

Not one exhibit ARB filed with that reply was filed whole. ARB is describing its own request.

**III. REQUEST**

Plaintiff respectfully requests that the Court **decline to consider** the materials identified above; in the alternative, that judicial notice of Exhibits A and B be **limited to the existence of the filings** and not extend to the truth of any matter stated within them; and in the further alternative, that Plaintiff be afforded an opportunity to respond.

Dated: August 17, 2026

Respectfully submitted,

Signed by:
Matthew Joyce
07B601B840D34AB...

**Matthew Joyce**

Plaintiff, Pro Se

600 Market Grove Dr #100
Wake Forest, NC 27587-7345
Phone: (919) 259-4661
Email: m.joyce07@proton.me

Matthew Joyce
Plaintiff, Pro Se
600 Market Grove Dr #100
Wake Forest, NC 27587-7345
Phone: (919) 259-4661
Email: m.joyce07@proton.me

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**SACRAMENTO DIVISION**

| | |
|---|---|
| MATTHEW JOYCE, an individual,<br>Plaintiff,<br>v.<br>ARB GAMING LLC dba MODO.US; AFFIRM, INC.; GOLDMAN SACHS BANK USA; APPLE INC.; AMAZON.COM, INC.; and DOES 1-50,<br><br>Defendants. | Case No. 2:25-cv-01868-DJC-CSK (PS)<br><br>**PLAINTIFF'S RENEWED REQUEST FOR LEAVE TO FILE A SUPPLEMENTAL BRIEF IN RESPONSE TO NEW MATTER IN DEFENDANT ARB GAMING LLC'S REPLY** |

August 25, 2026, 10:00 a.m. — by Zoom — Hon. Chi Soo Kim

**RELIEF REQUESTED**

Plaintiff Matthew Joyce respectfully requests leave to file the supplemental brief attached to this request as Exhibit 1. The proposed brief responds only to matter raised for the first time in Defendant ARB Gaming LLC's reply (ECF 106) and does not supplement on any ground available to Plaintiff when he filed his opposition.

**I. THE COURT PERMITTED THIS RENEWAL, AND THE REPLY MADE IT NECESSARY**

On August 5, 2026, the Court denied Plaintiff's earlier request for leave "WITHOUT PREJUDICE to renewal after Defendant ARB Gaming LLC has submitted its reply brief,

should such a renewal be necessary." (ECF 104.) ARB filed its reply on August 10, 2026. (ECF 106, with ECF 106-1 and ECF 106-2.)

The condition the Court attached is satisfied. The reply raises four matters that appear nowhere in ARB's opening motion, and to which Plaintiff has had no opportunity to respond.

**First, a new doctrine.** The reply argues that Plaintiff is judicially estopped from disputing formation. (ECF 106 § II.B.) The word "estoppel" appears nowhere in ARB's opening motion (ECF 56; ECF 56-1), whose argument headings run from § IV.A through § IV.F, and nowhere in Plaintiff's opposition (ECF 96). Judicial estoppel entered this case with the last brief.

**Second, new evidence.** A supplemental declaration attaching an excerpt of a notifications log (ECF 106-2), and a supplemental request for judicial notice attaching two arbitration-record documents (ECF 106-1), were filed for the first time with the reply. Each is directed to formation. None accompanied the opening motion.

**Third, a new contention as to delegation.** The reply asserts that Plaintiff "does not challenge the delegation provision." (ECF 106 § II.D.) That contention appears for the first time in the reply.

**Fourth, a new sanctions theory.** The reply advances a theory of intentional misrepresentation and relies on *James v. Wilber*, 956 F. Supp. 2d 1145 (E.D. Cal. 2013), neither of which appears in the opening motion.

A party has no right to respond to new matter raised in a reply. *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 559 n.87 (C.D. Cal. 2014); *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) (a district court should not consider new evidence presented in a reply without giving the opposing party an opportunity to respond).

Plaintiff has separately filed an Objection to Reply Evidence under Local Rule 230(m)(1). That document states evidentiary objections only, as the rule requires. It may not, and does not, respond to the new argument. This request seeks leave to do so.

**II. THE SCOPE OF THE PROPOSED BRIEF**

Every section of the proposed brief answers identified new matter, and reaches nothing else.

| Proposed brief section | New matter in ECF 106 that it answers |
|---|---|
| § II — Judicial estoppel | § II.B — new doctrine, new authority |
| § III — Delegation and the burden of proof | § II.D — "does not challenge the delegation provision" |
| § IV — The supplemental notifications log | ECF 106-2 — new evidence |
| § V — Sanctions | § II.E — *James v. Wilber* and the misrepresentation theory |

Plaintiff does not supplement on any ground that was available to him when he filed his opposition. Nothing in the proposed brief reargues the opposition.

**III. THE ACCOMPANYING DECLARATION**

Plaintiff lodges with the proposed brief a short declaration limited to facts of his own account registration that ARB's new evidence places in issue. The declaration is confined to those facts and attaches no exhibits beyond those already in the record.

**IV. MECHANICS**

The proposed brief is submitted as Exhibit 1 to this request rather than filed, so that nothing enters the record without the Court's leave. A proposed order accompanies this request and has been emailed in Word to CSKorders@caed.uscourts.gov with the subject line "proposed order" and the case number, as the Court's standing order directs.

**V. CONCLUSION**

The Court permitted renewal "should such a renewal be necessary." A new doctrine, new evidence, a new contention as to delegation, and a new sanctions theory, all arriving with the last brief and all directed at formation, are what necessity looks like. Plaintiff respectfully requests leave to file the supplemental brief attached as Exhibit 1.

Dated: August 17, 2026

Respectfully submitted,

Signed by:

Matthew Joyce

07B601B840D34AB...

**Matthew Joyce**

Plaintiff, Pro Se
600 Market Grove Dr #100
Wake Forest, NC 27587-7345
Phone: (919) 259-4661
Email: m.joyce07@proton.me

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 11 of 103

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Michael Kowalok, | ) | CASE NO. 4:25-CV-02161 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| vs. | ) | |
| | ) | |
| ARB Gaming, LLC d/b/a MODO, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT ARB GAMING, LLC D/B/A MODO'S MOTION TO COMPEL INDIVIDUAL ARBITRATION**

Pursuant to the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* (the "FAA"), defendant ARB Gaming, LLC d/b/a Modo ("ARB"), by and through its undersigned counsel, hereby move this Court for an order compelling Michael Kowalok ("Plaintiff"), a customer of ARB, to submit his claims against ARB to individual arbitration and stay any further litigation activity and deadlines applicable until the completion of such arbitration. As grounds for this motion, ARB relies on its contemporaneously filed Memorandum of Law in Support and supporting Declaration of William Colello, ARB's Vice President of Player Operations.

Contemporaneous with this Motion to Compel, ARB has filed a Motion to Dismiss Plaintiff's claims against it pursuant to Fed. R. Civ. P. 12(b)(2). Accordingly, ARB respectfully requests that this Court dismiss Plaintiff's claims against it pursuant to Fed. R. Civ. P. 12(b)(2), or alternatively, grant its Motion to Compel Arbitration and compel Plaintiff's claims to arbitration.

WHEREFORE, subject to the above order of review, ARB respectfully requests that this Honorable Court enter an order compelling arbitration and staying all further litigation of

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 13 of 103

Plaintiff's claims against it until completion of the arbitration, and for such other and further relief that the Court deems just and equitable.

Dated: November 24, 2025


s/ Robert A. Zimmerman
Robert A. Zimmerman (0055478)
Jaquan S. Williams (0100189)
**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**
127 Public Square, Suite 4900
Cleveland, Ohio 44114
Telephone: 216.363.4500
Facsimile: 216.363.4588
Email: rzimmerman@beneschlaw.com
jawilliams@beneschlaw.com

**DUANE MORRIS LLP**
Walter A. Saurack (admitted pro hac vice)
22 Vanderbilt
335 Madison Ave. 23rd Floor
New York, NY 10017
Phone: 212-404-9200
Email: wasaurack@duanemorris.com

Gregory Bailey (pro hac vice application to follow)
201 S. Biscayne Boulevard, Suite 3400
Miami, FL 33131-4325
Phone: 305-960-2250
Email: gbailey@duanemorris.com

*Attorneys for ARB Gaming, LLC d/b/a MODO*

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT ARB GAMING, LLC D/B/A MODO'S MOTION TO COMPEL INDIVIDUAL ARBITRATION

### I. INTRODUCTION

Michael Kowalok ("Plaintiff"), a customer of defendant ARB Gaming, LLC d/b/a Modo ("ARB"), filed his putative class action Complaint on October 8, 2025, asserting four causes of action against ARB: (1) declaratory judgment that ARB's games are illegal under O.R.C. § 2915, *et seq.*; (2) recovery under the Ohio gambling loss recovery statute, O.R.C. § 3763, *et seq.* (the "Ohio Loss Recovery Act" or "LRA"); (3) violations of the Ohio Consumer Sales Practices Act, O.R.C. § 1345, *et seq.*; and (4) unjust enrichment. Compl. ¶¶ 108–53. Plaintiff's claims are subject to arbitration on an individual basis[1] because every Ohio customer of ARB's platform (modo.us, the "Platform")—including Plaintiff himself—affirmatively accepted and agreed to arbitrate individually through the Terms of Use (collectively, the "Terms"), each of which included a class action waiver and provision requiring ***arbitration of all past, pending, and future disputes***. *See* Declaration of William Colello in Support of Defendant ARB Gaming, LLC's Motion to Compel Arbitration ("Colello Decl.") ¶¶ 10, 17-19, 23, attaching Exhibit A (the relevant Terms).

Notably, Plaintiff does not dispute that he agreed to the Terms, but rather that the Terms (and the arbitration provision therein) are void under O.R.C. § 3763.02 and *Lester v. Buel*, 49 Ohio St. 240, 257 (1892) and/or that the Terms are unconscionable as an adhesion contract, without citing any additional support. Compl. ¶¶ 85–91. Neither argument is persuasive.

The rationale of *Lester* was tied to the unique context on the future prices of grain in the market—whose illegality, unlike the markedly different games at issue here, was beyond any

[1] ARB files this motion to compel arbitration concurrently with its motion to dismiss for lack of personal jurisdiction. ARB asks that the Court hear and decide this motion to compel Arbitration after it decides its motion to dismiss based upon lack of personal jurisdiction.

serious dispute because the legality of wagers on the rise and fall of prices of personal property where the property was not to be delivered had already been determined in Ohio. However, there has been no decision in Ohio that ARB's games—which do not require any money to play—are somehow illegal "gambling" such that the Terms, or any arbitration provision therein, are void.

The arbitration provisions are "valid[ and] irrevocable," 9 U.S.C. § 2, and must be "rigorously enforce[d] . . . according to their terms." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013). Plaintiff, an actual user of the Platform, is obligated to arbitrate his dispute pursuant to the Terms. And, to allow Plaintiff to seek class representation of other users without regard to the Terms that apply to the other users themselves, would afford Plaintiff greater rights than the users who are also bound by the applicable Terms.

Notably, every court to have considered the exact question raised here found that identical statewide claims under the LRA were subject to arbitration on the same grounds raised herein. *See, e.g., Deleon v. Sweepsteaks Limited*, No. 1:25-CV-11481 (D. Ma. Nov. 20, 2025) ("[T]he existence of the arbitration agreement is not in dispute here. The parties' disagreement involves a different issue – whether the arbitration clause itself is void. . . . Because the parties delegated issues of arbitrability to the arbitrator, the question of the validity of the arbitration agreement is to be resolved by the arbitrator."); *Kennedy v. VGW Holdings Ltd.*, No. 1:24-CV-2184-TWT, 2025 WL 1932750, at *5-6 (N.D. Ga. July 14, 2025) (compelling arbitration of class action plaintiff's claims against online gaming operator because she accepted the terms of use and arbitration provision); *Ambrosia v. Blazesoft, Ltd., et al.*, No. 1:25-cv-01723 (N.D. Ill., Oct. 21, 2025) (compelling arbitration for putative class because customers accepted the terms and any question of the arbitration agreement was delegated exclusively to the arbitrator); *Bishoy Nessim v. Fliff, Inc.*, No. 5:23-cv-01048-SSS-SHK, 2024 WL 1600649, at *19-20 (C.D. Cal. Jan. 5, 2024)

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 16 of 103

(granting motion to compel arbitration for gaming defendant and finding whether defendant's operations constitute illegal gambling goes to the legality of the contract as a whole, not to the validity of the arbitration clause specifically, and therefore is a question for the arbitrator).

For the reasons stated in this Memorandum, ARB respectfully requests that the Court compel arbitration and dismiss or stay this matter pending arbitration.

## II. STATEMENT OF FACTS

### A. The Parties and Claims

ARB offers customers the ability to access its free-to-play online social gaming platform designed solely for amusement and entertainment through the Platform, accessible at the following URL: modo.us. Colello Decl. ¶ 6. The Platform does not provide any essential or critical service, rather its users voluntarily choose whether to participate, and its users are free to stop playing at any time without consequence. The Terms, which includes an arbitration clause, present users with clear, straightforward terms governing their use of the platform. Courts have repeatedly enforced arbitration agreements in voluntary online-service contexts, including gaming platforms. *See, e.g.*, *Ranazzi v. Amazon.com*, 2015-Ohio-4411, ¶¶ 11-14 (6th Dist.) (finding plaintiff manifested assent to arbitration provisions in terms where plaintiff clicked on an "I agree" button when registering for an Amazon account and placing orders); *Rudolph v. Wright Patt Credit Union*, 2021-Ohio-2215, ¶¶ 54-58 (2d Dist.) (rejecting plaintiff's argument that he lacked constructive notice of the arbitration terms because they were sufficiently conspicuous, akin to a clickwrap agreement); *Campinha-Bacote v. AT&T Corp.*, 2017-Ohio-5608, ¶¶ 14-15 (10th Dist.) (affirming grant of motion to stay pending arbitration because plaintiff had assented to terms through clickwrap process); *Tompkins v. 23andMe, Inc.*, 840 F.3d 1016, 1032 (9th Cir. 2016) (enforcing arbitration agreement for voluntary online service); *Lag Shot LLC v. Facebook, Inc.*, No. 21-CV-01495-JST,

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 17 of 103

2021 WL 2660433, at *4–5 (N.D. Cal. June 25, 2021) (finding online agreement not unconscionable where users could freely decline service).

Plaintiff is an Ohio resident who played ARB's games and now seeks to represent a putative class of Ohio residents who allegedly played and lost money on ARB's games. Compl. ¶¶ 92-107. His allegations against ARB in this case arise from his use of the Platform. *Id.* ¶ 92-96. The Complaint seeks declaratory relief under O.R.C. § 2915, *et seq.*, Compl. ¶¶ 108–14; recovery under the LRA, Compl. ¶¶ 115–30; for alleged violations of the Ohio Consumer Sales Practices Act, O.R.C. § 1345, *et seq.*, Compl. ¶¶ 131–48; and, unjust enrichment, Compl. ¶¶ 149–53. These claims arise directly from the services provided by ARB that Plaintiff used and the Terms he accepted when registering his account before playing any games.

Pursuant to the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* (the "FAA"), arbitration agreements are valid, irrevocable, and enforceable. 9 U.S.C. §§ 2-4; *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985). And because Plaintiff's claims fall within the scope of the arbitration agreement, and because any challenges to enforceability must be decided by the arbitrator under the delegation clause, the Court should compel arbitration and stay this case pending its outcome. *Swiger v. Rosette*, 989 F.3d 501, 506 (6th Cir. 2021) (express delegation clause and incorporation of arbitration rules "clearly and unmistakably show[] that the parties agreed to arbitrate issues of arbitrability"); *Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842, 852 (6th Cir. 2020) ("It's not about the ***merits*** of the case. It's not even about ***whether*** the parties have to arbitrate the merits. Instead, it's about ***who should decide*** whether the parties have to arbitrate the merits." (emphasis in original)).

**B. All Users of the Platform Agreed to the Terms and Arbitration Provisions**

At all relevant times hereto, ARB required all users to first create a user account and register with the Platform prior to accessing, using, or playing any games on it. Colello Decl. ¶¶ 7-

10. The Platform also required all users to agree to and accept the then-applicable Terms, each of which included an arbitration provision during the relevant period. *Id.* ¶¶ 7-10, 15, 23.

A new user who wished to access the Platform must have affirmatively accepted and agreed to the Terms. *Id.* ¶¶ 7-9, 14, 29. In order to use the Platform or make any purchases in Ohio, all users were required by the programming and operation of the Platform to first create a user account and register with the Platform. *Id.* In order to access any of the games, all users were and are required to accept and agree to the Terms. *Id.* Acceptance of the Terms is and was accomplished by checking a box next to a statement that included the language "I agree with the Terms of Service and Sweepstakes Rules," prior to the confirmation of completion of the sign-up process. *Id.* ¶¶ 10-13. The statement is directly above a greyed-out button saying "Submit," and within the statement the hyperlinks to the "Terms of Service," and "Sweepstakes Rules" are bolded and in bright blue font against a dark background. *Id.* ¶¶ 10-13.

All of these features are reflected in the example screenshot below:




*Id.* ¶ 11 (**Figure 1**). In addition to requiring new users to accept the then-applicable Terms at the time of registration, from time-to-time the Terms were amended. *Id.* ¶¶ 14-18. After every

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 19 of 103

amendment to the Terms during the relevant period, every Platform user was required to re-agree to the amended Terms as a condition of continued use of the Platform and its services, upon their next login to or access of the Platform. *Id.*

When users accessed the Terms, all versions included a notice of the arbitration provision at the beginning. *Id.* ¶¶ 20-23. As a customer himself, Plaintiff created a customer account and registered with ARB prior to playing any games. *Id.* ¶¶ 17-19. Pursuant to the amendments to the Terms, Plaintiff accepted and re-agreed to the then-applicable Terms in place as a condition of continued use. *Id.* ¶¶ 18-19. The most recent version of the Terms that Plaintiff accepted and agreed to was the Terms dated August 4, 2025 (hereafter, the "August 2025 Terms"). *See id.* ¶ 19.

Importantly, the August 2025 Terms required arbitration of all disputes subject to application of the Judicial Arbitration and Mediation Services, Inc. ("JAMS") rules, *id.* ¶ 24; Ex. A, § 17.10, and required that questions of arbitrability, enforceability, and validity be determined by an arbitrator, *id.* ¶ 21; Ex. A, § 17.2 ("You and MODO agree that any ***past, pending or future dispute, claim or controversy*** . . . (including without limitation any dispute concerning the breach, enforcement, construction, validity, interpretation, enforceability or arbitrability of this Agreement or the Terms of Use) . . . shall be determined by arbitration") (emphasis added). Likewise, pursuant to the August 2025 Terms, ARB and its customers agreed to arbitrate disputes on an individual basis and waived their rights to a trial by jury. *Id.* ¶¶ 23-25; Ex. A, §§ 17.16 ("You may only arbitrate or litigate on an individual claims basis only and for your own losses only."), 18 ("Waiver of Jury Trial"). Additionally, pursuant to the August 2025 Terms, ARB's customers also unconditionally waived their rights at least to bring, participate in, or recover relief from any class, collective, or other representative action. *Id.* ¶¶ 23, 26-27; Ex. A, § 17.16.

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 20 of 103

Again, all versions of the Terms during the relevant time period required arbitration of all disputes subject to application of AAA or JAMS Rules, and included an opt out provision. *Id.* ¶¶ 22-23, 26 (affirming unattached versions contained similar provisions). Though the exact language of each version of the Terms in effect during the relevant time period may have varied, each such version of the Terms contained: (1) an arbitration agreement wherein the parties agreed to arbitrate disputes on an individual basis and waived their rights to a trial by jury; (2) an opt out provision; and, (3) a waiver to bring, participate in, or recover relief from any class, collective, or other representative action. *Id.* ¶ 20, 25.; *id.* ¶¶ 22-23, 26 (affirming unattached versions contained similar provisions). Therefore, Plaintiff and all users who made purchases through the Platform, would have had to agree to be bound by all versions of the Terms, including the class action waiver provision and arbitration agreement. *Id.* ¶¶ 20, 23.

Accordingly, all claims by the Platform users—including Plaintiff's claims—by agreement to the Terms, are mutually subject to mandatory and binding arbitration. *Id.* ¶ 31.

## III. ARGUMENT

### A. Legal Standard

The FAA applies to (1) "written [arbitration] provision[s]" (2) "evidencing a transaction involving commerce." 9 U.S.C. § 2. The FAA covers interstate commerce and intrastate commerce that would, "in the aggregate," have a "substantial effect on interstate commerce." *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56-57 (2003). The arbitration provision in the Terms is in writing, and the Platform permits online gaming, which are "transaction[s] involving interstate commerce." *See, e.g.*, *United States v. Carroll*, 105 F.3d 740, 742 (1st Cir. 1997) ("Transmission of photographs by means of the Internet is tantamount to moving . . . across state lines and thus constitutes . . . interstate commerce."); *United States v. McEwan*, 445 F.3d 237, 245 (3rd Cir. 2006) ("[T]he Internet is an instrumentality and channel of interstate commerce[.]"). Furthermore,

ARB is not located in Ohio, so any alleged transactions involving the Platform and residents of Ohio must be interstate. Thus, the FAA applies to the transactions at issue.

Under the FAA, arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA reflects a "liberal federal policy favoring arbitration," *AT&T Mobility LLC v. Concepcion,* 563 U.S. 333, 344-46 (2011), and requires courts to compel arbitration "upon being satisfied that the making of the agreement for arbitration . . . is not in issue., 9 U.S.C. § 4; *see also Am. Express Co.*, 570 U.S. 228, 233 (2013) ("[C]ourts must 'rigorously enforce' arbitration agreements according to their terms[.]" (internal citations omitted)). This policy extends to individualized arbitration proceedings. *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1619 (2018). When a contract contains an arbitration clause, there is a presumption of arbitrability, and "only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986). Any doubts concerning the scope of arbitrable issues are to be resolved in favor of arbitration. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983). "[The FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts ***shall*** direct the parties to proceed to arbitration on issues as to which an arbitration agreement" applies. *Dean Witter Reynolds*, 470 U.S. at 218 (emphasis in original). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24–25.

Thus, once this Court finds a valid written agreement to arbitrate, the Court must compel arbitration upon an application therefor.

### B. Users of the Platform Agreed to the Mandatory Arbitration Provisions

As indicated above, customers/users, including Plaintiff, cannot register, use, or access the Platform without clicking a checkbox to indicate that they agree to the Terms when first registering

and subsequently re-agreeing to the then-applicable Terms. Colello Decl. ¶¶ 7-10. The Terms are prominently hyperlinked next to the checkbox—they are bolded and in bright blue font against a dark background. *Id.* ¶¶ 11-12. Despite Plaintiff's attempts to paint the Terms as an unconscionable adhesion contract, Compl. ¶ 89, the Terms are typical and enforceable "clickwrap" agreements. "Clickwrap is a . . . term for agreements requiring a computer user to 'consent to any terms or conditions by clicking on a dialog box on the screen in order to proceed with [a] . . . transaction.'" *TruLogic, Inc. v. Gen. Elec. Co.*, 2021-Ohio-2860, ¶ 38 (2d Dist.) (alterations in original) (quoting *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1255 (10th Cir. 2012)).

Courts in the Sixth Circuit, Ohio courts, and elsewhere routinely grant motions to compel arbitration where the plaintiff-user agreed to online terms of service, including an arbitration clause, under signup flows materially identical to ARB's and found such clickwrap agreements sufficient to provide notice of terms of use. *See, e.g.*, *Adelstein v. Walmart Inc.*, 728 F. Supp. 3d 762, 768 (N.D. Ohio 2024) (granting Defendant's motion to compel arbitration where the terms in the clickwrap agreement were reasonably communicated to the plaintiff); *Ranazzi*, 2015-Ohio-4411, ¶¶ 11-14 (6th Dist.) (finding plaintiff manifested assent to arbitration provisions by clicking on an "I agree" button when registering for an Amazon account and placing orders); *Rudolph*, 2021-Ohio-2215, ¶¶ 54-58 (2d Dist.) (rejecting plaintiff's argument that he lacked constructive notice of the arbitration terms because they were sufficiently conspicuous, akin to a clickwrap agreement); *Campinha-Bacote*, 2017-Ohio-5608, ¶¶ 14-15 (10th Dist.) (affirming grant of motion to stay pending arbitration because plaintiff had assented to terms through clickwrap process).

Similarly, here, the Platform users had reasonable notice of the Terms, including the arbitration provisions. *Ranazzi*, 2015-Ohio-4411, ¶¶ 11-14; *Rudolph*, 2021-Ohio-2215, ¶¶ 54-58; *Campinha-Bacote*, 2017-Ohio-5608, ¶¶ 14-15. ARB customers acknowledged and agreed to the

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 23 of 103

Terms by clicking the checkbox above to the "Submit" button. Plaintiff's inability to negotiate the Terms and that he could not have used ARB's Platform without agreeing to the Terms is irrelevant. Nor does it matter that no independent signature was required to assent to the arbitration provision. *See, e.g.*, *Reed v. Best Buy Warehousing Logistics, LLCs*, 625 F. Supp. 3d 662, 666 (N.D. Ohio 2022) ("[P]laintiff gives no reason why her checking a box stating 'I Agree' cannot be considered an electronic signature, manifesting her assent to be bound.").

Accepting Plaintiff's interpretation would require the Court to find that no clickwrap agreements—*e.g.*, cellphone agreements, agreements for web services, etc.—could ever be enforceable, which is ludicrous.[2] Therefore, ARB's Terms—which Plaintiff agreed to—are enforceable clickwrap agreements.

### C. The Terms Delegated Questions of Arbitrability to the Arbitrator

The FAA creates a strong, liberal policy in favor of arbitration. *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 (1991); *Volt Info. Sci., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 475–76 (1989). The FAA's heavy presumption in favor of arbitrability requires courts to resolve all doubt as to the scope of arbitrable issues in favor of arbitration. *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24; *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 675 (6th Cir. 2003) ("Supreme Court precedent dictates that we resolve any doubts as to arbitrability 'in favor of arbitration.'").

"[P]arties may agree to have an arbitrator decide not only the merits of a particular dispute but also '"gateway" questions of "arbitrability," such as whether the parties have agreed to arbitrate

---

[2] Further, the contract at issue here is for "nonessential recreational activity", which other courts examining similar platform terms have found minimal procedural unconscionability. *See, e.g., Nessim*, 2024 WL 1600649 (order granting motion to compel arbitration for gaming operator because applicable arbitration clause delegated questions to the arbitrator).

or whether their agreement covers a particular controversy." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 67-68 (2019); *see also In re: Automotive Parts Antitrust Litigation*, 951 F.3d 377, 381–82 (6th Cir. 2020) (finding gateway questions of arbitrability delegated to an arbitrator). Additionally, the Sixth Circuit has noted that "district courts in our circuit have long found that the incorporation of the [arbitration] Rules provides 'clear and unmistakable' evidence that the parties agreed to arbitrate 'arbitrability.'" *Blanton*, 962 F.3d at 942; *see also McGee v. Armstrong*, 941 F.3d 859, 866 (6th Cir. 2019). Where parties have clearly and unmistakably shown intent to delegate issues of arbitrability to the arbitrator, issues of arbitrability are for an arbitrator to determine absent a question as to the validity of the arbitration agreement itself. *See Swiger*, 989 F.3d at 506 (express delegation clause and incorporation of arbitration rules "clearly and unmistakably show[] that the parties agreed to arbitrate issues of arbitrability").

Here, the August 2025 Terms—the last version that Plaintiff agreed to, Colello Decl. ¶ 19—delegated questions of arbitrability to the arbitrator. *Id.* ¶ 21; Ex. A, § 17.2 ("any past, pending, or future dispute . . . shall be determined by arbitration"). That is clear and unmistakable evidence that the parties intended for the issue of arbitration to be arbitrated.

Further evidence that the arbitration provision delegates substantive arbitrability to the arbitrator lies in the fact that the August 2025 Terms required adherence to JAMS rules. *Id.* ¶ 24; Ex. A, § 17.10. JAMS rules expressly provide that issues of jurisdiction and arbitrability shall be submitted to and ruled on by the arbitrator. (June 1, 2021), https://www.jamsadr.com/rules-streamlined-arbitration/#Rule-8. Incorporation of arbitral rules—such as JAMS rules—into an arbitration agreement is independently sufficient to delegate all questions of arbitrability to the arbitrator ***as a matter of law***. *See Swiger*, 989 F.3d at 506 (express delegation clause and incorporation of arbitration rules "clearly and unmistakably show[] that the parties agreed to

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 25 of 103

arbitrate issues of arbitrability"); *Blanton*, 962 F.3d at 845-46) (finding incorporation of arbitral rules "provides 'clear and unmistakable' evidence that the parties agreed to arbitrate 'arbitrability.'").

Under these circumstances, this Court should enforce the delegation clause within the Terms and compel Plaintiff to proceed with his case in arbitration.

**D. The Class Action Waiver Is Enforceable**

Both the Supreme Court and courts in this Circuit have held that arbitration agreements precluding class action relief are valid and enforceable. *Am. Express Co.*, 570 U.S. at 236–39; *Credit Acceptance Corp. v. Davisson*, 644 F. Supp. 2d 948, 959 (N.D. Ohio 2009) (finding an arbitration agreement's class action waiver is enforceable consistent with the FAA and Ohio's public policy); *Howard v. Wells Fargo Minnesota, NA*, No. 1:06CV2821, 2007 WL 2778664, at *4 (N.D. Ohio Sept. 21, 2007) (finding that a class action waiver in the arbitration agreement was enforceable because plaintiff was still able to vindicate her rights and was "only limited to the forum in which she may establish her right to relief."). This is because a class action waiver "does not constitute the elimination of the right to pursue [a] remedy" but rather "merely limits arbitration to the two contracting parties." *Am. Exp. Co.*, 570 U.S. at 236.

Plaintiff agreed to the August 2025 Terms, which included both a class action waiver and required that customers arbitrate their claims on an individual basis. Colello Decl. ¶¶ 20, 23, 26-28; Ex. A, §§ 17, 17.16. There is nothing substantively unconscionable about the class action waiver. *Am. Exp. Co.*, 570 U.S. at 236–39; *Pleasants v. Am. Exp. Co.*, 541 F.3d 853, 857–59 (8th Cir. 2008).

Therefore, by agreeing to the August 2025 Terms, and the class action waiver therein, Plaintiff should be required to arbitrate his claim on an individual non-class action basis.

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 26 of 103

### E. Questions of "Voidness" Are Delegated to the Arbitrator

Plaintiff's reliance on *Lester* to argue that the Terms are void is misplaced. Compl. ¶¶ 88, 138. *Lester*, a case from 1892, dealt with individuals who were entering contracts, containing no arbitration provisions, to buy and sell grain with the intent to speculate in the rise or fall of prices in the grain market in Chicago. 46 Ohio. St. at 250-51. The parties would pay or receive the difference between the contract price and market price of the goods at the time for delivery, without delivering any goods, making it a gambling contract that was void under the statute. *Id.* at 253. That is not the case here. Further, allowing Plaintiff to circumvent the Terms and ARB's arbitration provision, would be incompatible with Ohio and U.S. Supreme Court precedents requiring the issue of the contract's validity to be considered by the arbitrator in the first instance. *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445–46 (2005); *Rudolph*, 2021-Ohio-2215, ¶¶ 54-58 (2d Dist.); *Campinha-Bacote*, 2017-Ohio-5608, ¶¶ 14-15 (10th Dist.). The language of the arbitration agreements and governing caselaw therefore unambiguously require Plaintiff to arbitrate not only the merits of his request for recovery, but also his threshold argument that the Terms are void. *See Buckeye Check Cashing*, 546 U.S. at 446; *In re: Automotive Parts Antitrust Litigation*, 951 F.3d at 381–82.

Any question about whether the Terms are void because they effectuate illegal gambling are to be resolved by the arbitrator, not the Court. Unless Plaintiff is challenging the validity of the arbitration clause itself—he is not, *see* Compl. ¶ 88 ("[T]he *entire* contract is void . . . .")—the FAA requires any issue of the contract's validity as a whole to be considered by the arbitrator in the first instance. *See, e.g.*, *Buckeye Check Cashing*, 546 U.S. at 445–46). There is no plausible argument here that ARB's customers, including Plaintiff, did not enter into the Terms, nor does Plaintiff allege as such. The issue of validity of the Terms is for the arbitrator to decide.

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 27 of 103

Plaintiff's claims are subject to arbitration particularly in light of the fact that he agreed to the Terms. To hold otherwise would allow Plaintiff to have it both ways—*i.e.*, adopting and advancing the claims for himself and of users while simultaneously shirking the obligations and limitations governing those other users' claims. *See Cleveland-Akron-Canton Advert. Coop. v. Physician's Weight Loss Ctrs. of Am., Inc.*, 2009-Ohio-5699, ¶ 20 (8th Dist.) ("Once the third-party beneficiary has accepted the benefit of the contract, it can receive no greater rights from the contract than those possessed by the signatories."). Courts facing similar LRA claims in other states have likewise compelled arbitration for the customer seeking to represent a class. *See Sweepsteaks Limited*, No. 1:25-CV-11481, at *4 (compelling arbitration of plaintiffs' class action claims because of express delegation clause); *Kennedy*, 2025 WL 1932750, at *5-6 (compelling arbitration of plaintiff's class action claims against online gaming operator because she accepted the terms of use and arbitration provision); *Ambrosia*, Case No. 1:25-cv-01723 (same); *Nessim*, 2024 WL 1600649 (same in context of injunction action of gaming operator).

Therefore, the Terms are not void, and Plaintiff's claims are subject to arbitration.

**F. Plaintiff's Claims Are Within the Scope of Arbitration**

There can be no question that if another ARB customer brought claims for declaratory judgment, under the LRA, the Ohio Consumer Sales Practices Act, or common law unjust enrichment, that such claims would be within the scope of arbitration. The August 2025 Terms included an arbitration provision requiring arbitration of "any past, pending or future dispute, claim or controversy arising out of or relating to any purchase or transaction by [the customer], [the customer's] access to or use of any Platform or the Service, or to this Agreement. . . ." Colello Decl. ¶ 21, Ex. A, § 17.2. Such claims fall squarely within the scope of the arbitration provision, as it "aris[es] out of or relat[es] to [] purchase[s] or transaction[s]" made using or on ARB's Platform. Colello Decl. ¶ 21, Ex. A, § 17.2; *see generally* Compl. ¶¶ 38, 129, 131-48.

Even if there were any doubts—which there are none—as to whether a user's claim falls within the scope of arbitration, this Court must resolve those doubts in favor of arbitration. *See Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24-25 ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]"); *W. Branch Loc. Sch. Dist. Bd. of Educ. v. W. Branch Educ. Ass'n*, 2015-Ohio-2753, ¶ 28 (7th Dist.) ("The law in Ohio is clear that arbitration is favored and any doubts in the applicability of a given provision should be resolved in favor of arbitration.").

Thus, Plaintiff's claims all fall within the scope of the arbitration provision.

## IV. CONCLUSION

For the foregoing reasons, this Court should compel arbitration of Plaintiff's claims on an individual basis in accordance with the arbitration provisions in the August 2025 Terms of ARB's Terms and stay further proceedings pending the completion of such arbitration.

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 29 of 103

Dated: November 24, 2025

*s/ Robert A. Zimmerman*
Robert A. Zimmerman (0055478)
Jaquan S. Williams (0100189)
**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**
127 Public Square, Suite 4900
Cleveland, Ohio 44114
Telephone: 216.363.4500
Facsimile: 216.363.4588
Email: rzimmerman@beneschlaw.com
jawilliams@beneschlaw.com

**DUANE MORRIS LLP**
Walter A. Saurack (admitted pro hac vice)
22 Vanderbilt
335 Madison Ave. 23rd Floor
New York, NY 10017
Phone: 212-404-9200
Email: wasaurack@duanemorris.com

Gregory Bailey (pro hac vice application to follow)
201 S. Biscayne Boulevard, Suite 3400
Miami, FL 33131-4325
Phone: 305-960-2250
Email: gbailey@duanemorris.com

*Attorneys for ARB Gaming, LLC d/b/a MODO*

## CERTIFICATION OF COUNSEL

Pursuant to Local Rule 7.1(f), undersigned counsel hereby certifies that this memorandum complies with the page limitation for standard track cases, such limitation applying in the absence of any track designation for this case.

*/s/ Robert A. Zimmerman*
One of the Attorneys for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on November 24, 2025, I electronically filed the above document with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to all registered counsel.

/s/ *Robert A. Zimmerman*
One of the Attorneys for Defendant

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 31 of 103

# EXHIBIT B

# TERMS OF USE

**IMPORTANT NOTICE: These Terms of Use have been updated as of August 4, 2025, and shall supersede and replace all prior Terms of Use.**

**These Terms of Use ("the Terms" or "TOU") and the Arbitration Agreement (see Section 16) form binding agreements between you ("You," or "User,") and ARB Gaming, LLC d/b/a Modo.us ("Modo," the "Company," "Us, or "We") which provide all of the terms and conditions governing Your access and use of www.modo.us and any related applications (the "Website," "Site," or "Platform") as well as Your creation of Your Modo user account ("User Account"), use of the games, promotions or contests (collectively or individually, "Games") on the Site, and any transactions or dealings with Us in any way (collectively, the "Service").**

***IMPORTANT NOTICES*:**

**THIS WEBSITE AND THE SERVICES PROVIDED HEREIN DO NOT OFFER "REAL MONEY GAMBLING." NO ACTUAL MONEY IS REQUIRED TO PLAY, AND THE SERVICE IS INTENDED FOR ENTERTAINMENT PURPOSES ONLY.**

**THESE TERMS OF USE INCLUDE AN ARBITRATION AND CLASS ACTION WAIVER AGREEMENT WHICH REQUIRES THAT ANY PAST, PENDING, OR FUTURE DISPUTES BETWEEN YOU AND US SHALL BE RESOLVED BY FINAL AND BINDING ARBITRATION ON AN INDIVIDUAL BASIS ONLY AND FOR YOUR OWN LOSSES ONLY. YOU MAY NOT PROCEED AS A CLASS REPRESENTATIVE, MEMBER OR PART OF ANY PROPOSED CLASS, COLLECTIVE ACTION, PRIVATE ATTORNEY GENERAL SUIT, QUI TAM ACTION OR ANY REPRESENTATIVE PROCEEDING, OR OTHERWISE SEEK TO RECOVER ON BEHALF OF OTHERS OR FOR THE BENEFIT OF OTHERS IN ANY TYPE OF CLAIM OR ACTION. ARBITRATION MEANS YOU WILL NOT BE ABLE TO SEEK DAMAGES IN COURT OR PRESENT YOUR CASE TO A JURY, UNLESS OTHERWISE PERMITTED BY THESE TERMS.**

**OPT-OUT. IF YOU DO NOT WISH TO BE SUBJECT TO ARBITRATION ON A RETROACTIVE BASIS AND AS TO ANY FUTURE CLAIMS, *AND* YOU HAVE *NOT* PREVIOUSLY AGREED TO AN ARBITRATION PROVISION WITH US IN CONNECTION WITH YOUR USE OF OUR SERVICES, YOU MAY OPT OUT OF THE ARBITRATION AGREEMENT WITHIN THIRTY (30) DAYS OF ENTERING THIS AGREEMENT BY FOLLOWING THE INSTRUCTIONS PROVIDED IN THE "BINDING ARBITRATION AGREEMENT AND CLASS ACTION WAIVER" – SEE SECTION 16 OF THESE TERMS, BELOW. OPT-OUT REQUESTS SENT AFTER THE THIRTY (30) DAY PERIOD SHALL BE NULL AND VOID. EVEN IF YOU OPT OUT OF THE ARBITRATION AGREEMENT IN SECTION 16, ALL OTHER REMAINING SECTIONS OF THESE TERMS APPLY.**

**PLEASE READ THE FOLLOWING TERMS OF USE, THE ARBITRATION AGREEMENT AND CLASS ACTION WAIVER (SEE SECTION 16 BELOW), AND THE**

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 33 of 103

**MODO PRIVACY POLICY CAREFULLY BEFORE USING THE SERVICES OFFERED IN CONNECTION WITH ANY MODO SERVICES OR WEBSITE OR APPLICATION. YOU AGREE THAT YOUR CONTINUED USE OR ACCESS OF THE SITE OR SERVICES SHALL BE SUBJECT TO THESE TERMS OF USE, WHICH FURTHER INCORPORATE AND INCLUDE THE PRIVACY POLICY, THE PLAYER SAFETY POLICY, AND ANY OTHER POLICIES THAT EXPRESSLY INCORPORATE THESE TERMS (COLLECTIVELY, "INCORPORATED POLICIES").**

**IT IS AN EXPRESS CONDITION OF THIS AGREEMENT THAT ANY CLAIMS YOU MAY HAVE AGAINST MODO ARISING FROM ANY PAST, PRESENT OR FUTURE USE OF TRACKING SOFTWARE, INCLUDING BUT NOT LIMITED TO USE OF A META PIXEL, "COOKIES," "GET REQUESTS" OR JAVASCRIPT IN HTML CODE OF THE COMPANY'S WEBSITE THAT INTERCEPTS, TRACKS, STORES, AND ANALYZES YOUR INTERACTIONS WITH THE COMPANY'S WEBSITE FOR PURPOSES OF OBTAINING DATA OR TARGETED ADVERTISEMENT ARE HEREBY FULLY WAIVED, RELEASED AND COMPROMISED. MODO SHALL HAVE NO LIABILITY TO YOU FOR ANY PAST, PRESENT OR FUTURE CLAIMS ARISING OUT OF OR RELATED TO THE USE OF TRACKING TECHNOLOGY.**

**Acceptance of Terms.** You represent and warrant that You have the right, authority, and capacity to accept these Terms and to abide by them, that You are of legal age and that You have fully read and understood the Terms. You must read these Terms carefully in their entirety **before checking the box for acceptance of these Terms**. By using, or otherwise accessing the Service, or clicking to accept or agree where that option is made available, You confirm that you have read and agree to these Terms. If you do not agree to these Terms, then you may not access or use the Platform or Service. All of your activity on the Website or Platform and all or your transactions with Modo, including all events which occurred before your acceptance of these Terms, shall be subject to these Terms.

The Service is not sponsored, endorsed, or administered by, or associated with Apple®, Facebook® or Google®. You understand that you are providing your information to Modo only and not to Apple®, Facebook® or Google®.

**1. Changes to Terms of Use and Incorporated Policies**

**1.1** From time to time, We may modify or amend these Terms. If We do so, any such modifications or changes shall be reflected in the TOU or Incorporated Policies, as applicable, on the Site. We may also, but shall not be required to, notify You by email regarding any material changes to the TOU or Incorporated Policies. Whether You receive or review such notifications, You agree that You will be bound by any such changes and that it shall be Your responsibility to check the Terms Of Use, including the Incorporated Policies, as posted on the Site prior to accessing the Site or partaking in any Service. Your further use of the Service after any changes are posted shall constitute further consent and agreement to the terms as changed or amended.

**1.2** From time to time, We may also modify or amend any of the Incorporated Policies. If we do so, any such modifications or changes shall be reflected in the Incorporated Policies as posted on the Site. You agree that You will be bound by any such changes and that it

shall be Your responsibility to check the Incorporated Policies as posted on the Site prior to accessing the Site or partaking in any Service. Your further use of the Service after any changes are posted shall constitute further consent and agreement to the Incorporated Policies as changed or amended.

**1.3** If You have any questions about these Terms or the Incorporated Policies, please contact customer support at support@modo.us.

**1.4** In the event of any conflict between the Terms and the Incorporated Policies, the Terms shall control.

**2. Limited Revocable License (the "License")**

**2.1** Virtual Coins. The Service includes a License (as defined below) to You to use virtual tokens to play all Games on the Site, including, but not limited to, chips, coins, credits, or points (collectively, "Virtual Coins"), that may be provided for use on the Platform. No matter the reference or format of the Games, Virtual Coins are non-transferrable and may be used subject to the License only. With the exception of "no purchase necessary" promotional contests or giveaways, there is no opportunity for a User on the Platform to win real-money or any prize while playing the Games, regardless of whether any purchase was made at any point by the User.

**2.2** The License. Subject to Your agreement and continuing compliance with these Terms, we grant You a limited, personal, non-exclusive, non-transferable, non-sublicensable, revocable, license to access and use the Service, Games and Virtual Coins solely for Your personal, private entertainment on the Platform and for no other reason (the "License"). Other than this limited, personal, revocable, non-transferable, non-sublicensable License to use the Virtual Coins with the Service, You have no right or title in or to any such Virtual Coins appearing or originating with the Service, or any other attributes associated with use of the Service or stored within the Service. You acknowledge and agree that Your License to use the Service is limited by these Terms and if You do not agree to, or act in contravention of, these Terms, Your License to use the Service may be immediately terminated. We have the absolute right to manage, regulate, control, modify and/or eliminate such Virtual Coins as it sees fit in its sole discretion to the extent legally permissible, and We shall have no liability to You or anyone for the exercise of such rights.

**2.3** No Right to Sell or Assign. The transfer or sale of Virtual Coins by You to any other person is strictly prohibited. You may NOT sell or assign Your User Account to any other person under any circumstances. Any attempt to do so is in violation of these Terms, will result in in closure and forfeiture of the User Account, and may result in a lifetime ban from the Service and possible legal action.

**2.4** No Purchase Required. No purchase is required to set up a User Account or play Games. The Platform is committed to at all times providing additional access to Virtual Coins or otherwise to free-to-play Games to Users who deplete their balance of Virtual Coins. While it is never required to make any purchase in order to play the Games, Users may, subject to the License, increase the number of certain Virtual Coins they may access for licensed use on the Platform only, increase the variety of available Games, and remove advertisements by making a

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 35 of 103

purchase. You understand and agree that any purchases are final and that We are not required to provide a refund for any reason. Virtual Coins are non-transferrable, and carry no cash value. All Virtual Coins under this License are forfeited if Your User Account is terminated or suspended for any reason, in our sole and absolute discretion or if the Services are no longer available. To the extent legally permissible, if Your User Account, or a particular subscription for the Service associated with Your User Account, is terminated, suspended and/or if any Virtual Coins are selectively removed or revoked by Us from Your User Account, no refund will be granted, and no Virtual Coins will be credited to You or converted to cash or other forms of reimbursement.

**2.5** These Terms do not grant You any right, title or property or ownership interest in the Service or any Virtual Coins.

**2.6** This Service is licensed, not sold, to You. You agree that we and our own licensors own all rights, title and interest in and to the Service, including all intellectual property rights therein as further specified below in Section 9, and that we retain ownership of the Service even after any installation on Your device. You agree not to delete or in any manner alter the copyright, trademark or other proprietary rights notices or markings which may appear on the Service.

**2.7** Except as identified and specified in these Terms, You agree not to:

**2.7.1** sell, rent, distribute, transfer, license, sub-license, lend or otherwise assign any rights of any part of the Service to any third party;

**2.7.2** copy, modify, create derivative works of the Service (including but not limited to any software that forms part of the Service), including, without limitation, making adaptations or modifications to the Service;

**2.7.3** reproduce the Service or any part in any form or by any means;

**2.7.4** exploit the Service in any unauthorized way whatsoever, including without limitation, by trespass or burdening network capacity;

**2.7.5** disassemble, decompile, reverse engineer, or attempt to derive the source code of the Service, in whole or in part, or permit or authorize a third party to do so, except to the extent such activities are expressly permitted by law;

**2.7.6** make the Service available to multiple users by any means, including by uploading the Service to a file-sharing service or other type of hosting service or by otherwise making the Service available over a network where it could be used by multiple devices at the same time;

**2.7.7** misrepresent the source of ownership of the Service;

**2.7.8** scrape, build databases or otherwise create permanent copies of any content derived from the Service; or

**2.7.9** use the Service in any manner to harass, abuse, stalk, threaten, defame or otherwise infringe or violate the rights of any other party.

**3. Eligibility**

Your eligibility for continued use of the Service is contingent on Your ongoing compliance with these Terms, in particular:

**3.1** You are over 21 years of age at the time of accessing or using the Service and are, under the laws of the jurisdiction(s) applicable to You, legally allowed to participate in the Games and access the Service;

**3.2** You understand and accept that we are unable to provide You with any legal advice or assurances and that it is Your sole responsibility to ensure that at all times You comply with the laws that govern You and that You have the complete legal right to use the Service;

**3.3** You will monitor Your User Account and ensure that no child or person under the age of 21 can access the Service using Your User Account. You accept full responsibility for any unauthorized use of the Service by minors and You acknowledge that You are responsible for any use of the Service, including use of Your credit card or other payment instrument by minors;

**3.4** You do not access the Games or Service from the states of Arizona, Connecticut, Delaware, Idaho, Louisiana, Maryland, Michigan, Montana, Nevada, New Jersey, New York Pennsylvania, Rhode Island, Washington, or West Virginia or any jurisdiction outside the United States or as otherwise posted within these Terms or on the Platform (the "Restricted Territories");

**3.5** You participate in the Games strictly in Your personal capacity for recreational and entertainment purposes only;

**3.6** You further represent and warrant that all information you supply to Us is complete and accurate. Knowingly submitting incomplete or inaccurate information may result in immediate termination of Your User Account, revocation of any License from Us, and any further participation or access to the Service, at Modo's sole discretion, to the extent legally permissible;

**3.7** You will not be involved in any fraudulent or other unlawful activity in relation to Your participation in any of the Games and You will not use any software-assisted methods or techniques (including but not limited to "bots" designed to play automatically) for Your participation in any of the Games. We reserve the right to invalidate any participation in the event of such behavior;

**3.8** If, in the reasonable opinion of Modo, we form the view that a player is abusing any promotion, to derive any advantage or gain for themselves or another player, including by way of fraudulent conduct, we may, at our sole discretion, withhold, deny or cancel any advantage, bonus or promotional prize as we see fit, or terminate or suspend the User Account of such player.

**3.8.1** You will not directly or indirectly participate in groups or take advantage of, or encourage others to participate in or take advantage of schemes, organizations, agreements, or groups designed to share: (a) hacks or money-making strategies; (b) special offers or packages emailed to a specific set of players and redeemable by URL; or (c) identification documents (including, but not limited to, photographs, bills and lease documents) for the purpose of misleading Modo as to a player's identity.

**3.9** In relation to any purchase, You must only use a valid form of payment accepted by the Platform or its third party payment processing provider(s) ("Payment Agent(s)") which lawfully belongs to You (the "Payment Mechanism").

**4. Your User Account**

**4.1** You must create a User Account in order to access or use the Service.

**4.2** Only one User Account is permitted per person. In the event You open or try to open more than one User Account, all User Accounts You have opened or try to open may then be terminated or suspended any prizes or Virtual Coins balances may be voided.

**4.3** If You lose access to Your User Account, You must not register a new User Account. Rather, You must contact customer support at support@modo.us to have Your User Account status updated.

**4.4** You are required to keep Your personal details up to date. If You change Your address, email, phone number or any other contact details or personal information, please contact customer support. The name that You provide to us at registration must match any identification You provide for Your User Account verification.

**4.5** During the registration process, You will be required to select a password unless: (i) You login to Your User Account using the Facebook® login facility in which case Your Facebook® password will apply; or (ii) You login to Your User Account using the Google® login facility in which case Your Google® password will apply.

**4.6** You confirm that You will not share Your User Account or password with any other person or let anyone else access or use Your User Account without our written permission. You will not access or use a User Account which has been rented, leased, sold, traded, or otherwise transferred from the User Account creator without our written permission.

**4.7** If You become aware, or have reasons to suspect, that the security of Your User Account may have been compromised, including loss, theft or unauthorized disclosure of Your password and User Account details, You must notify us immediately.

**4.8** You are responsible for maintaining the confidentiality of Your User Account and accept responsibility for all uses of the User Account, including any purchases (whether or not authorized by You).

**4.9** We reserve the right to close Your User Account if it is inactive for a period of sixty days or longer and therefore Dormant under Section 6.11. You agree that We are not

required to give notice to You prior to taking such action, although we may choose to do so in our sole discretion.

**4.10** If You wish to close Your User Account, You may do so at any time by contacting customer support. Closing Your User Account will forfeit all continued access to and right to use, enjoy or benefit from any Virtual Coins associated with Your User Account.

**4.11** We reserve the right to refuse to open or the right to close a User Account at our sole discretion.

**4.12** User Account registrations may be limited to one User Account registration per person or per IP address at our sole discretion.

**4.13** We reserve the right, at our sole discretion, to deactivate or suspend your User Account (notwithstanding any other provision contained in these Terms of Use) where we have reason to believe that you have played or are likely to play in tandem with other player(s) as part of a club, syndicate, group, etc., or played the Games in a coordinated manner with other player(s) involving the same (or materially the same) actions, decisions, or selections.

**5. Games and Contests**

**5.1** In addition to these Terms, Games offered on the Service may have their own rules which are available on the Service. It is Your responsibility to read the rules of a Game before playing. You must familiarize Yourself with the applicable terms of play and read the relevant rules before playing any Game.

**6. VIP Rank**

**6.1** We may, at our sole discretion, grant, modify, limit, suspend, or revoke any VIP Rank benefits, rewards, or features at any time, for any reason, with or without prior notice. VIP Ranks and any associated benefits are provided as discretionary rewards and are not guaranteed. Players have no entitlement to receive or retain any VIP Rank or related rewards. More information on rank-specific benefits and achieving these tiers can be found at https://modo.us/vip-ranks, which can be modified by us at any time as provided for in these Terms.

**6.2** The VIP Rank benefits that may be subject to such changes, limitation, and/or suspension include, but are not limited to:

- **6.2.1** Exclusive Pick-Me-Up Click N' Claims
- **6.2.2** Birthday Click N' Claim Rewards
- **6.2.3** Daily and Weekly VIP Rank Discounts
- **6.2.4** Daily Bonus Streak repair
- **6.2.5** Access to Live Chat Priority Support
- **6.2.6** VIP Points earned per daily log-in

**6.3** Without limiting the foregoing, the following are common examples of when such limitations may occur:

- **6.3.1** When an account is under review by our teams

**6.3.2** When an account is pending closure or has been closed

**6.3.3** When limitations are applied in connection with Responsible Social Gaming practices

**6.3.4** When an account is found to be in violation of these Terms or Sweepstakes Rules

**6.3.5** When we identify technical or operational issues affecting the delivery of benefits

**6.3.6** At our discretion, based on other risk, operational, or compliance considerations

**6.4** Nothing in these Terms guarantees the continued availability of any VIP Rank benefit or feature. We reserve the right to add, modify, suspend, and/or remove VIP Rank benefits and eligibility criteria at any time for any reason.

**6.5 Black Diamond VIP Rank**

**6.5.1** Black Diamond is an invitation-only VIP Rank tier that may be granted at our sole discretion. In addition to standard VIP Rank benefits, Black Diamond members may receive access to a dedicated VIP host, special event invitations, and enhanced or personalized promotions. We may, at any time and for any reason, grant, modify, limit, suspend, or revoke any Black Diamond benefits, rewards, or features with or without prior notice. Black Diamond status and its associated benefits are discretionary and not guaranteed. Players have no entitlement to receive or retain Black Diamond status or any related rewards.

**7. Purchases**

**7.1** The name on Your Payment Mechanism must match the name on Your User Account. If it comes to our attention that the name You registered on Your User Account and the name linked to Your Payment Mechanism differ, Your User Account will be suspended, purchases may be voided, and any Virtual Coins balance may be adjusted accordingly. **You must promptly notify us if Your Payment Mechanism is cancelled, lost or stolen or if the security of Your Payment Mechanism has otherwise become compromised.**

**7.2** You acknowledge and agree that we may, from time to time and without notice, appoint one or more Payment Agents to process or make payments from or to You on our behalf.

**7.3** If one or more of Your Virtual Coins purchases is subject to a charge back request, Your User Account will be suspended. In the event of any charge back on Your User Account, the amount of the charge back will be a debt owed by You to Us, and You must immediately submit payment for such purchases through an alternative Payment Mechanism.

**7.4** You agree that we and/or our Payment Agents appointed by us from time to time may store Your Payment Mechanism details to process future purchases. By accepting these Terms, you authorize us and/or our Payment Agents to store Your payment credentials in compliance with applicable payment processing regulations.

**7.5** A Payment Agent will have the same rights, powers and privileges that we have under these Terms and will be entitled to exercise or enforce their rights, powers and privileges

as our agent or in their own name. In no event will we be liable to You for any loss, damage or liability resulting from the Payment Agent's negligence and/or acts beyond the authority given by us.

**7.6** All purchases will be in USD.

**7.7** If You make a purchase, the purchased, licensed Virtual Coins may be added to Your User Account instantaneously unless there is any delay due to situations outside our control, including without limitation a force majeure event, poor internet connectivity, internet failure or electricity outages.

**7.8** When You make a purchase, it will appear on Your statement as a purchase from "Modo."

**7.9** When You make a purchase, You will receive two confirmations: (i) an on-screen confirmation that the transaction has taken place; and (ii) an email to the email address on Your User Account confirming that the transaction has taken place.

**7.10** When You log into Your User Account Your licensed Virtual Coins balance will be displayed in the upper right-hand corner of Your screen, both on the Modo mobile application and on the Modo website.

**7.11** Virtual Coins will automatically expire in the event a User Account becomes Dormant. For the purpose of these Terms "Dormant" means there has been no game play activity utilizing Virtual Coins for a consecutive period of sixty (60) days.

**7.12** Our Customer Support can be reached twenty-four hours a day, seven days a week at support@modo.us. The expected response time is as soon as possible but may take up to twelve (12) hours.

**7.13 Notice for California Users Under Civil Code Section 1789.3**

The Complaint Assistance Unit of the Division of Consumer Services of the California Department of Consumer Affairs may be contacted in writing at 1625 N. Market Blvd., Suite N – 112, Sacramento, CA 95834, or by telephone at 1(800) 952 – 5210.

**8. Promotions**

**8.1** All promotions, contests, and special offers are subject to these Terms, the official rules of the promotion, contest, or special offer, and any additional terms that may be published at the time of the promotion, contest or special offer.

**8.2** We reserve the right to withdraw or alter any such promotions without prior notice to You at our sole discretion.

**8.3** We reserve the right at our sole discretion and without any requirement to provide a justification to exclude You from any promotions, contests or special offers that may be offered from time to time.

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 41 of 103

**8.4** We reserve the right to exclude You from any promotions, contests or special offers if we believe that You have tried to enter said promotions, contests of special offers by using more than one User Account or are otherwise engaging in any fraudulent or illegal activity (including participation that would be in breach of the law in Your local jurisdiction), whether or not You would have or might have won but for such activity. Where multiple entries/User Accounts have been used, we reserve the right to suspend those User Accounts and withhold any promotional benefits.

**8.5** You confirm that You grant us an irrevocable, perpetual, worldwide, non-exclusive, royalty-free License to use in whatever way we see fit, and without further acknowledgement of You as the author, any content You post or publish as part of a promotion, contest or competition.

**9. Verification**

**9.1** You acknowledge that we, or a third party acting on our behalf, are entitled to conduct any verification checks (including but not limited to age and identity verifications and credit background checks) that we may reasonably require and/or that are required of us under applicable laws and regulations or by relevant regulatory authorities. You agree to comply with all verification checks in a timely manner.

**9.2** You agree that we may restrict Your opening or use of a User Account pending any verification checks having been completed to our satisfaction.

**9.3** The documents required may include, but are not limited to, photo identification, such as a government issued passport or driver's license; a utility bill that matches the address registered on Your User Account; and source of wealth or source of funds documentation such as a payslip or bank statement.

**9.4** In the event that any verification check cannot be completed for any reason, including Your failure to provide any requested documentation, then We may, in our sole discretion, terminate, deactivate or otherwise restrict Your User Account.

**9.5** You acknowledge and agree that we may use third party service providers to run external identification, location verification and other verification checks based on the information provided by You from time to time. You must enable and allow "Locations Services" on Your device or PC in order to operate the Service or access Your User Account.

**10. Intellectual Property**

**10.1** These Terms confer only the right to use the Service and they do not convey any rights of ownership in or to the Service.

**10.2** All rights, title and interest, including without limitation any copyright, patent, trade secret or other intellectual property right in the Service will remain our sole property or where licensed from a third party their sole property.

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 42 of 103

**10.3** Your use of the Games will not convey any ownership rights in the intellectual property to You. The titles, source and object codes, game client and server software, the "look and feel" of the Games, sounds, musical compositions, audio-visual effects, concepts and methods of operation, layout, text, data, User Accounts, themes, objects, characters and character likenesses, character names and character profile information, stories, dialogue, catch phrases, locations, artwork, animations files, images, graphics, documentation, gaming history and recording of game play, transcripts of any chat rooms, and moral rights, whether registered or not, and all applications related to the above will remain vested in us or any third party supplier of the Games.

**10.4** Notwithstanding anything to the contrary in these Terms, You acknowledge and agree that You shall have no ownership or other property interest in the User Account, and You further acknowledge and agree that all rights in and to the User Account are and shall forever be owned by and inure to the benefit of us.

**11. Responsibility for User Generated Content**

**11.1** You are responsible for complying with all laws applicable to Your User Content. You agree not to submit to the Service, or send to other users of the Service, any defamatory, inaccurate, abusive, obscene, profane, offensive, sexually oriented, threatening, harassing, racially offensive, illegal material or any material that infringes or violates another party's rights.

**11.2** You will not provide inaccurate, misleading or false information to us or to any other user of the Service. If information provided to us, or another user of the Service, subsequently becomes inaccurate, misleading or false, You will notify us of such change immediately.

**11.3** We may, in our sole discretion, delete any User Content without notice but are under no obligation to do so. We have no responsibility for the conduct of any user in the Service, including any User Content submitted in the Service. We assume no responsibility for monitoring the Service for inappropriate content or conduct. Your use of the Service is at Your own risk.

**11.4** You hereby grant us the sole and exclusive, irrevocable, sub-licensable, transferable, worldwide, royalty-free license to reproduce, modify, create derivative works from, publish, distribute, sell, transfer, transmit, publicly display and use any User Content and to incorporate the same in other works in any form, media, or technology now known or later developed.

**11.5** You further hereby grant to us the unconditional, right to use and exploit Your name, likeness and any other information or material included in any User Content and in connection with any User Content or Your User Account, without any obligation to You. You waive any rights of attribution and/or any moral rights You may have in Your User Content, regardless of whether Your User Content is altered or changed in any manner except as prohibited by law.

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 43 of 103

**11.6** You acknowledge and agree that all User Content whether publicly posted or privately transmitted to the Service is at Your sole responsibility and risk. We disclaim any responsibility for the backup and/or retention of any User Content transmitted to the Service.

**11.7** Prohibited Content; User Content that is prohibited in the Service includes, but is not limited to:

- User Content that promotes racism, bigotry, hatred or physical harm of any kind against any group or individual;
- Harassing User Content;
- User Content of a sexual or offensive nature;
- User Content that promotes terrorism or religious hatred;
- User Content that promotes illegal activities or conduct that is abusive, threatening, obscene or defamatory;
- User Content of commercial nature without authorization from us; or
- User Content promoting the services of another business or competitor.

**11.8** If You see any material in the Service that in Your belief is offensive, hateful, harassing or that You otherwise think is prohibited, please notify us by contacting support@modo.us.

**12. Third Party Websites & Content**

**12.1** The Service may contain links to content owned and/or operated by third parties, for instance third parties who may invite You to participate in promotional offers or rewards programs or third-party advertisers or payment providers. Any separate charges or obligations that You may incur in Your dealings with these third parties are Your sole responsibility. We are not responsible for any such third-party services or content and do not have control over any materials made available therein.

**12.2** Our inclusion of a link to a third-party website, services or content in the Service does not imply our endorsement, advertising, or promotion of such websites, services or content or any materials available and we make no guarantee as to the content, functionality, or accuracy of any third-party website.

**12.3** By accessing a third-party website, services or content, You accept that we do not exercise any control over such websites, services or content and have no responsibility for them. The third-party sites may collect data or solicit personal information from You. We are not responsible for privacy policies, or for the collection, use or disclosure of any information those sites may collect. It is always best to read and understand the terms of services and privacy policies applicable to any third-party website, services or content You may access.

**12.4** We do not endorse, do not assume and will not have any liability or responsibility to You or any other person for any third-party products, services, materials or websites. Please note that the relevant third party is fully responsible for all goods and services it provides to You and for any and all damages, claims, liabilities and costs it may cause You to suffer, directly or indirectly, in full or in part.

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 44 of 103

**12.5** If You use third party social networking websites to discuss the Service such as Facebook® and Twitter®, You acknowledge and agree that:

- any content that You post on such social networking sites are subject to the relevant terms and conditions of that website;
- You will not post any comments that are false, misleading or deceptive or defamatory to us, our employees, agents, officers or other players; and
- we are not responsible or liable for any comments or content that You or others post on social networking sites.

## 13. Copyright Infringement Notice

Modo requires our Users to respect the intellectual property rights of others. If You are the owner of copyright and You believe that Your work has been used in the Service in a way that constitutes copyright infringement, please provide our Copyright Agent with a notice meeting all of the requirements of the Digital Millennium Copyright Act ("DMCA"). Your notice should contain the following information:

- a physical or electronic signature of the person authorized to act on behalf of the owner of the copyright or other intellectual property interest;
- a clear description of the copyrighted work or other intellectual property that You claim has been infringed;
- a description of where the material that You claim is infringing is located in the Service.
- Your address, telephone number, and email address;
- a statement by You that You have a good faith belief that the disputed use is not authorized by the copyright owner, its agent or the law; and
- a statement by You, made under penalty of perjury, that the above information in Your notice is accurate and that You are the copyright or intellectual property owner or authorized to act in the copyright or intellectual property owner's behalf.

Before you file Your DMCA notice, please carefully consider whether or not the use of the copyrighted material at issue is protected by the Fair Use doctrine. If You file a DMCA notice when there is no infringing use, You could be liable for costs and attorneys' fees.

Our agent for notice of claims of copyright or other intellectual property infringement can be reached as follows:

By email: legal@arbinteractive.com

## 14. Disruptions, Errors & Omissions

**14.1** Disclaimer of Warranties. THE SERVICES, IN WHOLE AND IN PART (INCLUDING, WITHOUT LIMITATION, ALL CONTENT, AND USER MATERIALS), ARE PROVIDED, TRANSMITTED, DISTRIBUTED, AND MADE AVAILABLE "AS IS" AND "AS AVAILABLE" WITHOUT EXPRESS OR IMPLIED WARRANTIES OF ANY KIND, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF TITLE, IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE

OR NON-INFRINGEMENT. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, WE MAKE NO WARRANTY: (A) THAT THE SERVICES WILL BE UNINTERRUPTED OR ERROR FREE; (B) THAT DEFECTS OR ERRORS IN THE SERVICES WILL BE CORRECTED; (C) THAT THE SERVICES WILL BE FREE FROM VIRUSES OR OTHER HARMFUL COMPONENTS; (D) AS TO THE QUALITY, ACCURACY, COMPLETENESS AND VALIDITY OF ANY INFORMATION OR MATERIALS IN CONNECTION WITH THE SERVICES; (E) THAT YOUR USE OF THE SERVICES WILL MEET YOUR REQUIREMENTS; OR (F) THAT TRANSMISSIONS OR DATA WILL BE SECURE.

**14.2 <u>Exceptions</u>. SOME JURISDICTIONS DO NOT ALLOW THE DISCLAIMER, EXCLUSION OR LIMITATION OF CERTAIN WARRANTIES, LIABILITIES AND DAMAGES, SO SOME OF THE ABOVE DISCLAIMERS, EXCLUSIONS AND LIMITATIONS MAY NOT APPLY TO YOU. IN SUCH JURISDICTIONS, OUR WARRANTIES AND LIABILITY WILL BE LIMITED TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW.**

**14.3** We are not liable for any downtime, server disruptions, errors, lagging, or any technical or political disturbance to the Service or Games, nor attempts by You to participate by methods, means or ways not intended by us.

**14.4** We accept no liability for any damages or losses which are deemed or alleged to have arisen out of or in connection with any Service including, without limitation, delays or interruptions in operation or transmission, loss or corruption of data, communication or lines failure, any person's misuse of a Service or any errors or omissions in the Service.

**14.5** In the event of a Service system malfunction, then all Game play on the Service will be void.

**14.6** In the event of an error or malfunction in a Game, then all Game play resulting from the error or malfunction will be voided.

**14.7** We reserve the right to remove any part of the Games from the Service at any time. Any part of the Games that indicate incorrect behavior affecting, game data, or Virtual Coins balances, that may be due to error, misconfiguration or a bug, will be cancelled and removed from the Service. We reserve the right to alter player balances and User Account details under such circumstances, at our sole discretion, in order to correct any mistake.

**14.8** We may temporarily suspend the whole or any part of the Service for any reason at our sole discretion. We may, but will not be obliged to, give You as much notice as is reasonably practicable of such suspension. We will restore the Service, as soon as is reasonably practicable, after such temporary suspension.

**14.9** We reserve the right to declare participation in a Game void, partially or in full, if, in our sole discretion, we deem it obvious that there was an error, mistake, misprint or technical error on the pay-table, win-table, minimum or maximum stakes, odds or software.

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 46 of 103

**14.10** If You are incorrectly awarded any Virtual Coins or prizes as a result of (a) any human error; (b) any bug, defect or error in the Service; or (c) the failure of any Games to operate in accordance with the rules of the relevant game, then We will not be liable to award You any such Virtual Coins or prizes, and You agree that any such Virtual Coins or prizes that have been awarded in error to Your User Account will be voided.

**14.11** We retain absolute discretion in the event of a discrepancy between the result showing on a user's device and the server software. Such discretion includes the authority to recognize the result showing on the server software as the official and governing result.

**15. Limitation of Liability and Indemnification**

**15.1 Limitation of Liability. BY ACCESSING, USING OR DOWNLOADING THE SERVICE, YOU ACKNOWLEDGE AND AGREE THAT SUCH USE IS AT YOUR OWN RISK AND THAT NEITHER THE COMPANY NOR ANY OF THE PARTIES INVOLVED IN CREATING, PRODUCING, OR DELIVERING THE SERVICES OR THE COMPANY OR ANY OF THEIR AFFILIATES, SUBSIDIARIES, AGENTS, EMPLOYEES, OFFICERS, DIRECTORS, CONSULTANTS, SUPPLIERS, ADVERTISERS, PAYMENT SERVICES PROMOTERS, PARTNERS, OR CONTRACTORS (COLLECTIVELY "RELEASED PARTIES") ARE LIABLE FOR ANY DIRECT, INCIDENTAL, CONSEQUENTIAL, INDIRECT, SPECIAL, OR PUNITIVE DAMAGES, OR ANY OTHER LOSSES, COSTS, OR EXPENSES OF ANY KIND (INCLUDING, WITHOUT LIMITATION, LOST PROFITS, LOSS OF DATA, LEGAL FEES, EXPERT FEES, COST OF PROCURING SUBSTITUTE SERVICES, LOST OPPORTUNITY, OR OTHER DISBURSEMENTS) WHICH MAY ARISE, DIRECTLY OR INDIRECTLY, THROUGH THE ACCESS TO, USE OF, RELIANCE ON ANY MATERIAL OR CONTENT ON THE SERVICES, OR BROWSING OF THE SERVICES OR THROUGH YOUR DOWNLOADING OF ANY MATERIALS, DATA, TEXT, IMAGES, VIDEO OR AUDIO FROM THE SERVICES, SPECIFICALLY INCLUDING ANY PAST, PRESENT OR FUTURE USE OF "COOKIES," "GET REQUESTS," PIXELS AND OTHER TRACKING TECHNOLOGY, EVEN IF WE HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.**

**RELEASED PARTIES CANNOT AND DO NOT WARRANT OR GUARANTEE CONTINUOUS, UNINTERRUPTED, OR SECURE ACCESS TO THE SERVICES. WITHOUT LIMITING THE FOREGOING, RELEASED PARTIES ASSUME NO RESPONSIBILITY, AND WILL NOT BE LIABLE, FOR ANY DAMAGES RELATING TO OR CAUSED BY ANY VIRUSES, BUGS, HUMAN ACTION OR INACTION OF ANY COMPUTER SYSTEM, PHONE LINE, HARDWARE, SOFTWARE OR PROGRAM MALFUNCTIONS, OR ANY OTHER ERRORS, FAILURES OR DELAYS IN COMPUTER TRANSMISSIONS OR NETWORK CONNECTIONS ON ACCOUNT OF YOUR ACCESS TO OR USE OF THE SERVICES.**

**15.2** Indemnification. BY USING THE SERVICES, YOU AGREE TO INDEMNIFY, DEFEND AND HOLD HARMLESS (INCLUDING REASONABLE ATTORNEY'S FEES AND COSTS OF SUIT) THE RELEASED PARTIES FROM ANY AND ALL THIRD PARTY

CLAIMS AGAINST THE COMPANY RELATED IN ANY WAY TO YOUR USER ACCOUNT, YOUR USE OF THE SERVICES OR YOUR ACCESS TO THE SITE.

**15.3** One Year Limitations Period. You and Modo agree that any claims, regardless of form, arising out of or related to the Site (including Services) or these Terms of Use or Privacy Policy must BE FILED within ONE (1) YEAR of the action, omission, event or occurrence giving rise to the claim or suit, after which such claims will be time-barred and prohibited, without regard to any longer period of time which may be provided by any period of limitation or repose by law or statute.

**15.4 SOLE AND EXCLUSIVE REMEDY/LIMITATION ON RECOVERY. UNLESS OTHERWISE PROHIBITED BY LAW, IN ANY DISPUTE WITH THE RELEASED PARTIES, YOUR SOLE AND EXCLUSIVE REMEDY UNDER ANY LEGAL THEORY FOR ANY LOSS OR DAMAGE WHATSOEVER ARISING FROM ANY CAUSE SHALL BE LIMITED TO RECOVERY OF THE AMOUNT OF YOUR OWN PURCHASES DURING THE ONE (1) YEAR PERIOD PRECEDING THE DATE ON WHICH YOU FIRST ASSERT ANY SUCH CLAIM.**

**15.5 YOU RECOGNIZE AND AGREE THAT THE WARRANTY DISCLAIMERS IN SECTION 13.1, AND THE INDEMNITIES, LIMITATIONS OF LIABILITY AND LIMITATIONS OF REMEDIES IN THIS SECTION 14, ARE MATERIAL AND BARGAINED-FOR BASES OF THESE TERMS AND THAT THEY HAVE BEEN TAKEN INTO ACCOUNT AND REFLECTED IN THE DECISION BY YOU AND MODO TO ENTER INTO THESE TERMS OF USE.**

**15.6 NOTHING IN THESE TERMS OF USE WILL OPERATE SO AS TO EXCLUDE ANY LIABILITY OF MODO FOR DEATH OR PERSONAL PHYSICAL INJURY THAT IS DIRECTLY AND PROXIMATELY CAUSED BY MODO'S NEGLIGENCE OR WILLFUL MISCONDUCT.**

**15.7 TO THE EXTENT ANY OF THE LIMITATIONS OF REMEDY, INCLUDING WAIVER OF THE RIGHT TO PRIVATE OR PUBLIC INJUNCTIVE RELIEF, ARE NOT PERMITTED BY LAW OF ANY APPLICABLE JURISDICTION, SUCH LIMITATIONS SHALL NOT APPLY AND SHALL BE DEEMED AS SEVERABLE AND STRICKEN FROM THESE TERMS. THE PARTIES AGREE FURTHER THAT SUCH PROVISION(S) SHALL NOT AFFECT THE ENFORCEABILITY OF THE TERMS OR THE ARBITRATION AGREEMENT (Section 16), WHICH THE PARTIES AGREE SHALL REMAIN IN PLACE AND IN FORCE LESS ANY SUCH STRICKEN PROVISIONS.**

**16. CUSTOMER SERVICE AND INITIAL DISPUTE RESOLUTION PROCEDURE**

**Customer Support**

**16.1** If You need customer service in relation to the Service, You may contact us by at support@modo.us.

**16.2** To protect Your privacy, all communications between You and us should be carried out using or referencing the email address that You used to register Your User Account for the Service. Failure to do so may result in our response being delayed.

**Initial Dispute Resolution Procedure and Conference**

**16.3** The parties shall use best efforts to resolve informally any customer service issue promptly and in good faith. If for some reason You are not satisfied or your claim is not resolved (a "Dispute"), You may then pursue arbitration as set out below in Section 16. However, You must first submit a Notice of Dispute as set forth in this Section 15 and engage in a conference either by telephonic or videoconference means with Modo prior to and as a condition precedent to initiating arbitration or any formal proceeding over a Dispute as required by Section 16.

**16.4** **Notice of Dispute Required Prior to Arbitration**. The party initiating a claim over a Dispute must give notice to the other party in writing of its intent to initiate an informal dispute resolution conference. The initial conference shall occur within thirty (30) days after the other party receives such notice or within a time period required by law, unless an extension is mutually agreed upon by the parties.

**16.5** All initial dispute resolution conferences shall be conducted individually, between Modo and You. Multiple individuals with Disputes cannot participate in the same informal telephonic dispute resolution conference. If a party is represented by counsel (which such representation will be at such parties' sole cost and expense), counsel may participate in the conference, but each party shall also attend and participate in the conference.

**16.6** To notify Modo that You intend to initiate an informal dispute resolution conference, please inform us by sending a Notice of Dispute via email to disputeresolution@arbgamingllc.com and include the following information:

**(a)** Your username and email address associated with Your User Account;

**(b)** Your first and last name, as registered on your User Account;

**(c)** Your residence address;

**(d)** Your telephone number (home and/or mobile);

**(e)** a detailed explanation of the complaint/claim and basis for the claim;

**(f)** any specific dates and times associated with the complaint/claim (if applicable); and

**(g)** the remedy, action or any amount You are seeking from Modo.

**16.7** Upon receipt of Your Notice of Dispute, We will respond in writing within thirty (30) days after receipt of such Notice, unless an extension is mutually agreed upon by the parties.

Failure to submit a written communication with the information outlined above may result in a delay in our ability to identify and respond to Your complaint/claim in a timely manner, and may, in Modo's discretion, extend the time period for resolution before a formal proceeding may be commenced, as permitted by these Terms.

**16.8** The parties shall use their best efforts to settle any Dispute, claim, question, or disagreement and engage in good faith negotiations which shall be a pre-condition to either party initiating a formal arbitration as provided in Section 16. If the parties do not reach an agreed upon solution within a period of thirty (30) days from the time of the initial Notice, then either party may initiate binding arbitration, to the extent permitted by law, as the sole means to resolve claims, subject to these Terms and the Arbitration Agreement.

**16.9** The aforementioned Notice of Dispute and informal dispute resolution process is a condition precedent to commencing any formal arbitration proceeding under the Arbitration Agreement (Section 16 below), including litigation if you have successfully opted-out of the arbitration agreement. The parties agree that any relevant limitations period or other deadlines will be tolled solely by the amount of time the parties initiate and engage in this informal dispute resolution process.

**16.10** Regardless of whether you decide to opt out of arbitration, the terms set forth in this Section 15 Initial Dispute Resolution shall remain in full force and effect as part of these Terms.

**17. BINDING ARBITRATION AGREEMENT AND CLASS ACTION WAIVER**

**PLEASE READ THIS ARBITRATION & CLASS ACTION WAIVER AGREEMENT (THE "AGREEMENT") CAREFULLY BECAUSE IT REQUIRES YOU AND MODO TO ARBITRATE CERTAIN DISPUTES AND CLAIMS AND LIMIT THE MANNER IN WHICH YOU AND MODO CAN SEEK RELIEF FROM EACH OTHER. THIS AGREEMENT APPLIES TO ANY CLAIMS YOU OR COMPANY CURRENTLY POSSESS AND ANY CLAIMS THE PARTIES MAY RAISE IN THE FUTURE. WHILE YOU MUST AGREE TO THESE TERMS OF USE IN ORDER TO USE THE SERVICES, IF YOU HAVE NOT PREVIOUSLY AGREED TO AN ARBITRATION PROVISION IN CONNECTION WITH YOUR USE OF OUR SERVICE, THERE IS AN OPTION, DESCRIBED BELOW IN SECTION 16.12, TO OPT OUT OF THE ARBITRATION PROVISIONS. THE OPTION TO OPT-OUT IS TIME-LIMITED TO THIRTY (30) DAYS OF ENTERING THIS AGREEMENT AND REQUIRES YOUR IMMEDIATE ATTENTION.**

**If you reside in or access the Service at any time while located in the United States, this Section 16 (Binding Arbitration Agreement and Class Action Waiver Agreement) shall be construed under and be subject to the Federal Arbitration Act, notwithstanding any other choice of law set out in these Terms of Service.**

**THIS AGREEMENT INCLUDES AN ARBITRATION PROVISION WHICH SETS FORTH HOW PAST, PENDING OR FUTURE DISPUTES BETWEEN YOU AND MODO SHALL BE RESOLVED BY FINAL AND BINDING ARBITRATION.**

**ARBITRATION MEANS YOU WILL NOT BE ABLE TO SEEK DAMAGES IN COURT OR PRESENT YOUR CASE TO A JURY.**

**THIS ARBITRATION AND CLASS ACTION WAIVER AGREEMENT ALSO REQUIRES THAT ANY PAST, PENDING OR FUTURE DISPUTES WITH THE COMPANY SHALL PROCEED FOR YOUR OWN LOSSES ONLY. YOU MAY NOT PROCEED AS A CLASS REPRESENTATIVE, MEMBER OR PART OF ANY PROPOSED CLASS, COLLECTIVE ACTION, PRIVATE ATTORNEY GENERAL SUIT, QUI TAM ACTION, OR ANY REPRESENTATIVE PROCEEDING, OR OTHERWISE SEEK TO RECOVER ON BEHALF OF OTHERS OR FOR THE BENEFIT OF OTHERS IN ANY TYPE OF CLAIM OR ACTION.**

**17.1** Acceptance of Terms. By using, or otherwise accessing the Service, or clicking to accept or agree to the Terms where that option is made available, you confirm that you have read and accept and agree to this Agreement. Except to the extent that you may opt-out as provided below, all of your activity on the Website or Platform and all or your transactions with Modo, including all events which occurred before your acceptance of this Agreement, shall be subject to this Agreement.

**17.2** Scope of Agreement to Arbitrate. You and Modo agree that any past, pending, or future dispute, claim or controversy arising out of or relating to any purchase or transaction by you, your access to or use of any Platform or the Service, or to this Agreement, the Terms of Use, or Privacy Policy (including without limitation any dispute concerning the breach, enforcement, construction, validity, interpretation, enforceability, or arbitrability of this Agreement or the Terms of Use) (a "Dispute"), shall be determined by arbitration, including claims that arose before acceptance of any version of this Agreement. In addition, in the event of any Dispute concerning or relating to this Agreement — including the scope, validity, enforceability, or severability of this Agreement or its provisions, as well as the arbitrability of any claims—you and Modo agree and delegate to the Arbitrator the exclusive jurisdiction to rule on their own jurisdiction over the Dispute, including any objections with respect to the scope, validity, enforceability, or severability of this Agreement or its provisions, as well as the arbitrability of any claims or counterclaims presented as part of the Dispute.

**17.3** Notwithstanding the above provision and Agreement to Arbitrate, all parties retain the right to seek relief in a small claims court for disputes or claims solely within the scope of a small claim's court jurisdiction.

**17.4** Lack of Estoppel or Preclusive Effect. The parties agree that any issues determined in arbitration or any other proceeding between the parties shall be conducted and decided for the benefit of the parties or express third party beneficiaries only and shall have no preclusive or estoppel effect against a party in any subsequent or other arbitration or litigation matter, such that all issues shall be decided anew in any subsequent or other proceedings involving either party. The parties reach this agreement in order to narrowly and efficiently tailor their legal positions without concern that any third party may attempt to offensively use any finding or determination of fact or law against You or Modo.

**17.5** Third-Party Beneficiaries. You further agree and intend that this Agreement and the Terms are entered into for the express benefit of your spouse, heirs, children and next-of-kin and shall bind same to the extent of any claims arising from your use of the Service which is brought by them or by any person for the use or benefit of your spouse, heirs, children and next-of-kin. Modo agrees also that this Agreement is intended to benefit and shall bind any successor-in-interest or assignee of Modo.

**17.6** Intellectual Property. Notwithstanding the requirement to arbitrate in this Section 16, you and Modo are NOT required to arbitrate any claims for the alleged unlawful use of copyrights, trademarks, trade names, trade dress, logos, trade secrets, or patents, and the parties agree that in the event of infringement of copyrights, trademarks, trade names, trade dress, logos, trade secrets, or patents of a party, they shall also be entitled to seek injunctive relief from a court of competent jurisdiction, and the parties shall not be able to hold out a user's access to the Service as a basis to enforce this arbitration agreement as to such claims.

**17.7** Separate Agreement. The parties acknowledge that this Agreement is a separate agreement between the parties governed by the Federal Arbitration Act, and that any alleged or determined invalidity or illegality of all or any part of the Terms of Use, the Service, the Platform, or the Privacy Policy shall have no effect upon the validity and enforceability of this Agreement.

**17.8** Applicable Law. While the Federal Arbitration Act shall control, to the extent the law of any state is applied or considered with respect to issues bearing upon the enforceability or scope of this Agreement, the parties agree that the law of the State of Delaware shall exclusively apply, notwithstanding any consideration or application of choice of law or conflicts of law principles.

**17.9 NOTICE TO CALIFORNIA RESIDENTS.** In accordance with California Civil Code sections 1541 and 1542, you hereby agree to waive all rights and remedies under Section 1542.

**INITIATING ARBITRATION UNDER JAMS RULES**

**17.10** Following the conclusion of the initial dispute resolution process required by Section 15, you or Modo may seek arbitration of a Dispute in accordance with the provisions of this Agreement. You and Modo agree that JAMS ("JAMS") will administer the arbitration under its Comprehensive Arbitration Rules and Procedures ("JAMS Rules") in effect at the time arbitration is sought ("JAMS Rules"). The parties further agree that, to the extent applicable, the JAMS Mass Arbitration Procedures and Guidelines shall apply. The JAMS Rules referenced above are available at https://www.jamsadr.com/adr-rules-procedures/.

You and Modo further agree:

**17.10.1** The arbitration will be handled on the merits by a sole arbitrator. The parties agree that any JAMS arbitrator appointed, including merits and process arbitrators, must have the following minimum qualification: practicing attorneys or retired federal court judges who have at least ten years of substantive expertise in litigating and resolving of complex

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 52 of 103

business disputes, including motions to compel arbitration and litigation or adjudication regarding whether disputes are arbitrable;

**17.10.2** For purpose of Sections 16.1 and 16.2 of the JAMS Rules, the JAMS Streamlined Arbitration Rules and Procedures and JAMS Expedited Procedures shall *not* apply unless otherwise explicitly agreed to by all parties to the Dispute;

**17.10.3** In lieu of JAMS Rule 15, the parties shall be presented with a list of eight (8) potential arbitrators, be allowed three (3) strikes and the parties shall rank those potential arbitrators in order of preference. JAMS shall select the arbitrator with the highest combined preference (e.g., if both parties select a potential arbitrator as their top preference, that arbitrator will be selected). To the extent a process arbitrator is appointed pursuant to the JAMS Rules, the selection process shall also be as prescribed in this paragraph;

**17.10.4** In lieu of JAMS Rule 18, the parties shall have the right to submit a dispositive motion at the outset of the arbitration to the Arbitrator in order to resolve issues other than the ultimate issue of fact. The submission and scheduling of such motions shall be addressed at a conference held before the JAMS arbitrator, and the Parties agree that any dispositive motions shall be resolved and the remainder of the arbitral proceeding stayed pending resolution, absent good cause and immediate necessity to proceed.

**17.10.5** Unless and only to the extent prohibited under JAMS Rules, the arbitration will be held in Wilmington, Delaware or, at either your or our election, will be conducted telephonically or via other remote electronic means;

**17.10.6** The JAMS Rules will govern payment of all arbitration fees, currently available at https://www.jamsadr.com/arbitration-fees, You will only be required to pay arbitration fees of $250 in connection with any arbitration initiated under this Section 16, but You will still be responsible for paying your own attorneys' fees;

**17.10.7** Except as otherwise waived or limited under the Terms or this Agreement, the JAMS arbitrator shall be authorized to award any remedies, including equitable or injunctive relief, that would be available in an individual lawsuit except:

**(a) In any arbitration arising out of or related to this Agreement, the arbitrator(s) are not empowered to award punitive or exemplary damages, and the parties waive any right to recover any such damages; and**

**(b) In any arbitration arising out of or related to this Agreement, the arbitrator(s) may not award any incidental, indirect or consequential damages, including damages for lost profits;**

**17.10.8** The arbitration decision and award shall consist of a written statement signed by the Arbitrator regarding the disposition of each claim and the relief, if any, as to each claim. Unless the parties agree otherwise, the award shall be a reasoned award and contain a concise written statement of the reasons for the award;

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 53 of 183

**17.10.9** Except as and to the extent otherwise may be required by law, the arbitration proceeding, pleadings, and any award shall be treated as confidential and shall not be used by the parties except as may be necessary in connection with a court application for a preliminary remedy, a judicial challenge to an award or its confirmation and enforcement.

**17.10.10** In the event JAMS is unavailable or unwilling to hear the dispute in accordance with this Agreement, the parties shall agree to, or a court shall select, another arbitration provider subject to the procedural agreements of this Section 16; and

**17.10.11** You and Modo agree that any award issued by the Arbitrator in excess of $50,000 in favor of either party, or any award which grants any form of declaratory or equitable relief that would significantly impact other Modo users or the operation of the Platform, may be appealed in accordance with the JAMS Optional Arbitration Appeal Procedures at either party's election. The JAMS Optional Arbitration Appeal Procedures are available at https://www.jamsadr.com/adr-rules-procedures/.

**17.11** Batch Arbitration/Mediation. To increase efficiency of resolution, in the event 20 or more similar arbitration demands against Modo, presented by or with the assistance of the same law firm or organization or group of law firms or organizations working in coordination, are submitted to JAMS in accordance with the rules described above within a 60-day period, JAMS shall consolidate those arbitrations as contemplated in the JAMS Mass Arbitration Rules. Following the submission, initial presentation and resolution of briefing and motion practice contemplated in Section 16.9.4 on dispositive issues other than the ultimate issue of fact, to the extent claims and issues remain pending, JAMS shall group the arbitration demands into a first batch of no more than 25 demands to be set for resolution as a single arbitration. Once resolution of the first batch has concluded (or sooner if the parties agree), counsel for the parties must engage in a single mediation before a JAMS mediator of all remaining demands from claimants. Counsel for the parties must agree on a mediator within thirty (30) days after conclusion of the first batch. If the parties cannot agree on a JAMS mediator within 30 days, JAMS will appoint a JAMS mediator as an administrative matter. All parties will cooperate for the purpose of ensuring that the mediation is scheduled as quickly as practicable after the mediator is appointed. If the parties are unable to resolve their demands by mediation, JAMS shall continue to batch the remaining arbitration demands into batches of no more than 100 demands per batch (plus, to the extent there are fewer than 100 arbitration demands left over after the batching described above, a final batch consisting of the remaining demands) for administration. A single arbitration with one set of filing and administrative fees and one arbitrator will be assigned per batch. For avoidance of doubt, consolidation does not require that all arbitrations in a single batch be decided the same, nor does it impair your right to present any evidence or argument that you think particular to your case, so long as it is consistent with JAMS Rules. You agree to cooperate in good faith with the Company and JAMS to implement such a batch approach to resolution and fees and to efficiently consolidate discovery, submission of evidence, and motion practice.

**17.12** By signing a demand for arbitration, a party certifies, to the best of their knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, that: (i) the demand for arbitration is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of dispute resolution; (ii) the

claims and other legal contentions are warranted by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law; and (iii) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. The Arbitrator shall be authorized to afford any relief or impose any sanctions available under Federal Rule of Civil Procedure 11 or any applicable state law (including attorney's fees) for either party's violation of this requirement.

**OPTION AND PROCEDURE TO OPT OUT OF ARBITRATION**

**17.13 IF YOU HAVE NOT PREVIOUSLY AGREED TO AN ARBITRATION PROVISION IN CONNECTION WITH YOUR USE OF OUR SERVICE, YOU MAY OPT OUT OF THE AGREEMENT TO ARBITRATE BY FOLLOWING THE INSTRUCTIONS BELOW. IF YOU DO NOT OPT-OUT, THE ARBITRATION PROVISIONS WILL APPLY RETROACTIVELY TO ALL CLAIMS YOU MAY POSSESS, WHETHER ASSERTED TO DATE OR NOT.**

**17.14 OPT-OUT. IF YOU DO NOT WISH TO AGREE TO THE PROVISIONS OF THIS SECTION 16 AGREEMENT REQUIRING ARBITRATION AND CLASS ACTION WAIVER AND YOU HAVE NOT PREVIOUSLY AGREED TO AN ARBITRATION PROVISION IN CONNECTION WITH YOUR USE OF OUR SERVICE, YOU MUST, WITHIN THIRTY (30) DAYS OF ENTERING THIS AGREEMENT, SEND A WRITTEN NOTICE OF YOUR DECISION TO OPT OUT TO ARB GAMING LLC, ATTN: ARBITRATION OPT-OUT, 13802 N SCOTTSDALE RD SUITE 151-94 SCOTTSDALE AZ 85254-3403, WITH THE SUBJECT "OPT-OUT." **REQUESTS TO OPT OUT AFTER THE 30 DAY PERIOD SHALL NOT BE EFFECTIVE.****

**17.15** Whether to agree to arbitration is an important decision. It is your decision to make and you are not required to rely solely on the information provided in these terms of use. You should take reasonable steps to conduct further research and to consult with counsel (at your expense) regarding the consequences of your decision.

**WAIVER OF CLASS RELIEF AND COLLECTIVE ACTION**

**17.16 TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER YOU NOR MODO SHALL BE ENTITLED TO ARBITRATE OR LITIGATE ANY DISPUTE IN A REPRESENTATIVE CAPACITY. YOU MAY ONLY ARBITRATE OR LITIGATE ON AN INDIVIDUAL CLAIMS BASIS ONLY AND FOR YOUR OWN LOSSES ONLY. UNDER THIS AGREEMENT, YOU MAY NOT PROCEED IN ARBITRATION OR COURT AS A CLASS REPRESENTATIVE, MEMBER OR PART OF ANY PROPOSED CLASS, COLLECTIVE ACTION, PRIVATE ATTORNEY GENERAL SUIT, QUI TAM ACTION OR ANY REPRESENTATIVE PROCEEDING, OR OTHERWISE SEEK TO RECOVER ON BEHALF OF OTHERS OR FOR THE BENEFIT OR USE OF OTHERS IN ANY TYPE OF CLAIM OR ACTION. YOU AND MODO ARE EACH WAIVING RESPECTIVE RIGHTS TO PARTICIPATE IN A CLASS ACTION. BY ACCEPTING THIS AGREEMENT, YOU GIVE UP YOUR RIGHT TO**

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 55 of 103

**PARTICIPATE IN ANY PAST, PENDING OR FUTURE CLASS ACTION OR ANY OTHER CONSOLIDATED OR REPRESENTATIVE PROCEEDING, INCLUDING ANY PROCEEDING EXISTING AS OF THE DATE YOU AGREED TO THIS AGREEMENT.**

**17.17** Severability. This Agreement applies solely to the extent permitted by law. If for any reason any provision of this Agreement or portion thereof, is found to be unlawful, void, or unenforceable, that part of this Agreement will be deemed severable and shall not affect the validity and enforceability of the remainder of this Agreement which shall continue in full force and effect. To the fullest extent allowable by law and equity, the parties agree that any such provision may be blue-penciled or otherwise construed by the forum presiding over any dispute to give effect to the intent of the parties and consistent with the overall purpose and intent of the agreement, and may be deemed replaced by an enforceable provision that comes closest to the intention underlying the unenforceable provision.

**END OF SECTION 16 ARBITRATION AGREEMENT**

**18. Waiver of Jury Trial**

**18.1** EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THE PLATFORM OR SERVICES OR ANY TRANSACTIONS BETWEEN THE PARTIES, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY.

**19. Miscellaneous**

**19.1** Entire Agreement. These Terms constitute the entire agreement between You and us with respect to Your use of the Service and supersede all prior or contemporaneous communications and proposals, whether electronic, oral or written, between You and us with respect to Your participation.

**19.2** Tax. You are solely responsible for any taxes which apply to Your use of the Service.

**19.3** Force Majeure. We will not be liable or responsible for any failure to perform, or delay in performance of, any of our obligations under these Terms that is caused by events outside of our reasonable control, including but not limited to an act of God, hurricane, war, fire, riot, earthquake, weather, pandemic or endemic, terrorism, act of public enemies, strikes, labor shortage, actions of governmental authorities or other *force majeure* event.

**19.4** Severability. In the event any provision of these Terms is held unenforceable, such provision will be ineffective but shall not affect the enforceability of the remaining provisions. To the fullest extent allowable by law and equity, the parties agree that any such provision may be blue-penciled or otherwise construed by the forum presiding over any dispute to give effect to the intent of the parties and consistent with the overall purpose and intent of the agreement, and may be deemed replaced by an enforceable provision that comes closest to the intention underlying the unenforceable provision.

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 56 of 103

**19.5** Assignment. These Terms are personal to You, and are not assignable, transferable or sub-licensable by You except with our prior written consent. We reserve the right to assign, transfer or delegate any of our rights and obligations hereunder to any third party without notice to You, and in such case the Terms shall apply to and bind any successor-in-interest or assignee of ours.

**19.6** Third-Party Beneficiaries. You further agree and intend that these Terms are entered into for the express benefit of your spouse, heirs, children and next-of-kin and shall bind same to the extent of any claims arising from your use of the Service which is brought by them or by any person for their use or benefit.

**19.7** Entire Agreement. These Terms contain the entire understanding between You and us, and supersede all prior understandings between You and us relating to the subject matter.

**19.8** Business Transfers. In the event we undergo a change of control, merger, acquisition, or sale of assets, Your User Account and associated data may be part of the assets transferred to the purchaser or acquiring party.

**19.9** Waiver. Our failure to assert breach or a violation of these Terms or otherwise failure to exercise any rights under these Terms shall not constitute or be deemed a waiver or forfeiture of such rights or a waiver or forfeiture of such rights in the future.

**19.10** Survival of Obligations. SECTIONS 13, 14, 15, 16, 17 and 19 SHALL BE DEEMED TO SURVIVE THE TERMINATION OF THESE TERMS OF USE OR YOUR USER ACCOUNT FOR ANY REASON.

**20. Applicable Law and Jurisdiction**

**20.1** Governing Law. Subject to the Arbitration Agreement contained in Section 16, which is governed by the Federal Arbitration Act, the parties agree that these Terms and the related Service are governed by and shall be construed in accordance with the laws of the State of Delaware without regard to its principles of conflicts of law. To the extent this governing law provision is finally determined to be unenforceable as it relates to the use of the Services, the parties agree that the governing law shall in such event be the applicable law in the jurisdiction in which the user who is a party to the dispute properly utilizes the services. Nothing herein is intended to limit a party's right to appeal a determination by a court of law that the laws of the State of Delaware are unenforceable.

**20.2** Exclusive Forum. Subject to the Arbitration Agreement contained in Section 16, the parties agree that any dispute, controversy, or claim arising out of or in connection with these Terms, or the breach, termination or invalidity of these Terms, will be submitted exclusively to state or federal courts in Delaware and You and we consent to the venue and personal jurisdiction of those courts. Notwithstanding the foregoing, any motion to compel arbitration or to enforce an arbitral award issued hereunder may be brought before any court of competent jurisdiction.

# EXHIBIT C

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 58 of 103

**UNITED STATES DISTRICT COURT**
**DISTRICT OF OREGON**
**PORTLAND DIVISION**

| | |
|---|---|
| BETHANY ANDERSON, on behalf of themselves and other similarly situated,<br>Plaintiff,<br>v.<br>ARB GAMING, LLC, d/b/a Modo.us,<br>Defendant. | Case No.: 6:25-cv-2069-AP<br>**DECLARATION IN SUPPORT** |

**DECLARATION OF WILLIAM COLELLO IN SUPPORT OF DEFENDANT ARB GAMING, LLC D/B/A MODO'S MOTION TO COMPEL ARBITRATION**

I, William Colello, on oath depose and state as follows:

1. I am the Vice President of Player Operations of ARB Gaming, LLC d/b/a MODO ("ARB"), and in this capacity, I am familiar with the corporate and organizational structure as well as the operations of ARB.

2. I provide this Declaration in support of ARB's Motion to Compel Arbitration of the claim asserted by Plaintiff Bethany Anderson ("Plaintiff") against ARB.

3. I am over eighteen years old and capable of testifying as to the facts set forth in this Declaration based on my own personal knowledge.

4. I have reviewed the putative class action Complaint filed by Plaintiff dated November 6, 2025.

5. It is my understanding from the Complaint that Plaintiff asserts three causes of action: (1) declaratory judgment that ARB's games are illegal, pursuant to 28 U.S.C §§ 2201, *et seq.*; (2) recovery under the Oregon gambling loss recovery statute, Or. Rev. Stat. § 30.720, *et seq.* (the "Oregon Loss Recovery Act" or "LRA"); and (3) violations of the Unlawful Trade Practices Act, Or. Rev. Stat. § 646.605, *et seq*. It is my further understanding that Plaintiff alleges his claims



DM1\20481702.1

pursuant to the Oregon Loss Recovery Act, on the theory that the games offered by ARB constitute unlawful gambling under Oregon law.

6. ARB offers customers the ability to access its free-to-play social games online designed solely for amusement and entertainment through the following URL: modo.us (the "Platform").

7. In order to use the Platform, all persons were and are required to agree to certain Terms of Use provided on the Platform.

8. Under all applicable Terms of Use (collectively, the "Terms") agreed to by all customers of ARB's platform, claims of ARB and all its customers arising from or relating to ARB's Platform and services were and are subject to mandatory and binding arbitration.

9. At all relevant times hereto, in order to have accessed, used, or played games on ARB's Platform and services or to make any purchases, ARB's Platform required all customers to first create a customer account and register a user account. This process required users to take affirmative steps to agree to the applicable Terms.

10. At all relevant times, in order to create an account on the Platform, each customer was directed to a screen wherein they were required to check a box next to a statement that included the language, "I agree with the Terms of Service and Sweepstakes Rules," prior to completion of registration.

11. **Figure 1** below is a true and accurate screenshot depicting an example of the initial screen encountered by all persons when attempting to sign up to create and use the Platform and services for the first time.




**FIGURE 1, Registration and Clickwrap Acceptance Form**

12. Though the exact language of the excluded states may have varied, during the relevant period, the Terms of Use were hyperlinked and were bolded and in bright blue font against a dark background, as shown in **Figure 1**.

13. At all relevant times hereto, no ARB customer could have used or accessed the ARB Platform and its services, or made any purchases on or through the Platform, unless the customer first agreed to and accepted the then-applicable Terms in accordance with the procedures described above in ¶¶ 7–12.

14. In addition to requiring new customers to accept the then-applicable Terms at the time of registration, from time-to-time ARB has amended its Terms.

15. Though the exact language of the Terms may have varied, all versions of the applicable Terms during the relevant time period required arbitration of all past, present or pending, and future disputes.

16. After every amendment to the Terms described in ¶¶ 14-15, every Platform user was required to re-agree to the amended Terms as a condition of continued use of the Platform and its services, upon the user's next login to or access of the Platform.

17. Plaintiff is a customer and user of the Platform. On or about August 8, 2024, Plaintiff created a customer account and registered with ARB prior to playing any games, and Plaintiff last played on the Platform on October 10, 2025, and last logged into her account on November 13, 2025.

18. Pursuant to the amendments to the Terms, Plaintiff accepted and re-agreed to the then-applicable Terms in place as a condition of continued use, and did not opt-out of the arbitration agreement pursuant to the Terms.

19. The most recent version of the Terms that Plaintiff accepted and agreed to was the version dated August 4, 2025 Terms (hereafter, the "August 2025 Terms"). A true and accurate copy of the August 2025 Terms is attached hereto as Exhibit A.

20. The August 2025 Terms included the following notice at the beginning:

> IMPORTANT NOTICES
>
> . . .
>
> THESE TERMS OF USE INCLUDE AN ARBITRATION AND CLASS ACTION WAIVER AGREEMENT WHICH REQUIRES THAT ANY PAST, PENDING, OR FUTURE DISPUTES BETWEEN YOU AND US SHALL BE RESOLVED BY FINAL AND BINDING ARBITRATION ON AN INDIVIDUAL BASIS ONLY AND FOR YOUR OWN LOSSES ONLY. YOU MAY NOT PROCEED AS A CLASS REPRESENTATIVE, MEMBER OR PART OF ANY PROPOSED CLASS, COLLECTIVE ACTION, PRIVATE ATTORNEY GENERAL SUIT, QUI TAM ACTION OR ANY REPRESENTATIVE PROCEEDING, OR OTHERWISE



DM1\20481702.1

> SEEK TO RECOVER ON BEHALF OF OTHERS OR FOR THE BENEFIT OF OTHERS IN ANY TYPE OF CLAIM OR ACTION. ARBITRATION MEANS YOU WILL NOT BE ABLE TO SEEK DAMAGES IN COURT OR PRESENT YOUR CASE TO A JURY, UNLESS OTHERWISE PERMITTED BY THESE TERMS.
>
> OPT-OUT. IF YOU DO NOT WISH TO BE SUBJECT TO ARBITRATION ON A RETROACTIVE BASIS AND AS TO ANY FUTURE CLAIMS, AND YOU HAVE NOT PREVIOUSLY AGREED TO AN ARBITRATION PROVISION WITH US IN CONNECTION WITH YOUR USE OF OUR SERVICES, YOU MAY OPT OUT OF THE ARBITRATION AGREEMENT WITHIN THIRTY (30) DAYS OF ENTERING THIS AGREEMENT BY FOLLOWING THE INSTRUCTIONS PROVIDED IN THE "BINDING ARBITRATION AGREEMENT AND CLASS ACTION WAIVER" – SEE SECTION 16 OF THESE TERMS, BELOW. OPT-OUT REQUESTS SENT AFTER THE THIRTY (30) DAY PERIOD SHALL BE NULL AND VOID. EVEN IF YOU OPT OUT OF THE ARBITRATION AGREEMENT IN SECTION 16, ALL OTHER REMAINING SECTIONS OF THESE TERMS APPLY.

Ex. A, at 1.

21. The August 2025 Terms of the Terms also include a broad arbitration provision requiring that all past, pending, and future disputes be arbitrated, and that questions of arbitrability, enforceability, and validity be determined by an arbitrator:

> You and Modo agree that ***any past, pending, or future dispute, claim or controversy*** arising out of or relating to any purchase or transaction by you, your access to or use of any Platform or the Service, or to this Agreement, the Terms of Use, or Privacy Policy (including without limitation ***any dispute concerning*** the breach, enforcement, construction, ***validity, interpretation, enforceability, or arbitrability*** of this Agreement or the Terms of Use) (a "Dispute"), ***shall be determined by arbitration***, including claims that arose before acceptance of any version of this Agreement.

Ex. A, at § 17.2.

22. All versions of the Terms during the relevant time period required arbitration of all past, present or pending, and future disputes subject to application of either the AAA or JAMS Rules. *See* Ex. A, § 17.10 (specifying JAMS). The exception being that ARB and customers "retain the right to seek relief in a small claims court" for disputes within the scope of small claims court jurisdiction. *See, e.g.*, Ex. A, § 17.3.



DM1\20481702.1

23. Though the exact language of each version of the Terms in effect during the relevant time period may have varied, each such version of the Terms contained an arbitration agreement wherein the parties agreed to arbitrate disputes on an individual basis. *See* Ex. A, at 1 ("These terms of use include an arbitration and class action waiver agreement which requires that any past, pending, or future disputes between you and us shall be resolved by final and binding arbitration on an ***individual*** basis only and for your own losses only.") (emphasis added) (capitalization omitted); *id.* at §17.16 ("You may only arbitrate or litigate on an ***individual*** claims basis only and for your own losses only.") (emphasis added) (capitalization omitted).

24. The August 2025 Terms additionally required arbitration of all disputes subject to application of the Judicial Arbitration and Mediation Services, Inc. ("JAMS") rules. *See id.* § 17.10 ("Initiating Arbitration Under JAMS Rules").

25. Pursuant to the August 2025 Terms, ARB its customers agreed to arbitrate disputes on an individual basis and waived their rights to a trial by jury. *See id.* §§ 17.16 ("You may only arbitrate or litigate on an individual claims basis only and for your own losses only.") (capitalization omitted), 18 ("Waiver of Jury Trial").

26. Though the exact language of each version of the Terms in effect during the relevant period may have varied, each such version of the Terms contained an arbitration provision wherein the Platform users unconditionally waived their rights at least to bring, participate in, or recover relief from any class, collective, or other representative action. *See* Ex. A, § 17, 17.16.

27. Pursuant to the August 2025 Terms, the specific class action waiver stated:

> TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER YOU NOR MODO SHALL BE ENTITLED TO ARBITRATE OR LITIGATE ANY DISPUTE IN A REPRESENTATIVE CAPACITY. YOU MAY ONLY ARBITRATE OR LITIGATE ON AN INDIVIDUAL CLAIMS BASIS ONLY AND FOR YOUR OWN LOSSES ONLY. UNDER THIS AGREEMENT, YOU MAY NOT PROCEED IN ARBITRATION OR COURT AS A CLASS REPRESENTATIVE,

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 64 of 103

> MEMBER OR PART OF ANY PROPOSED CLASS, COLLECTIVE ACTION, PRIVATE ATTORNEY GENERAL SUIT, QUI TAM ACTION OR ANY REPRESENTATIVE PROCEEDING, OR OTHERWISE SEEK TO RECOVER ON BEHALF OF OTHERS OR FOR THE BENEFIT OR USE OF OTHERS IN ANY TYPE OF CLAIM OR ACTION. YOU AND MODO ARE EACH WAIVING RESPECTIVE RIGHTS TO PARTICIPATE IN A CLASS ACTION. BY ACCEPTING THIS AGREEMENT, YOU GIVE UP YOUR RIGHT TO PARTICIPATE IN ANY PAST, PENDING OR FUTURE CLASS ACTION OR ANY OTHER CONSOLIDATED OR REPRESENTATIVE PROCEEDING, INCLUDING ANY PROCEEDING EXISTING AS OF THE DATE YOU AGREED TO THIS AGREEMENT.

*See id.* § 17.16.

28. At all relevant times hereto, customers who made purchases on or through the Platform and its services would have had to agree to be bound to the Terms via the procedures described in ¶¶ 7–12 above.

29. I and ARB know this to be true and accurate because all new users of the Platform would have been required to follow the registration and acceptance procedures described above in ¶¶ 7–12 in order to create and register for any account, and no purchases would have been possible on or through the Platform and its services unless and until the customer had created an account and agreed to and accepted the then-applicable Terms.

30. I and ARB further know this to be true and accurate because, at all relevant times hereto, all existing ARB customers would have been required to accept the then-applicable Terms through the procedures described above in ¶¶ 7–12 as a condition of continued use of ARB's Platform and services.

31. Accordingly, all claims by and between ARB and its customers, including Plaintiff, by agreement to the Terms, are mutually subject to mandatory and binding arbitration.

[*signature page follows*]

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 65 of 103

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 1/9/2026 day of January 2026

Signed by:
William Colello
0CB23621590E41E...

Name: William Colello
Title: Vice President of Player Operations
ARB Gaming, LLC



DM1\20481702.1

**CERTIFICATE OF SERVICE**

I hereby certify that on January 9, 2026, a true and correct copy of **DECLARATION OF WILLIAM COLELLO IN SUPPORT OF DEFENDANT ARB GAMING, LLC D/B/A MODO'S MOTION TO COMPEL ARBITRATION** was served on all parties and counsel of record via the CM/ECF System.

*/s/ Janice Reeder*
Janice Reeder,
an employee of Duane Morris LLP

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 67 of 103

# EXHIBIT D

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 68 of 103

Tyson E. Hafen (UT Bar No. 14188)
**DUANE MORRIS LLP**
100 North City Parkway, Suite 1560
Las Vegas, NV 89106
Tele: 702.868.2600; Fax: 702.385.6862
E-Mail: tehafen@duanemorris.com

WILLIAM M. GANTZ (*pro hac vice* forthcoming*)*
**DUANE MORRIS LLP**
100 High Street, Suite 2400
Boston, MA 02110-1724
T: 857.448.4234; F: 857.401.3026
Email: BGantz@duanemorris.com

Attorneys for Defendants *ARB Gaming, LLC* and *ARB Gaming Interactive Incorporated*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH**

| | |
|---|---|
| NATHAN WALKER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ARB GAMING, LLC and ARB INTERACTIVE INCORPORATED,<br><br>Defendants. | Case No.: 2:25-cv-00991-JCB<br><br>**DEFENDANTS ARB GAMING, LLC AND ARB INTERACTIVE INC'S MOTION TO COMPEL ARBITRATION AND MEMORANDUM OF LAW IN SUPPORT** |

Pursuant to the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* (the "FAA"), Defendants ARB Gaming, LLC and ARB Interactive Incorporated (collectively, "ARB") move this Court for an order compelling Plaintiff Nathan Walker ("Plaintiff"), a customer of ARB, to submit his claims against ARB to individual arbitration and stay any further litigation activity and deadlines applicable until the completion of such arbitration. As grounds for this Motion to Compel

Arbitration, ARB relies on the accompanying Memorandum of Law in Support and the concurrently filed supporting Declaration of William Colello.

Contemporaneous with this Motion to Compel Arbitration, ARB has filed a Motion to Dismiss for lack of personal jurisdiction. Accordingly, ARB respectfully requests that this Court first address the Motion to Dismiss.

Subject to the above requested order of review, to the extent this Court does not dismiss this action for lack of personal jurisdiction as requested in the contemporaneously filed Motion to Dismiss, ARB respectfully requests this Court enter an order compelling arbitration of Plaintiff's claims on an individual basis for the reasons outlined herein, and for such other and further relief that the Court deems just and proper.

Dated: March 6, 2026

Respectfully submitted,

**DUANE MORRIS LLP**

*/s/ Tyson E. Hafen*
Tyson E. Hafen (UT Bar No. 14188)
William M. Gantz (*pro hac vice* forthcoming)

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 70 of 103

**TABLE OF CONTENTS**

I. INTRODUCTION .......... **Error! Bookmark not defined.**

II. STATEMENT OF THE FACTS .......... 2

A. The Parties and Claims .......... 2

B. All Users of the Platform Agreed to the Terms and Arbitration Provisions .......... 3

III. ARGUMENT .......... 6

A. Legal Standard .......... 6

B. Plaintiff Agreed to Mandatory Arbitration Provisions .......... **Error! Bookmark not defined.**

C. The Terms Delegated Questions of Arbitrability to the Arbitrator .......... 9

D. The Class Action Waiver is Enforceable .......... 15

## TABLE OF AUTHORITIES

**Cases**

*Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228 (2013)....1, 6, 15

*Ambrosia v. Blazesoft Ltd.*, No. 25 C 1723, 2025 WL 2976477 (N.D. Ill. Oct. 21, 2025)....12

*AT&T Mobility LLC v. Concepcion,* 563 U.S. 333 (2011)....6, 15

*Awuah v. Coverall N. Am., Inc.*, 554 F.3d 7 (1st Cir. 2009)....10

*Ball v. Skillz Inc.*, No. 2:20-cv-00888-JAD-BNW, 2020 WL 6685514 (D. Nev. Nov. 12, 2020)....13

*Belnap v. Iasis Healthcare*, 844 F.3d 1272 (10th Cir. 2017)....10

*Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842 (6th Cir. 2020)....10

*Boatner v. SSPS LLC*, No. 25 Civ. 3251 (DEH), 2025 WL 3281509 (S.D.N.Y. Nov. 25, 2025)....12

*Boyle v. Sweepsteaks Ltd.*, No. 8:25-cv-00302-JVS-ADS, 2025 WL 1674480 (C.D. Cal. May 19, 2025).... 11-12

*Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440 (2006).... 10-12, 14

*Christensen v. Desert Rock Cap., Inc.*, No. 2:24-cv-00808-RJS-CMR, 2025 WL 1135598 (D. Utah Apr. 17, 2025)....16

*Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52 (2003)....6

*Curran v. Sideprize LLC*, No. 2477CV01075, 2025 WL 1927786 (Mass. Super. Ct. Apr. 30, 2025).... 13-14

*Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213 (1985)....2, 7

*Doe v. VGW Malta Ltd.*, No. 1:23-CV-3226-TWT, 2023 WL 8234650 (N.D. Ga. Nov. 28, 2023)....12

*Fair Gaming Advocs. MA LLC v. VGW Holdings Ltd.*, No. 2384-CV-02451, 2024 WL 5279408 (Mass. Super. Dec. 17, 2024)....13

*Fedor v. United Healthcare, Inc.*, 976 F.3d 1100 (10th Cir. 2020)....2

*Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991)....9

*Hancock v. Am. Tel. & Tel. Co., Inc.*, 701 F.3d 1248 (10th Cir. 2012)....8

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 72 of 103

*Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63 (2019) ....9

*Lewis v. Eassit, Inc.*, No. 2:22-CV-00121-HCN-DAO, 2023 WL 2522812 (D. Utah Mar. 15, 2023) ....15

*Love v. Overstock.com, Inc.*, No. 2:22-cv-00118-DBB-CMR, 2022 WL 3345730 (D. Utah Aug. 12, 2022) ....10

*Lowery v. N.A.R., Inc.*, No. 2:18-cv-00480-JNP-PMW, 2019 WL 1099710 (D. Utah Mar. 8, 2019) ....15

*M.M. v. Sweepsteakes Ltd.*, No. 25-11481-RGS, 2025 WL 3240413 (D. Mass. Nov. 20, 2025) .... 11-12

*Mid Atl. Cap. Corp. v. Bien*, 956 F.3d 1182 (10th Cir. 2020) ....6

*Miller v. Corinthian Colleges, Inc.*, 769 F.Supp.2d 1336 (D. Utah 2011) ....15

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1 (1983)....7, 9

*Munoz v. Conduent State & Loc. Sols., Inc.*, No., 2025 WL 799482 (10th Cir. Mar. 13, 2025) ....3

*Nessim v. Fliff, Inc.*, No. 5:23-cv-01048-SSS-SHKx, 2024 WL 1600649 (C.D. Cal. Jan. 5, 2024) ....12

*Pagano v. NordicTrack, Inc.*, 749 F.Supp.3d 1183 (D. Utah 2024) .... 8-9

*Penhall v. Young Living Essential Oils, LC*, No. 2:20-cv-00617-DBB-CMR, 2022 WL 15504063 (D. Utah Oct. 27, 2022) .... 8-9

*Prima Paint Corp. v. Flood & Conklin Mfg., Co.*, 388 U.S. 395 (1967)....10, 12

*Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63 (2010) ....2

*United States v. Carroll*, 105 F.3d 740 (1st Cir. 1997)....6

*United States v. McEwan*, 445 F.3d 237 (3rd Cir. 2006)....6

*Volt Info. Scis., Inc. v. Bd. of Trs. of the Leland Stanford Junior Univ.*, 489 U.S. 468 (1989)....9

*Zions Mgmt. Servs. v. Record*, 305 P.3d 1062 ....6

**Statutes**

Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* .... *passim*

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 73 of 103

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS ARB GAMING, LLC AND ARB INTERACTIVE INC'S MOTION TO COMPEL ARBITRATION**

## I. INTRODUCTION

Plaintiff Nathan Walker ("Plaintiff"), a customer of ARB Gaming, LLC ("ARB Gaming") and ARB Interactive Incorporated ("ARB Interactive," and together with ARB Gaming, "ARB"), filed his putative Class Action Complaint on November 2, 2025, asserting a single cause of action against ARB: recovery under Utah's Gambling Act, Utah Code Ann. § 76-9-1401, *et seq.* Plaintiff's claims are subject to arbitration on an individual basis because every Utah customer of ARB's platform (modo.us, the "Platform")—including Plaintiff himself—affirmatively accepted and agreed to arbitrate individually through the Terms of Use (collectively, the "Terms"), each of which included a class action waiver and provision requiring ***arbitration of all past, pending, and future disputes***. *See* William Colello in Support of Defendant ARB Gaming, LLC and ARB Interactive Incorporated's Motion to Compel Arbitration ("Colello Decl.") ¶¶ 8, 15, 20-23, attaching Exhibit A (the relevant Terms).

The arbitration provisions are "valid[ and] irrevocable," 9 U.S.C. § 2, and must be "rigorously enforce[d] . . . according to their terms." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013). Plaintiff, an actual user of the Platform, is obligated to arbitrate his dispute pursuant to the Terms. And, to allow Plaintiff to seek class representation of other users without regard to the Terms that apply to the other users themselves, would afford Plaintiff greater rights than the users who are also bound by the applicable Terms

## II. STATEMENT OF THE FACTS

### A. The Parties and Claims

ARB offers customers the ability to access its free-to-play online social gaming platform designed solely for amusement and entertainment through the Platform, accessible at the following URL: modo.us. Colello Decl. ¶ 6. The Platform does not provide any essential or critical service, rather its users voluntarily choose whether to participate, and its users are free to stop playing at any time without consequence. The Terms, which includes an arbitration clause, present users with clear, straightforward terms governing their use of the platform.

Plaintiff is a Utah resident who played ARB's games and now seeks to represent a putative class of Utah residents who allegedly played on ARB's games. Compl. ¶¶ 6, 40. His allegations against ARB in this case arise from his use of the Platform. *See id.* ¶ 36–39. Indeed, Plaintiff's claims arise directly from the services provided by ARB that Plaintiff used and the Terms he accepted when registering his account before playing any games.

Pursuant to the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* (the "FAA"), arbitration agreements are valid, irrevocable, and enforceable. 9 U.S.C. §§ 2-4; *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985). And because Plaintiff's claim falls within the scope of the arbitration agreement, and because any challenges to enforceability are to be decided by the arbitrator under the delegation clause, the Court should compel arbitration and stay this case pending its outcome. *See Fedor v. United Healthcare, Inc.*, 976 F.3d 1100, 1105 (10th Cir. 2020) ("While courts typically resolve 'arbitrability' issues such as validity, scope, or enforcement of an arbitration contract, delegation clauses within arbitration contracts can commit the determination of such issues to an arbitrator." (internal citations omitted) (citing *Granite Rock Co. v. Int'l Bhd of Teamsters*, 561 U.S. 287, 298 (2010)); *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S.

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 75 of 103

63, 68–69 (2010)); *see also Munoz v. Conduent State & Loc. Sols., Inc.*, No. , 2025 WL 799482, at * (10th Cir. Mar. 13, 2025) ("Unless the agreement provides otherwise, courts resolve threshold arbitrability questions 'such as the validity, scope, or enforcement of an arbitration contract,' but the parties may choose to 'commit the determination of such issues to an arbitrator' via a delegation clause in the arbitration agreement." (internal citation omitted) (citing *Fedor*, 976 F.3d at 1105)).

**B. All Users of the Platform Agreed to the Terms and Arbitration Provisions**

At all relevant times hereto, ARB required all users to first create a user account and register with the Platform prior to accessing, using, or playing any games on it. Colello Decl. ¶¶ 7-10. The Platform also required all users to agree to and accept the then-applicable Terms, each of which included an arbitration provision during the relevant period. *Id.* ¶¶ 7-10, 13-15.

A new user who wished to access the Platform must have affirmatively accepted and agreed to the Terms. *Id.* ¶¶ 7-9, 14, 29. In order to use or access the Platform in Utah, all users were required by the programming and operation of the Platform to first create a user account and register with the Platform. *Id.* In order to access any of the games, all users were and are required to accept and agree to the Terms. *Id.* Acceptance of the Terms is and was accomplished by checking a box next to a statement that included the language "I agree with the Terms of Service and Sweepstakes Rules," prior to the confirmation of completion of the sign-up process. *Id.* ¶¶ 10-13. The statement is directly above a greyed-out button saying "Submit," and within the statement the hyperlinks to the "Terms of Service," and "Sweepstakes Rules" are bolded and in bright blue font against a dark background. *Id.* ¶¶ 10-13.

All of these features are reflected in the example screenshot below:




*Id.* ¶ 11 (**Figure 1**). In addition to requiring new users to accept the then-applicable Terms at the time of registration, from time-to-time the Terms were amended. *Id.* ¶¶ 14-18. After every amendment to the Terms during the relevant period, every Platform user was required to re-agree to the amended Terms as a condition of continued use of the Platform and its services, upon their next login to or access of the Platform. *Id.*

When users accessed the Terms, all versions included a notice of the arbitration provision at the beginning. *Id.* ¶ 20. As a customer himself, Plaintiff created a customer account on June 21, 2024, and registered with ARB prior to playing any games. *Id.* ¶ 17. Pursuant to the amendments to the Terms, Plaintiff accepted and re-agreed to the then-applicable Terms in place as a condition of continued use. *Id.* ¶¶ 18-19. The most recent version of the Terms that Plaintiff accepted and agreed to was the Terms dated August 4, 2025 (hereafter, the "August 2025 Terms"). *See id.* ¶ 19.

Importantly, the August 2025 Terms required arbitration of all disputes subject to application of the Judicial Arbitration and Mediation Services, Inc. ("JAMS"), *id.* ¶ 24; Ex. A, § 17.10, and required that questions of arbitrability, enforceability, and validity be determined by an arbitrator. *Id.* ¶ 21; Ex. A, § 17.2 ("You and MODO agree that any ***past, pending or future dispute,***

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 77 of 103

***claim or controversy*** . . . (including without limitation any dispute concerning the breach, enforcement, construction, validity, interpretation, enforceability or arbitrability of this Agreement of the Terms of Use) . . . shall be determined by arbitration.") (emphasis added). Likewise, pursuant to the August 2025 Terms, ARB and its customers agreed to arbitrate disputes on an individual basis and waived their rights to a trial by jury. *Id.* ¶¶ 23-25; Ex. A, at § 17.16 ("You may only arbitrate or litigate on an individual claims basis only and for your own losses only."), 18 ("Waiver of Jury Trial"). Additionally, pursuant to the August 2025 Terms, ARB's customers also unconditionally waived their rights at least to bring, participate in, or recover relief from any class, collective, or other representative action. *Id.* ¶¶ 23, 26-27; Ex. A, § 17.16.

Again, all versions of the Terms during the relevant time period required arbitration of all disputes subject to application of AAA or JAMS Rules, and included an opt out provision. *Id.* ¶ 22 (identifying JAMS as applicable Rules for Plaintiff's claim, and affirming unattached versions contained similar provisions through AAA or JAMS). Though the exact language of each version of the Terms in effect during the relevant time period may have varied, each such version of the Terms contained: (1) an arbitration agreement wherein the parties agreed to arbitrate disputes on an individual basis and waived their rights to a trial by jury; (2) a provision to "opt out" of the arbitration agreement provision; and (3) a waiver to bring, participate in, or recover relief from any class, collective, or other representative action. *Id.* ¶ 18-20, 26-27; *id.* ¶¶ 22-23, 26 (affirming that unattached versions contained the same material provisions). Therefore, Plaintiff (and all users who accessed or used the Platform), would have had to agree to be bound by all versions of the Terms, including the class action waiver provision and arbitration agreement. *Id.* ¶¶ 28-30.

Accordingly, all claims by the Platform users—including Plaintiff's claims—by agreement to the Terms, are mutually subject to mandatory and binding arbitration. *Id.* ¶ 31.

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 78 of 103

## III. ARGUMENT

### A. Legal Standard

The FAA applies to (1) "written [arbitration] provision[s]" (2) "evidencing a transaction involving commerce." 9 U.S.C. § 2. The FAA covers interstate commerce and intrastate commerce that would, "in the aggregate," have a "substantial effect on interstate commerce." *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56-57 (2003). The arbitration provision in the Terms is in writing, and the Platform permits online gaming, which are "transaction[s] involving interstate commerce." *See, e.g., United States v. Carroll*, 105 F.3d 740, 742 (1st Cir. 1997) ("Transmission of photographs by means of the Internet is tantamount to moving . . . across state lines and thus constitutes . . . interstate commerce."); *United States v. McEwan*, 445 F.3d 237, 245 (3rd Cir. 2006) ("[T]he Internet is an instrumentality and channel of interstate commerce[.]"). Furthermore, ARB is not located in Utah, so any alleged transactions involving the Platform and residents of Utah must be interstate. Thus, the FAA applies to the transactions at issue.

Under the FAA, arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA reflects a "liberal federal policy favoring arbitration," *AT&T Mobility LLC v. Concepcion,* 563 U.S. 333, 344-46 (2011), and requires courts to compel arbitration "upon being satisfied that the making of the agreement for arbitration . . . is not in issue." 9 U.S.C. § 4; *see also Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013) ("[C]ourts must 'rigorously enforce' arbitration agreements according to their terms[.]" (internal citations omitted)); *Mid Atl. Cap. Corp. v. Bien*, 956 F.3d 1182, 1192 (10th Cir. 2020) ("[The FAA's] ''principal purpose' . . . is to 'ensur[e] that private arbitration agreements are enforced according to their terms.'" (first alteration added) (quoting *AT&T Mobility LLC*, 563 U.S. at 344)); *Zions Mgmt. Servs. v. Record*,

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 79 of 103

305 P.3d 1062, 1067 ("[T]he FAA 'was designed to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate' and to 'ensure the enforceability, according to their terms, of private agreements to arbitrate.'" (quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of the Leland Stanford Junior Univ.*, 489 U.S. 468, 474, 476 (1989)). "[The FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts ***shall*** direct the parties to proceed to arbitration on issues as to which an arbitration agreement" applies. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).

Similarly, the Utah Uniform Arbitration Act ("UUAA") provides that "[a]n agreement contained in a record to submit to arbitration any existing or subsequent controversy arising between the parties to the agreement is valid, enforceable, and irrevocable except upon a ground that exists at law or in equity for the revocation of a contract." Utah Code § 78B-11-107. Utah courts have consistently held arbitration clauses to be enforceable. The plain language of the UUAA requires a court to compel arbitration once it determines that a valid agreement to arbitrate exists. The UUAA states as follows:

> (1) On motion of a person showing an agreement to arbitrate and alleging another person's refusal to arbitrate pursuant to the agreement:
>
> > (a) if the refusing party does not appear or does not oppose the motion, the court shall order the parties to arbitrate; and
> >
> > (b) if the refusing party opposes the motion, the court shall proceed summarily to decide the issue and order the parties to arbitrate unless it finds that there is no enforceable agreement to arbitrate.

§ 78B-11-108(1). Thus, once this Court finds a valid written agreement to arbitrate, the Court should compel arbitration upon an application therefor.

**B. Plaintiff Agreed to Mandatory Arbitration Provision**

As indicated above, Plaintiff, as well as all other users of the Platform, cannot register, use, or access the Platform without clicking a checkbox to affirm that they agree to the Terms when first registering and subsequently re-agreeing to the then-applicable Terms. Colello Decl. ¶¶ 7-10. The Terms are prominently displayed next to the checkbox—they are bolded and in bright blue font with hyperlinks against a dark background. *Id.* ¶¶ 11-12. In short, the Terms were accepted via a typical and enforceable "clickwrap" agreement process. "Clickwrap is a commonly used term for agreements requiring a computer user to 'consent to any terms or conditions by clicking on a dialog box on the screen in order to proceed with [a] . . . transaction.'" *Hancock v. Am. Tel. & Tel. Co., Inc.*, 701 F.3d 1248, 1255 (10th Cir. 2012) (quoting *Feldman v. Google, Inc.*, 513 F.Supp.2d 229, 236 (E.D. Pa. 2007)).

"Clickwrap agreements are increasingly common and 'have routinely been upheld.'" *Id.* at 1256 (quoting *Smallwood v. NCsoft Corp.*, 730 F.Supp.2d 1213, 1226 (D. Haw. 2010)). Courts, including the District of Utah, have regularly found such clickwrap agreements sufficient to provide reasonable notice of terms of use. *See, e.g.*, *Pagano v. NordicTrack, Inc.*, 749 F.Supp.3d 1183, 1190 (D. Utah 2024) (finding that "notice was conspicuous" as to the terms being agreed to where plaintiffs "were required to affirmatively click a checkbox located adjacent to a notice stating they had each read and agreed to the . . . Terms); *Penhall v. Young Living Essential Oils, LC*, No. 2:20-cv-00617-DBB-CMR, 2022 WL 15504063, at *5–6 (D. Utah Oct. 27, 2022) (finding plaintiff had reasonable notice where the agreement contained a paragraph stating that the individual had "read and agree[d] to be bound by the terms and conditions of the Agreement," the corresponding agreements were hyperlinked beneath the text, and under said hyperlinks, was a

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 81 of 183

checkbox next to text stating, "By clicking on this box, I agree to these statements and to be bound by the terms and conditions of this Agreement.").

Similarly, here, the Platform users had reasonable notice of the Terms, including the arbitration provisions therein. *See Pagano*, 749 F.Supp.3d at 1190; *Penhall*, 2022 L 155040063 at *5–6. ARB customers acknowledged and expressly agreed to the Terms by clicking the checkbox above to the "Submit" button. Plaintiff's inability to negotiate the Terms and that he could not have used ARB's Platform without agreeing to the Terms is irrelevant, and particularly more so when the Plaintiff's use of the Platform to seek entertainment was entirely elective on his part. Therefore, ARB's Terms—which Plaintiff agreed to—are enforceable clickwrap agreements.

**C. The Terms Delegated Questions of Arbitrability to the Arbitrator**

Any disputes concerning the scope of arbitrability were expressly delegated to the arbitrator. The FAA creates a strong, liberal policy in favor of arbitration. *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 (1991); *Volt Info. Scis., Inc.*, 489 U.S. at 475–76. The FAA's heavy presumption in favor of arbitrability requires courts to resolve all doubt as to the scope of arbitrable issues in favor of arbitration. *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24.

"[P]arties may agree to have an arbitrator decide not only the merits of a particular dispute but also '"gateway" questions of "arbitrability," such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 67-68 (2019).

Here, the August 2025 Terms—the last version that Plaintiff agreed to, Colello Decl. ¶ 19—delegated questions of arbitrability to the arbitrator. *Id.* ¶ 21, Ex. A, § 17.2 ("any past, present, or future dispute . . . shall be determined by arbitration."). That is clear and unmistakable evidence that the parties intended for the issue of arbitration to be arbitrated.

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 82 of 103

Further evidence that the arbitration provision delegates substantive arbitrability to the arbitrator lies in the fact that the August 2025 Terms required adherence to JAMS rules. *Id.* ¶ 24; Ex. A, § 17.10. The "incorporation" of arbitration rules that delegate arbitrability to the arbitrator "evidence[s] a clear and unmistakable intent to delegate questions of arbitrability to an arbitrator." *Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1279 (10th Cir. 2017); *see also Love v. Overstock.com, Inc.*, No. 2:22-cv-00118-DBB-CMR, 2022 WL 3345730, at *3–4 (D. Utah Aug. 12, 2022) (relying in part on *Belnap* in holding that "[b]ecause the arbitration clause plainly incorporates the AAA Rules, the court finds that the parties clearly and unmistakably intended for an arbitrator to decide arbitrability"). JAMS rules expressly provide that issues of jurisdiction and arbitrability shall be submitted to and ruled on by the arbitrator. (June 1, 2021), https://www.jamsadr.com/rules-streamlined-arbitration/#Rule-8. Incorporation of such arbitral rules into an arbitration agreement is independently sufficient to delegate all questions of arbitrability to the arbitrator ***as a matter of law***. *See, e.g.*, *Belnap*, 844 F.3d at 1279; *Love*, 2022 WL 3345730, at *3–4; *Awuah v. Coverall N. Am., Inc.*, 554 F.3d 7, 11 (1st Cir. 2009) (finding that incorporation of the AAA's Rule 7(a), which "says plainly that the arbitrator may 'rule on his or her own jurisdiction' including any objection to the 'existence, scope or validity of the arbitration agreement'" "is about as 'clear and unmistakable' as language can get" (citations omitted)); *Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842, 845–46 (6th Cir. 2020) ("[I]ncorporation of the [Arbitration] Rules (or similarly worded arbitral rules) provides 'clear and unmistakable' evidence that the parties agreed to arbitrate 'arbitrability.'").

While Plaintiff alleges that the Platform's games are unlawful—its claims still must be arbitrated pursuant to controlling precedent established by the United States Supreme Court in its seminal decisions in *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440 (2006), and *Prima*

*Paint Corp. v. Flood & Conklin Mfg., Co.*, 388 U.S. 395 (1967). *Buckeye* is directly on point in this regard. In that case, the Supreme Court decided the issue of "whether a court or an arbitrator should consider the claim that a contract containing an arbitration provision is void for illegality." *Buckeye*, 546 U.S. at 442. Applying the FAA, the Court found that when the "crux of the complaint is that the contract as a whole (including the arbitration provision) is rendered invalid" by an assertion of illegality, then "the issue of the contract's validity is considered by the arbitrator in the first instance." *Id.* at 445–46. The same result is mandated here—questions regarding illegality should be "considered by the arbitrator in the first instance." *Id.*

In fact, applying *Buckeye*, courts have routinely held that plaintiffs cannot avoid their arbitration agreements with other online casino-themed social game companies by challenging the terms as void gambling contracts. More recently, the District of Massachusetts and the Central District of California explicitly rejected identical arguments, in *M.M. v. Sweepsteakes Ltd.*, No. 25-11481-RGS, 2025 WL 3240413, at *1–2 (D. Mass. Nov. 20, 2025) and *Boyle v. Sweepsteaks Ltd.*, No. 8:25-cv-00302-JVS-ADS, 2025 WL 1674480, at *5 (C.D. Cal. May 19, 2025). Specifically, the District of Massachusetts compelled arbitration in *Sweepsteakes Ltd.*, where the defendant, operator of an online gaming platform, moved to compel arbitration alleging there was a contract between the parties that required "an arbitrator to resolve any disputes that might arise." *Sweepsteakes Ltd.*, 2025 WL 3240413, at *1. In contrast, the plaintiffs argued that "consideration was lacking, and that the agreement is a nonseverable provision of a contract that is void under Massachusetts law as contrary to public policy." *Id.* Nonetheless, the District of Massachusetts held that since the plaintiffs "agreed to a set of terms and conditions (the Terms and Conditions) in order to gain access to Sweepsteakes' gaming platform," that contained specific language

delegating "all questions of arbitrability to the arbitrator," then "the question of the validity of the arbitration agreement is to be resolved by the arbitrator." *Id.* at *1–2.

Similarly, in *Boyle*, the defendant was alleged to operate a casino-oriented internet gaming website, where users could play games such as slots, poker, and blackjack. 2025 WL 1674480, at *1. There too, the plaintiff argued that "the contract is void because it has an illegal purpose—online gambling," and that "*Buckeye* and *Prima Paint* are distinguishable," because "[w]hile the contracts in those cases were made for valid purposes but include unenforceable provisions, here, the contract was made with an illegal purpose." *Id.* at *5–6. The court disagreed, holding that "[u]nder California law, a contract that has an unlawful purpose and thus void is *an issue of enforceability, not formation*, and consequently controlled by *Buckeye* and its progeny." *Id.* at *5 (emphasis added). Accordingly, the court declined "to rule on the issue of illegality as it should be given to the arbitrator in the first instance" and held that "[w]hether the contract is void for illegality is a question for the arbitrator." *Id.* at *6; *see also Nessim v. Fliff, Inc.*, No. 5:23-cv-01048-SSS-SHKx, 2024 WL 1600649, at *1–10 (C.D. Cal. Jan. 5, 2024) (compelling dispute to arbitration despite allegations that "Fliff operates an illegal unregulated online sports book").

Other courts have reached similar results in suits against online gaming platforms alleged illegality. *See e.g.*, *Boatner v. SSPS LLC*, No. 25 Civ. 3251 (DEH), 2025 WL 3281509, at *2 (S.D.N.Y. Nov. 25, 2025) (declining to rule on the issue of illegality as it should be given to the arbitrator in the first instance); *Ambrosia v. Blazesoft Ltd.*, No. 25 C 1723, 2025 WL 2976477, at *4–5 (N.D. Ill. Oct. 21, 2025) (same); *Doe v. VGW Malta Ltd.*, No. 1:23-CV-3226-TWT, 2023 WL 8234650, at *3 (N.D. Ga. Nov. 28, 2023) (rejecting argument that "the arbitration provision" was void for illegality because "whether a contract was illegal or void" as impermissible "under

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 85 of 183

state law is a question for the arbitrator"); *Ball v. Skillz Inc.*, No. 2:20-cv-00888-JAD-BNW, 2020 WL 6685514, at *5 (D. Nev. Nov. 12, 2020).

For example, Massachusetts courts facing loss recovery act claims by *third party non-signatories* have also been compelled to arbitrate such claims under theories of estoppel and thus could not avoid the applicable arbitration provisions which actual customers were bound by. *See Fair Gaming Advocs. MA LLC v. VGW Holdings Ltd.*, No. 2384-CV-02451, 2024 WL 5279408 (Mass. Super. Dec. 17, 2024); *Curran v. Sideprize LLC*, No. 2477CV01075, 2025 WL 1927786 (Mass. Super. Ct. Apr. 30, 2025). In *Fair Gaming Advocates MA LLC*, an online gaming platform (VGW) was sued by a non-user "any person" seeking to recover the amount of all the alleged gambling losses of actual users of the "social casino" gaming platform under the Massachusetts gambling loss recovery statute. 2024 WL 5279408, at *1. The gaming platform's motion to compel arbitration was granted. *Id.* at *3. The court found that the plaintiff's "claim flow[ed] directly from Massachusetts residents' terms-of-service agreements" because Massachusetts residents were required to agree to the terms to play VGW's games and "the losses that provide the basis for [plaintiff]'s claim were all incurred as a direct result of playing [the games] pursuant to the terms of service." *Id.* at *2. The court in *Fair Gaming Advocates* thus granted VGW's motion to compel arbitration based on estoppel because the non-signatory plaintiff stood "in the shoes" of users who were signatories of the arbitration agreement. *Id.* at *2–3.

Similarly, in *Curran v. Sideprize LLC*, two online gaming operators (Underdog and PrizePicks) were sued by a third-party seeking to recover the amount of all the alleged gambling losses of actual users of the daily fantasy sports platforms. 2025 WL 1927786, at *1. The *Curran* court found that since the third party plaintiff's "claims flow[ed] directly from Massachusetts residents' terms-of-use agreements with" Underdog and PrizePicks because "[t]he agreements

were prerequisites for Massachusetts residents to participate in" the defendants' contests, and "the alleged losses that provide[d] the basis for [plaintiff's] claims were all incurred as a direct result of participating in [Underdog's and PrizePicks'] online platforms pursuant to their respective terms of use." *Id.* at *2. The court thus granted the motions to compel arbitration under the doctrine of direct benefits equitable estoppel. *Id.*

Moreover, the Terms separate and apart from the Platform are not gambling contracts. There is no consideration supporting the agreement, which could be won or lost. Rather, users gave consideration by agreeing to the Terms as a condition of accessing the site, and did so before the user could access or use the Platform. Indeed, there was no obligation under the Terms for users to make any purchases, play any games, or use the Platform under any provision of the Terms. In short, the process here is like millions of other websites that require users to agree to certain general Terms of Use before accessing the website or services provided or buying anything. Here, the Terms were agreed to between the users *before* accessing the Platform.

As demonstrated above, the parties delegated any alleged issue of illegality to the arbitral body. Nevertheless, the Terms are not void as a gambling contract under Utah law, as there is no obligation to make or pay any wager, nor any amount lent or advanced for the purpose of a wager. The Terms are plainly just ground rules between the parties for access to the Platform and that parties must arbitrate any disputes.

In sum, *Buckeye* governs this case and dictates: (1) the purported illegality of the contract is an issue for the arbitrator, rather than the Court, to decide; and (2) in any event, the arbitration provision is severable from the rest of the contract and may be enforced according to its terms. Accordingly, this Court should reject Plaintiff's demand that the Court preempt the role of the arbitrator by considering Plaintiff's merits argument on illegality before ordering the case to

arbitration. Under these circumstances, any question concerning the scope and applicability of the obligation to arbitrate should be delegated to the arbitral body under the applicable delegation clauses.

**D. The Class Action Waiver is Enforceable**

Both the Supreme Court and courts in this Circuit have held that arbitration agreements precluding class action relief are valid and enforceable. *See Am. Express Co.*, 570 U.S. at 236–39; *Miller v. Corinthian Colleges, Inc.*, 769 F.Supp.2d 1336, 1348–49 (D. Utah 2011) (granting defendant's motion to compel individual arbitration and holding that class action waivers in arbitration agreements requiring plaintiffs to arbitrate their claims on an individual basis were neither substantively nor procedurally unconscionable); *Lewis v. Eassit, Inc.*, No. 2:22-CV-00121-HCN-DAO, 2023 WL 2522812, at *3 (D. Utah Mar. 15, 2023) ("But collective or class action waivers are not substantively unconscionable under Utah law." (citing *Miller*, 769 F.Supp.2d at 1348–49)). This is because a class action waiver "does not constitute the elimination of the right to pursue [a] remedy" but rather "merely limits arbitration to the two contracting parties." *Am. Exp. Co.*, 570 U.S. at 236.

Plaintiff agreed to the August 2025 Terms, which included both a class action waiver and required that Plaintiff and ARB arbitrate their claims on an individual basis. Colello Decl. ¶¶ 23-27; Ex. A, at 1, and § 17.16. There is nothing substantively unconscionable about the class action waiver. *Am. Exp. Co.*, 570 U.S. at 236–39; *see also AT&T Mobility LLC,* 563 U.S. 333; *Miller*, 769 F.Supp.2d at 1348–49. Regardless, where this Court is uncertain as to the validity of the class action waiver, it should allow the arbitrator to resolve that issue. *See Lowery v. N.A.R., Inc.*, No. 2:18-cv-00480-JNP-PMW, 2019 WL 1099710, at *2 (D. Utah Mar. 8, 2019) (holding that the issue of whether plaintiff waived her right to bring, participate in, or maintain a class action should be

resolved through arbitration); *see also Christensen v. Desert Rock Cap., Inc.*, No. 2:24-cv-00808-RJS-CMR, 2025 WL 1135598, at *2 n.21 (D. Utah Apr. 17, 2025) ("[I]t is not apparent why this court could opine on the validity of only this [class action waiver] portion of the arbitration agreements and not others.").

Therefore, by agreeing to the August 2025 Terms, and the class action waiver therein, Plaintiff should be required to arbitrate his claim on an individual non-class action basis.

## III. CONCLUSION

For the foregoing reasons, this Court—to the extent that it does not dismiss this action for lack of personal jurisdiction—should compel arbitration of Plaintiff's claims on an individual basis in accordance with the arbitration provisions in the August 2025 Terms of ARB's Terms and stay further proceedings pending the completion of such arbitration.

Dated: March 6, 2026

Respectfully submitted,

**DUANE MORRIS LLP**

*/s/ Tyson E. Hafen*
Tyson E. Hafen (UT Bar No. 14188)
William M. Gantz (*pro hac vice* forthcoming)

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 89 of 183

**CERTIFICATE OF SERVICE**

I hereby certify that on March 6, 2026, I served via CM/ECF the foregoing **DEFENDANTS ARB GAMING LLC AND ARB INTERACTIVE INCORPORATED'S MOTION TO COMPEL ARBITRATION AND MEMORANDUM OF LAW IN SUPPORT** to all parties and counsel as identified on the CM/ECF-generated Notice of Electronic Filing.

*/s/ Janice Reeder*
Janice Reeder, an employee of Duane Morris LLP

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 90 of 103

# EXHIBIT E

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 91 of 103

William M. Gantz (admitted to N.D. Cal.)
**Duane Morris LLP**
100 High Street, Suite 2400
Boston, MA 02110-1724
Telephone: 857 488 4234
Facsimile: 857 401 3026
E-mail: BGantz@duanemorris.com

Karen L. Alexander (SBN: 265926)
**Duane Morris LLP**
750 B Street, Suite 2900
San Diego, CA 92101-4681
Telephone: 619 744 2200
Facsimile: 619 393 0884
E-mail:klalexander@duanemorris.com

Lauren M. Case (SBN: 280629)
**Duane Morris LLP**
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA 94105-1127
Telephone: 415 957 3024
Facsimile: 415 723 7201
E-mail:LMCase@duanemorris.com
Attorneys for Defendant
ARB Gaming, LLC

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

JIM DINSLAGE,

Plaintiff,

v.

ARB GAMING, LLC D/B/A MODO.US,

Defendant.

Case No. 3:25-CV-02562-VC

**DECLARATION OF PATRICK FECHTMEYER IN SUPPORT OF ARB GAMING, LLC'S OPPOSITION TO PLAINTIFF'S MOTION TO REMAND**

Date: May 8, 2025
Time 10:00 a.m.
Judge: Hon. Vince Chhabria
Ctrm: 4

Complaint Filed: February 10, 2025
[Removed from Napa Superior Court, Case No. 25-CV-000297]

Case 2:25-cv-01868-DJC-CSK Document 109 Filed 08/17/26 Page 102 of 191

I, Patrick Fechtmeyer, declare and state as follows:

1. I have personal knowledge of the facts contained in this declaration, and if called as a witness, I could and would testify as to their accuracy.

2. I am the chief executive of ARB Gaming, LLC ("ARB"), and in this capacity I am familiar with the corporate and organizational structure as well as the operations of ARB.

3. I have reviewed the records related to Plaintiff Jim Dinslage's account with ARB.

4. Mr. Dinslage opened his account on August 8, 2023.

5. During the lifetime of the account, Mr. Dinslage has attempted purchases totaling [redacted]. Plaintiff actually spent a total of [redacted], as not all of the attempted transaction were successful.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 10, 2025.

Patrick Fechtmeyer, CEO
ARB Gaming, LLC

Matthew Joyce
Plaintiff, Pro Se
600 Market Grove Dr #100
Wake Forest, NC 27587-7345
Phone: (919) 259-4661
Email: m.joyce07@proton.me

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**SACRAMENTO DIVISION**

MATTHEW JOYCE, an individual, Plaintiff, v. ARB GAMING LLC dba MODO.US; AFFIRM, INC.; GOLDMAN SACHS BANK USA; APPLE INC.; AMAZON.COM, INC.; and DOES 1-50, Defendants.

Case No. 2:25-cv-01868-DJC-CSK (PS)

**PLAINTIFF'S REQUEST FOR LEAVE TO FILE A SUPPLEMENTAL BRIEF AND REQUEST FOR JUDICIAL NOTICE IN OPPOSITION TO ARB GAMING LLC'S MOTION TO COMPEL ARBITRATION (ECF 56)**

August 25, 2026, 10:00 a.m. — by Zoom — Hon. Chi Soo Kim

Plaintiff Matthew Joyce, pro se, respectfully requests leave under Section I.B of this Court's Civil Standing Orders to file a supplemental brief, together with a Request for Judicial Notice, in opposition to Defendant ARB Gaming LLC's Motion to Compel Arbitration (ECF 56).

The proposed supplemental brief and the proposed Request for Judicial Notice are submitted with this request so that the Court may evaluate the request against their actual contents rather than a description of them. Plaintiff does not ask the Court to consider either document unless leave is granted.

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 94 of 103

## I. What is requested.

Plaintiff requests leave to file: (1) a supplemental brief of no more than six (6) pages addressed solely to ARB's evidentiary showing on contract formation; and (2) a Request for Judicial Notice of five documents filed on the public dockets of four United States District Courts, offered for their existence and content only.

Plaintiff does not seek to expand any page limit, to reopen any argument already briefed, or to delay the August 25, 2026 hearing.

## II. Good cause: the records did not exist in Plaintiff's possession when he filed his opposition.

Plaintiff filed his opposition to ECF 56 on July 28, 2026. The documents that are the subject of this request are filings made by ARB Gaming LLC and its officers in four other federal district courts. **Plaintiff obtained them on August 2, 2026 — five days after his opposition was filed.** He files this request the following day.

Plaintiff did not withhold these records. He did not have them. They are not his documents; they are ARB's, filed in *Kowalok v. ARB Gaming, LLC,* No. 4:25-cv-02161 (N.D. Ohio); *Anderson v. ARB Gaming, LLC,* No. 6:25-cv-02069 (D. Or.); *Walker v. ARB Gaming, LLC,* No. 2:25-cv-00991 (D. Utah); and *Dinslage v. ARB Gaming, LLC,* No. 3:25-cv-02562 (N.D. Cal.).

Plaintiff notes the circumstances only because they bear on diligence, and not as a request for indulgence. Defendant ARB is represented by Duane Morris LLP through attorneys in two offices; the appearances for ARB in this action and in the parallel arbitration name seven attorneys of that firm. Four law firms represent the four appearing defendants. Plaintiff is one person, proceeding without counsel, under the accommodations this Court granted at ECF 82, and filing by paper under ECF 74.

He located these records himself, on the public dockets of four district courts, and brought them to the Court's attention the next day.

**III. Why the records matter to a question already before the Court.**

Plaintiff's opposition disputes whether ARB has carried its burden of proving that an agreement to arbitrate was formed. 9 U.S.C. § 4. That question is squarely presented and fully briefed. The proposed supplemental brief adds no new theory. It supplies evidence bearing on the question already joined.

Two matters illustrate why the records are material, and Plaintiff states them here only to establish that this request is not made for delay:

**First**, in three of those actions, ARB submitted the same registration-screen exhibit as one another — and it differs from the exhibit ARB submitted here, and was sworn to by a different officer of the same company. One of those plaintiffs registered forty-two days before Plaintiff and another six days after him.

**Second**, in *Dinslage*, the same declarant who signed ARB's declaration in this case swore that he had "reviewed the records" of that plaintiff's account and identified the date the account was opened and the amounts spent. ARB's declaration here (ECF 56-9, ¶ 9) swears that ARB maintains "timestamps associated with acceptance, and the versions of the Terms accepted by users." No such record was submitted with ECF 56.

Plaintiff reserves the substance of both points for the supplemental brief, if leave is granted.

**IV. No prejudice, and the timing is set by the Court's own order.**

Defendants' reply briefs are due August 10, 2026 (ECF 98). The hearing is August 25, 2026. Granting this request would place these records before the Court and before ARB in advance of both dates. ARB may address them in its reply.

Plaintiff files this request more than seven days before the proposed filing, as Section I.B requires.

**V. A related matter, stated so the Court is not surprised by it.**

ARB's motion rests on a declaration stating that ARB maintains records of acceptance and the versions accepted. Those records were not submitted. If ARB submits them for the

first time with its reply brief, Plaintiff will have no opportunity to respond, because Section I.B permits no sur-reply absent leave sought seven days in advance — a deadline that would already have passed.

Plaintiff does not ask the Court to rule on that possibility now. The accompanying supplemental brief addresses it, and the relief requested there is the relief the Ninth Circuit prescribes: that such evidence be considered only if Plaintiff is given an opportunity to respond.

**VI. Conclusion.**

Plaintiff respectfully requests leave to file the accompanying supplemental brief and Request for Judicial Notice.

Dated: August 3, 2026

Respectfully submitted,




**Matthew Joyce**

Plaintiff, Pro Se

600 Market Grove Dr #100
Wake Forest, NC 27587-7345
Phone: (919) 259-4661
Email: m.joyce07@proton.me

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 97 of 103

Matthew Joyce
Plaintiff, Pro Se
600 Market Grove Dr #100
Wake Forest, NC 27587-7345
Phone: (919) 259-4661
Email: m.joyce07@proton.me

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**SACRAMENTO DIVISION**

| | |
|---|---|
| MATTHEW JOYCE, an individual,<br>Plaintiff,<br>v.<br>ARB GAMING LLC dba MODO.US; AFFIRM, INC.; GOLDMAN SACHS BANK USA; APPLE INC.; AMAZON.COM, INC.; and DOES 1-50,<br><br>Defendants. | Case No. 2:25-cv-01868-DJC-CSK (PS)<br><br>**[PROPOSED] ORDER** |

This matter came before the Court on Plaintiff Matthew Joyce's "[PROPOSED] ORDER — LEAVE TO FILE SUPPLEMENTAL BRIEF". Having considered the moving papers, any opposition and reply, the arguments of the parties, and the complete record in this action, and good cause appearing therefor,

IT IS HEREBY ORDERED that:

1. The Motion is GRANTED.

2. ______________________________________________________________

________.

IT IS SO ORDERED.

Dated: ______________________

________________________________________

Chi Soo Kim

United States Magistrate Judge

Case 2:25-cv-01868-DJC-CSK Document 102 Filed 08/03/26 Page 99 of 103

Matthew Joyce
Plaintiff, Pro Se
600 Market Grove Dr #100
Wake Forest, NC 27587-7345
Phone: (919) 259-4661
Email: m.joyce07@proton.me

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**SACRAMENTO DIVISION**

| | |
|---|---|
| MATTHEW JOYCE, an individual,<br>Plaintiff,<br>v.<br>ARB GAMING LLC dba MODO.US; AFFIRM, INC.; GOLDMAN SACHS BANK USA; APPLE INC.; AMAZON.COM, INC.; and DOES 1-50,<br><br>Defendants. | Case No. 2:25-cv-01868-DJC-CSK (PS)<br><br>**PROOF OF SERVICE** |

August 25, 2026, 10:00 a.m. — by Zoom — Hon. Chi Soo Kim

I, Matthew Joyce, declare:

I am the Plaintiff in this action and appear pro se. I am over the age of eighteen years. My address is 600 Market Grove Drive #100, Wake Forest, North Carolina 27587-7345.

On August 3, 2026, I served the following documents:

1. Plaintiff's Request for Leave to File a Supplemental Brief and Request for Judicial Notice in Opposition to ARB Gaming LLC's Motion to Compel Arbitration (ECF 56);

2. Proposed Supplemental Brief in Opposition to ARB Gaming LLC's Motion to Compel Arbitration (ECF 56);

3. Proposed Request for Judicial Notice, with exhibits; and

4. This Proof of Service.

**BY ELECTRONIC MAIL** pursuant to Federal Rule of Civil Procedure 5(b)(2)(E), each of the following having consented in writing to electronic service:

**ARB Gaming LLC** (Duane Morris LLP): dwall@duanemorris.com; WASaurack@duanemorris.com; klalexander@duanemorris.com

**Apple Inc.** (DLA Piper LLP US): john.gibson@dlapiper.com; ann.lozinski@dlapiper.com; lynda.west@us.dlapiper.com; michele.leyva@us.dlapiper.com

**Affirm, Inc.** (Troutman Pepper Locke LLP): kalama.lui-kwan@troutman.com; ryan.lewis@troutman.com

**Goldman Sachs Bank USA** (Morgan, Lewis & Bockius LLP): arjun.rao@morganlewis.com; marcos.sasso@morganlewis.com; madison.marshall@morganlewis.com; kathleen.rosello@morganlewis.com

**Counsel of record for Plaintiff-in-Interpleader Jamie Stahura** (The Mack Law Firm, PLLC): legal@themacklaw.com

**BY UNITED STATES MAIL**, first-class postage prepaid, in a sealed envelope addressed to:

Amazon.com, Inc.
2626 Glenwood Avenue, Suite 550
Raleigh, North Carolina 27608

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 3, 2026, at Wake Forest, North Carolina.

Dated: August 3, 2026

Respectfully submitted,

Signed by:
07B601B840D34AB...

**Matthew Joyce**

Plaintiff, Pro Se

600 Market Grove Dr #100
Wake Forest, NC 27587-7345
Phone: (919) 259-4661
Email: m.joyce07@proton.me

Matthew Joyce
600 Market Grove Drive #100
Wake Forest, NC 27587-7345
(919) 259-4661
m.joyce07@proton.me
Plaintiff, Pro Se

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**SACRAMENTO DIVISION**

| | |
|---|---|
| MATTHEW JOYCE, an individual,<br>Plaintiff,<br>v.<br>ARB GAMING LLC dba MODO.US;<br>AFFIRM, INC.;<br>GOLDMAN SACHS BANK USA;<br>APPLE INC.;<br>AMAZON.COM, INC.,<br>Defendants. | Case No. 2:25-cv-01868-DJC-CSK (PS)<br><br>**INDEX OF EXHIBITS** |

PLAINTIFF'S INDEX OF EXHIBITS

| Exhibit Letter | Date | Description of Document |
|---|---|---|
| Exhibit A | 11/24/2025 | *Kowalok v. ARB Gaming, LLC*, No. 4:25-cv-02161 (N.D. Ohio), ECF No. 16 — Defendant ARB's Motion to Compel Individual Arbitration and Memorandum of Law in Support, reproducing Figure 1 at page 7 |
| Exhibit B | 11/25/2025 | *Kowalok v. ARB Gaming, LLC*, No. 4:25-cv-02161 (N.D. Ohio), ECF No. 17-1 — Terms of Use dated August 4, 2025, including Section 3.4 "Restricted Territories" |
| Exhibit C | 1/9/2026 | Anderson v. ARB Gaming, LLC, No. 6:25-cv-02069 (D. Or.), ECF No. 25 — Declaration of William Colello in Support of |

| | | |
|---|---|---|
| | | Defendant ARB's Motion to Compel Arbitration |
| Exhibit D | 3/6/2026 | Walker v. ARB Gaming, LLC, No. 2:25-cv-00991 (D. Utah), ECF No. 16 — Defendant ARB's Motion to Compel Arbitration and Memorandum of Law in Support, reproducing Figure 1 at page 9 |
| Exhibit E | 4/14/2025 | Dinslage v. ARB Gaming, LLC, No. 3:25-cv-02562 (N.D. Cal.), ECF No. 18-4 — Declaration of Patrick Fechtmeyer in Support of Defendant ARB's Opposition to Plaintiff's Motion to Remand |

DATED: August 3, 2026

Signed by:
Matthew Joyce
07B601B840D34AB...

Matthew Joyce
Plaintiff, Pro Se
600 Market Grove Dr #100
Wake Forest, NC 27587
Phone: (919) 259-4661
Email: m.joyce07@proton.me

# EXHIBIT 1

Proposed Supplemental Brief
Lodged with Plaintiff's Renewed Request for Leave to File a Supplemental Brief
Not to be filed unless leave is granted

Matthew Joyce
Plaintiff, Pro Se
600 Market Grove Dr #100
Wake Forest, NC 27587-7345
Phone: (919) 259-4661
Email: m.joyce07@proton.me

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**SACRAMENTO DIVISION**

| | |
|---|---|
| MATTHEW JOYCE, an individual,<br>Plaintiff,<br>v.<br>ARB GAMING LLC dba MODO.US; AFFIRM, INC.; GOLDMAN SACHS BANK USA; APPLE INC.; AMAZON.COM, INC.; and DOES 1-50,<br><br>Defendants. | Case No. 2:25-cv-01868-DJC-CSK (PS)<br><br>**PLAINTIFF'S SUPPLEMENTAL BRIEF IN RESPONSE TO NEW MATTER IN DEFENDANT ARB GAMING LLC'S REPLY (PROPOSED — EXHIBIT 1)** |

August 25, 2026, 10:00 a.m. — by Zoom — Hon. Chi Soo Kim

## I. SCOPE

This brief answers four things ARB raised for the first time in its reply: judicial estoppel, a contention that Plaintiff does not challenge the delegation provision, a supplemental declaration attaching a notifications log, and a sanctions theory resting on *James v. Wilber*. Plaintiff does not reargue his opposition and does not supplement on any ground that was available to him when he filed it.

## II. JUDICIAL ESTOPPEL

**A. The doctrine arrived with the last brief.** The word "estoppel" appears nowhere in ARB's opening motion (ECF 56; ECF 56-1) or in Plaintiff's opposition (ECF 96). It appears for the first time in the reply.

**B. Judicial estoppel is equitable and discretionary.** *New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001). It is not a mechanical rule, and a court considering it weighs the equities as they appear on the whole record. ARB asks this Court to hold Plaintiff to a position taken in another proceeding. The same measure, applied to ARB's own filings, is set out below.

**C. ARB has depicted two different registration screens to two different federal courts, for accounts opened in the same period.**

The screen ARB filed here, attached to the declaration of its Chief Executive Officer, presents **two** checkboxes. The first reads: "I acknowledge that I am not a resident of the following states: Florida, Georgia, Idaho, New York, North Carolina, Rhode Island, Washington." Seven states. **North Carolina is among them — and the Form 1099-MISC ARB issued for Plaintiff's own account is addressed to him at a North Carolina street address.** (ECF 56-9, Ex. A; ECF 96 § IV.A; Joyce Decl. ¶ 6.)

The screen ARB filed in *Walker v. ARB Gaming, LLC*, No. 2:25-cv-00991 (D. Utah), reproduced as Figure 1 at page 9 of its motion to compel, presents **one** checkbox: "I agree with the Terms of Service and Sweepstakes Rules and acknowledge that I cannot enter into any Sweepstakes from AZ, CT, DE, ID, LA, MD, MI, MT, NJ, NV, NY, PA, RI, WA, WV, and any other non-US territories." Fifteen states. **North Carolina is not among them.** ARB filed the same figure at page 7 of its motion in *Kowalok v. ARB Gaming, LLC*, No. 4:25-cv-02161 (N.D. Ohio).

The two forms differ in more than the state list. One asks for a street address, city, state and ZIP; the other asks for a state of residency and a promotion code. One ends in a button reading "Next"; the other in a button reading "Submit." Plaintiff states what ARB filed and asks the Court to draw no inference about why the filings differ. **For an equitable doctrine measured by consistency across proceedings, the relevant fact is that they do.**

## III. DELEGATION

**A. The burden is ARB's.** The party seeking to compel arbitration bears the burden of proving an agreement to arbitrate by a preponderance of the evidence. *Norcia v. Samsung Telecomms. Am., LLC,* 845 F.3d 1279, 1283 (9th Cir. 2017). The word "burden" appears nowhere in ARB's motion or in its reply.

**B. The clause ARB quotes does not reach formation.** As ARB quotes it, the delegation provision covers disputes concerning the "breach, enforcement, construction, validity, interpretation, enforceability or arbitrability" of the agreement. Seven categories are listed. Formation is not among them. ARB reaches formation only by incorporating the JAMS rules. A rule incorporated by a contract cannot supply the authority to decide whether that contract was ever formed.

**C. Plaintiff challenges formation of the delegation and arbitration provisions specifically.** The reply states that Plaintiff "does not challenge the delegation provision." He does, and he does so on the ground that no agreement containing it was formed.

## IV. THE SUPPLEMENTAL NOTIFICATIONS LOG

Plaintiff's evidentiary objections to this exhibit are stated separately under Local Rule 230(m)(1) and are not repeated here. This section addresses weight.

**A. The declaration says more than the exhibit says.** The declaration states that Plaintiff "accepted" Terms and Conditions Version 14 on September 10, 2024. (ECF 106-2 ¶ 3(b).) The description field of that row reads "Terms and conditions version V14." The description field of the Version 13 row reads "Terms and conditions version V13 **accepted**." The declaration describes the two entries identically and does not address the difference between them.

**B. No document bearing either version identifier is in the record.** The only Terms document filed is the copy attached to the original declaration, which identifies itself as "Last Updated: September 10, 2024" and carries no version number of any kind. (ECF 56-9, Ex. B.)

**C. The exhibit is an excerpt of a scrolling record.** Nine rows are shown. The top row is cut mid-description and a scroll indicator appears at the right edge. The visible entries run from August 2, 2024 to January 7, 2025. No account-creation entry appears, although the declaration states that ARB maintains business records concerning user account creation.

## V. SANCTIONS

ARB's reply relies on *James v. Wilber*, 956 F. Supp. 2d 1145 (E.D. Cal. 2013). That decision states the standard ARB must meet and describes conduct nothing like this record.

**The standard requires bad faith.** "To be sanctionable under the Court's inherent power, the conduct must have constituted, or been tantamount to, bad faith." *Id.* at 1148. Recklessness may support sanctions only when combined with frivolousness, harassment, or an improper purpose, and "mere negligence or recklessness will not suffice." *Id.* Dismissal is warranted only where "a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings." *Id.*

**The conduct in *James* was fabricated witness testimony.** The plaintiff there, a pro se prisoner, represented that two inmates had witnessed the events underlying his claim when they could not have. The court issued an order to show cause, received briefing, and held an evidentiary hearing at which the plaintiff and both witnesses testified before it imposed terminating sanctions. *Id.* at 1147–48.

Nothing of that kind is before this Court. What ARB characterizes as misrepresentation is Plaintiff's reading of a screenshot ARB filed — and ARB's own reply concedes what that screenshot contains, stating that it "contains an acknowledgment requiring the user to represent that he is not a resident of the listed states." (ECF 106 at 9.) A disagreement about what a document establishes is not deliberate deception, and on *James*'s own terms it is not sanctionable.

## VI. CONCLUSION

ARB bears the burden of proving that this Plaintiff formed an agreement to arbitrate. Its reply raises a new doctrine, new evidence, a new delegation contention and a new

sanctions theory, none of which supplies that proof. The motion to compel should be denied.

Dated: August 17, 2026

Respectfully submitted,

Signed by:
Matthew Joyce
07B601B840D34AB...

**Matthew Joyce**

Plaintiff, Pro Se
600 Market Grove Dr #100
Wake Forest, NC 27587-7345
Phone: (919) 259-4661
Email: m.joyce07@proton.me

Matthew Joyce
Plaintiff, Pro Se
600 Market Grove Dr #100
Wake Forest, NC 27587-7345
Phone: (919) 259-4661
Email: m.joyce07@proton.me

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**SACRAMENTO DIVISION**

| | |
|---|---|
| MATTHEW JOYCE, an individual,<br>Plaintiff,<br>v.<br>ARB GAMING LLC dba MODO.US; AFFIRM, INC.; GOLDMAN SACHS BANK USA; APPLE INC.; AMAZON.COM, INC.; and DOES 1-50,<br><br>Defendants. | Case No. 2:25-cv-01868-DJC-CSK (PS)<br><br>**"[PROPOSED] ORDER GRANTING PLAINTIFF'S RENEWED REQUEST FOR LEAVE TO FILE A SUPPLEMENTAL BRIEF"** |

August 25, 2026, 10:00 a.m. — by Zoom — Hon. Chi Soo Kim

Plaintiff's Renewed Request for Leave to File a Supplemental Brief in Response to New Matter in Defendant ARB Gaming LLC's Reply came before the Court. Having considered the request and the record, and good cause appearing, the Court orders as follows:

1. Plaintiff's renewed request for leave is **GRANTED**.

2. The supplemental brief submitted as Exhibit 1 to the request is deemed filed as of the date of this Order.

3. Defendant ARB Gaming LLC may file a response to the supplemental brief, not to exceed the length of the supplemental brief, within seven (7) days of the date of this Order.

IT IS SO ORDERED.

Dated: ______________________

______________________

**Hon. Chi Soo Kim**

United States Magistrate Judge

Matthew Joyce
Plaintiff, Pro Se
600 Market Grove Dr #100
Wake Forest, NC 27587-7345
Phone: (919) 259-4661
Email: m.joyce07@proton.me

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**SACRAMENTO DIVISION**

| | |
|---|---|
| MATTHEW JOYCE, an individual,<br>Plaintiff,<br>v.<br>ARB GAMING LLC dba MODO.US; AFFIRM, INC.; GOLDMAN SACHS BANK USA; APPLE INC.; AMAZON.COM, INC.; and DOES 1-50,<br><br>Defendants. | Case No. 2:25-cv-01868-DJC-CSK (PS)<br><br>**PLAINTIFF'S OBJECTION TO EVIDENCE SUBMITTED FOR THE FIRST TIME WITH DEFENDANT GOLDMAN SACHS BANK USA'S REPLY (L.R. 230(m)(1))** |

August 25, 2026, 10:00 a.m. — by Zoom — Hon. Chi Soo Kim

## PRELIMINARY STATEMENT

Plaintiff submits this Objection under Local Rule 230(m)(1) to evidence submitted for the first time with Defendant Goldman Sachs Bank USA's reply in support of its motion to compel arbitration, filed August 10, 2026 (ECF 107, with ECF 107-1 and ECF 107-2). Consistent with Local Rule 230(m)(1), this filing states objections to the new evidence only and contains no further argument on the motion. Plaintiff files concurrently a separate objection to the evidence submitted for the first time with Defendant ARB Gaming LLC's reply (ECF 106; ECF 106-1; ECF 106-2), and, as to ARB's motion, a renewed request for leave to file a supplemental brief pursuant to the Court's order at ECF

104. Each objection is directed only to the evidence submitted with the reply it names, and matters bearing on the motions themselves are not raised here.

**The material is new, and this is where it first appears.** GS Bank's operative motion to compel arbitration is ECF 64, filed June 4, 2026, with three attachments. Its earlier motion, ECF 53, filed May 29, 2026 and denied without prejudice at ECF 65, was filed with two attachments. **No request for judicial notice accompanied either motion.** The phrase "judicial notice" does not appear anywhere in ECF 53, 53-1, 53-2, 64, 64-1, 64-2, or 64-3. The Request for Judicial Notice at ECF 107-1, and its Exhibit A at ECF 107-2, were filed for the first time with the reply on August 10, 2026. ECF 107-1 is the first request for judicial notice GS Bank has filed in this action.

**The Request presents itself on its face as material accompanying the motion, not the reply.** Its caption reads "REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION OF DEFENDANT GOLDMAN SACHS BANK, USA TO COMPEL ARBITRATION AND STAY ACTION," and its opening sentence states that it is "submitted in connection with GS Bank's **concurrently filed** Motion to Compel Arbitration." (ECF 107-1 at 2.) GS Bank's Motion to Compel Arbitration and Stay Action is ECF 64, filed June 4, 2026 — sixty-seven days before the Request.

**The material is not responsive evidence, and GS Bank's own reply says so.** Evidence submitted in direct response to evidence raised in the opposition is not "new" for this purpose. *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 559 n.87 (C.D. Cal. 2014); *see also Edwards v. Toys "R" Us*, 527 F. Supp. 2d 1197, 1205–06 n.31 (C.D. Cal. 2007). The court in *In re ConAgra* applied both halves of that rule: it considered the portion of a reply declaration that responded directly to evidence the opposing party had adduced, and declined to consider the remainder, offered in the first instance on reply.

The Request here answers a sentence in Plaintiff's opposition brief, which the reply quotes and cites to "Opp'n at 12:7-8." (ECF 107 at 5 (CM/ECF p. 10 of 17).) GS Bank characterizes that sentence in the same paragraph: "As a preliminary matter, this statement is not contained within Plaintiff's concurrently filed Declaration. For this reason alone,

this Court need not consider it as it has no evidentiary support whatsoever." (*Id.*) By GS Bank's own account, the material the Request answers is not evidence adduced in the opposition. The responsive-evidence exception has nothing to attach to.

## I. OBJECTIONS TO THE REQUEST FOR JUDICIAL NOTICE AND ITS EXHIBIT A (ECF 107-1, ECF 107-2)

**Objection 1 — Evidence submitted for the first time with a reply.** The Request for Judicial Notice and its exhibit accompanied neither of GS Bank's motions to compel arbitration and appear for the first time with the reply, after briefing closed. *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 559 n.87 (C.D. Cal. 2014) (considering the portion of a reply declaration that responded directly to evidence adduced in the opposition, and declining to consider the remainder, offered for the first time in reply); *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) (a district court should not consider new evidence presented in a reply without giving the opposing party an opportunity to respond).

**Objection 2 — What the Request describes is not what the Request filed.** The Request seeks notice of a single item, described twice and each time as a pleading: "A copy of **the complaint for damages** dated May 5, 2025, that Plaintiff Matthew Joyce filed in his state court action titled *Matthew Joyce v. ARB Gaming LLC dba Modo, et al.*, Case No. C25-01268 in Contra Costa County Superior Court. A true and correct copy of **the complaint** is attached hereto as Exhibit A." (ECF 107-1 at 2.)

Exhibit A runs to **347 pages**. The complaint the Request describes occupies pages 2 through 21, and a verification page appears at page 347. The intervening **325 pages are a four-page index titled "Plaintiff's Exhibits" (ECF 107-2 at 22–25) and the thirty-one exhibits that index lists (id. at 26–346).** Those exhibits are not pleadings. Two of them are expert reports. By the index's own descriptions, Exhibit 28 is a "Forensic statistical analysis of gameplay and financial activity prepared by Precision Consulting Firm, LLC," dated April 29, 2025, and Exhibit 29 is a "Forensic Psychological Analysis prepared by Lepage Associates," dated May 1, 2025. Exhibits 30 and 31 are "Affirm, Inc. debt

validation request" sets running to sixteen and eighteen pages, which include consumer credit-report material.

An expert report is opinion. Rule 201(b) permits notice only of a fact "not subject to reasonable dispute," and an expert's analysis and conclusions are the opposite of that. Whatever may be said of noticing the filing of a pleading, no authority GS Bank offers reaches the opinions of retained experts, and GS Bank does not argue that it does — the Request never mentions these exhibits at all.

The Request does not describe this material, does not designate any part of it, and states no purpose for which notice of it is sought. The authorities the Request offers are addressed to the filings themselves — the fact that a pleading was filed in a related proceeding. None of them is offered for, and Plaintiff is aware of none that supports, taking judicial notice of 325 pages of a party's evidentiary attachments. Plaintiff objects to the placement of that material into the record on reply, through a request that does not acknowledge it.

**Objection 3 — Judicial notice does not extend to the truth of allegations within a noticed pleading, and GS Bank's own authority states that limit at the page GS Bank cites.** A court may take notice of the existence of a court filing and of matters appearing on the face of the public record; it may not take as true disputed facts alleged within the filing. *Lee v. City of Los Angeles*, 250 F.3d 668, 689–90 (9th Cir. 2001), overruled on other grounds by *Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018). The Ninth Circuit has held that "taking judicial notice of findings of fact from another case exceeds the limits of Rule 201." *Wyatt v. Terhune*, 315 F.3d 1108, 1114 (9th Cir. 2003), overruled on other grounds by *Albino v. Baca*, 747 F.3d 1162 (9th Cir. 2014) (en banc); *see M/V Am. Queen v. San Diego Marine Constr. Corp.*, 708 F.2d 1483, 1491 (9th Cir. 1983) (a court may not take judicial notice of records in another cause "so as to supply, without formal introduction of evidence, facts essential to support a contention in a cause then before it").

The authority GS Bank offers states the same limit, on the page GS Bank pincites. *Peel v. BrooksAmerica Mortgage Corp.*, 788 F. Supp. 2d 1149, 1158 (C.D. Cal. 2011): "Therefore, a court may take judicial notice of the existence of another court's opinion or of the filing of pleadings in related proceedings; the Court may not, however, accept as true the facts found **or alleged** in such documents." *Peel* took notice of "the existence of these filings" and went no further. *Id.* GS Bank's remaining authority is to the same effect: *Tercero* granted notice of the complaints filed in other actions but declined to notice the orders entered in them, 2024 WL 4826348, at *3 n.2, and* Reyn's Pasta Bella* noticed briefs and a hearing transcript to determine what had been litigated, not whether anything asserted in them was true, 442 F.3d 741, 746 n.6 (9th Cir. 2006).

Plaintiff does not contend that a court may never take judicial notice of a public record. The line is the one *Peel* draws on the same page it is cited for: the existence, date, and operative terms of a document are properly noticed; the facts found or alleged within it are not. GS Bank's Request falls on the far side of that line. It does not ask the Court to notice that a complaint was filed in Contra Costa County Superior Court on a date. It asks the Court to notice what the contents of that complaint establish.

Exhibit A is a pleading containing allegations, together with the exhibits identified in Objection 2. Plaintiff objects to consideration of any allegation within Exhibit A, or of any document attached to it, for the truth of the matter stated.

**Objection 4 — No adjudicative fact is identified (Fed. R. Evid. 201).** Rule 201 governs judicial notice of an **adjudicative fact**, and permits notice only of a fact "not subject to reasonable dispute" because it is generally known or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(a)–(b). The Request identifies no fact. It identifies a document, asks that the document be noticed, and stops. Plaintiff objects to notice of a 347-page document in whole, with no fact designated and no purpose stated.

**Objection 5 — The propositions the reply actually draws from the exhibit are narrow.** The reply cites Exhibit A once, for the propositions that "[a]s of May 2025,

Plaintiff, through his attorney, filed a lawsuit against defendant ARB Gaming and others," and that "GS Bank is not a party to that dispute." (ECF 107 at 5.) Plaintiff objects to any use of Exhibit A beyond those two propositions, each of which appears on the face of the caption of the state-court complaint, and to any consideration of the contents of the exhibit for their truth.

**Objection 6 — Exhibit A is a pleading signed by counsel, offered for a position attributed to the party.** Exhibit A bears the signature block "LAW OFFICE OF RESHMA KAMATH, RESHMA KAMATH, Cal. Bar No. 333800 … Counsel for Plaintiff MATTHEW JOYCE" (ECF 107-2 at 2, 21), and the reply describes the filing as made "through his attorney" (ECF 107 at 5). Whether a statement in a filing may be treated as an admission of the party is committed to the discretion of the district court. *See Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 227 (9th Cir. 1988). Plaintiff respectfully submits that the discretion be exercised accordingly, and notes that the material is offered here through Fed. R. Evid. 201, which does not establish the truth of matters asserted within a noticed document. *Khoja*, 899 F.3d at 999.

## II. REQUEST

Plaintiff respectfully requests that the Court **decline to consider** ECF 107-1 and ECF 107-2 as submitted for the first time on reply; in the alternative, that judicial notice be **limited to the fact, date, and named parties of the filing shown on the face of the state-court complaint**, and not extend to the truth of any allegation within it nor to the 325 pages of exhibits and index filed with it; and in the further alternative, that Plaintiff be afforded an opportunity to respond.

Dated: August 17, 2026

Respectfully submitted,

Signed by:
Matthew Joyce
07B601B840D34AB...

**Matthew Joyce**

Plaintiff, Pro Se

600 Market Grove Dr #100
Wake Forest, NC 27587-7345
Phone: (919) 259-4661
Email: m.joyce07@proton.me

Matthew Joyce
Plaintiff, Pro Se
600 Market Grove Dr #100
Wake Forest, NC 27587-7345
Phone: (919) 259-4661
Email: m.joyce07@proton.me

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**SACRAMENTO DIVISION**

MATTHEW JOYCE, an individual,
Plaintiff,
v.
ARB GAMING LLC dba MODO.US; AFFIRM, INC.; GOLDMAN SACHS BANK USA; APPLE INC.; AMAZON.COM, INC.; and DOES 1-50,

Defendants.

Case No. 2:25-cv-01868-DJC-CSK (PS)

**PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE (FED. R. EVID. 201)**

August 25, 2026, 10:00 a.m. — by Zoom — Hon. Chi Soo Kim

Plaintiff Matthew Joyce respectfully requests, under Federal Rule of Evidence 201, that the Court take judicial notice of the document described below, attached as Exhibit A.

**Exhibit A** — *In the Matter of: Goldman Sachs Bank USA*, Consent Order, Administrative Proceeding File No. 2024-CFPB-0011, Document 1, filed October 23, 2024 (Consumer Financial Protection Bureau) (53 pages).

Rule 201 supplies the authority. A fact is judicially noticeable if it is "not subject to reasonable dispute" because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Where a party requests it and the court is supplied with the necessary information, the court "must take judicial notice." Fed. R. Evid. 201(c)(2). The court "may take judicial notice at any stage

of the proceeding." Fed. R. Evid. 201(d). Exhibit A is an official public record of a federal administrative agency, issued and published by the agency that entered it, and available to the public on that agency's own website. The complete document is supplied.

**SCOPE AND LIMITATION**

Plaintiff requests notice of the **existence, date, file number, and operative terms** of Exhibit A, and of nothing else.

Plaintiff does **not** request that the Court take notice of the truth of any finding of fact or conclusion of law within Exhibit A. A court may take judicial notice of matters of public record, but may not take judicial notice of disputed facts stated in public records; such a record is noticed not for the truth of the facts recited within it, but for the existence of the document. *Lee v. City of Los Angeles*, 250 F.3d 668, 689–90 (9th Cir. 2001); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018).

The terms for which notice is requested are these:

The document is captioned *In the Matter of: Goldman Sachs Bank USA*, Consent Order, Administrative Proceeding File No. 2024-CFPB-0011, filed October 23, 2024.

Paragraph 113, at Exhibit A pages 51 to 52, provides that the Consent Order "will terminate on the later of 5 years from the Effective Date" or five years from a later-initiated enforcement action, and that it "will remain effective and enforceable until such time, except to the extent that any provisions of this Consent Order have been amended, suspended, waived, or terminated in writing by the Bureau or its designated agent."

Plaintiff does not request judicial notice of any published decision cited in his papers. Published decisions are cited as authority and require no notice.

**RELEVANCE**

GS Bank's reply argues that the injunctive relief Plaintiff seeks is "private" rather than "public" because it would benefit only a subset of Goldman Sachs Apple Card accountholders. (ECF 107 at 9.) Exhibit A is a federal order entered against Goldman Sachs Bank USA on the Bureau's review of its "credit card marketing, offering, and servicing practices . . . in connection with Apple Card." (Ex. A at 1.) Plaintiff offers

Exhibit A solely as it bears on the scope and forward-looking character of the relief at issue, and asks the Court to draw no conclusion from it beyond what appears on its face. Plaintiff respectfully requests that the Court take judicial notice of Exhibit A for the limited purpose stated above.

Dated: August 17, 2026

Respectfully submitted,

Signed by:
Matthew Joyce
07B601B040D34AD

**Matthew Joyce**

Plaintiff, Pro Se
600 Market Grove Dr #100
Wake Forest, NC 27587-7345
Phone: (919) 259-4661
Email: m.joyce07@proton.me

Matthew Joyce
Plaintiff, Pro Se
600 Market Grove Dr #100
Wake Forest, NC 27587-7345
Phone: (919) 259-4661
Email: m.joyce07@proton.me

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**SACRAMENTO DIVISION**

MATTHEW JOYCE, an individual,
Plaintiff,
v.
ARB GAMING LLC dba MODO.US; AFFIRM, INC.; GOLDMAN SACHS BANK USA; APPLE INC.; AMAZON.COM, INC.; and DOES 1-50,

Defendants.

Case No. 2:25-cv-01868-DJC-CSK (PS)

**PLAINTIFF'S INDEX OF EXHIBITS TO REQUEST FOR JUDICIAL NOTICE**

August 25, 2026, 10:00 a.m. — by Zoom — Hon. Chi Soo Kim

Exhibit lodged in support of Plaintiff's Request for Judicial Notice. The exhibit is separately tabbed and internally paginated, restarting at page 1.

| **Exhibit** | **Filed** | **Document** | **Pages** |
|---|---|---|---|
| A | 10/23/2024 | *In the Matter of: Goldman Sachs Bank USA*, Consent Order, Administrative Proceeding File No. 2024-CFPB-0011, Document 1 (Consumer Financial Protection Bureau) | 1–53 |

Dated: August 17, 2026

Respectfully submitted,

Signed by:
Matthew Joyce
07B601B840D34AB...

**Matthew Joyce**

Plaintiff, Pro Se
600 Market Grove Dr #100
Wake Forest, NC 27587-7345
Phone: (919) 259-4661
Email: m.joyce07@proton.me

**UNITED STATES OF AMERICA**
**CONSUMER FINANCIAL PROTECTION BUREAU**

ADMINISTRATIVE PROCEEDING
File No. 2024-CFPB-0011

In the Matter of:

**GOLDMAN SACHS BANK USA**

**CONSENT ORDER**

The Consumer Financial Protection Bureau (Bureau) has reviewed the credit card marketing, offering, and servicing practices of Goldman Sachs Bank USA (Goldman) in connection with Apple Card and has identified the following violations of law. As a result of widespread errors in multiple technological and internal processes for dispute resolution, Goldman (a) failed to send acknowledgment notices and failed to send resolution letters within the required periods, in violation of the Truth in Lending Act (TILA), 15 U.S.C. §§ 1601 *et seq.*, and its implementing Regulation Z, 12 C.F.R. § 1026.13(c), (e)-(f); (b) made adverse reports to Consumer Reporting Agencies (CRAs) regarding amounts disputed in billing error notices prior to completing the requirements for billing error resolution, in violation of TILA, 15 U.S.C. §§ 1601 *et seq.*, and its

implementing Regulation Z, 12 C.F.R. § 1026.13(d)(2); (c) failed to conduct reasonable investigations for disputes that qualified as billing error notices, in violation of TILA, 15 U.S.C. §§ 1601 *et seq.*, and its implementing Regulation Z, 12 C.F.R. § 1026.13(f); (d) held consumers liable for amounts at issue in claims of unauthorized use before conducting a reasonable investigation, in violation of TILA, 15 U.S.C. §§ 1601 *et seq.*, and its implementing Regulation Z, 12 C.F.R. § 1026 Supp. I, Comment 12(b); (e) by violating TILA and its implementing Regulation Z, violated the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. § 5536(a)(1)(A); and (f) engaged in unfair acts or practices through its delay in resolving transaction disputes, in violation of sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531(a), 5536(a)(1)(B). In connection with Apple Card Monthly Installments (ACMI) for financing the purchase of Apple devices, Goldman (a) engaged in deceptive acts or practices through representations that misled consumers to expect that purchases of Apple devices made with Apple Card would be automatically enrolled in ACMI, in violation of sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531(a), 5536(a)(1)(B), and (b) engaged in deceptive acts or practices through its representations about the application of refunds to consumers' ACMI and non-ACMI balances, in violation of sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531(a), 5536(a)(1)(B). Under sections 1053 and 1055

of the CFPA, 12 U.S.C. §§ 5563, 5565, the Bureau issues this Consent Order (Consent Order).

## I.

## Overview

1. In December 2017, Goldman and Apple Inc. (Apple) entered an agreement to offer Apple Card, a credit card integrated with Apple software that offers both market-rate APRs and interest-free financing for qualifying Apple products.

2. Pursuant to the agreement, Goldman agreed to extend the credit offered through Apple Card and to investigate disputes submitted by consumers. Apple designed the consumer-facing interfaces that consumers used to manage Apple Card accounts on Apple devices, including the "Report an Issue" functionality in the "Wallet" application that allowed consumers to dispute Apple Card transactions, and developed the creative approach and design of Apple Card advertisements.

3. Goldman and Apple's agreement provided a targeted launch date of March 1, 2019 for the Apple Card, and incentivized an earlier introduction of Apple Card by giving Apple the right to seek $25 million in liquidated damages for each 90-day delay caused by Goldman.

4. Prior to launch, internal presentations to Goldman's board and the board of Goldman Sachs Group, Inc. noted "tight timelines" around the launch, that the launch involved Goldman's "first use" of "large scale" outsourcing for the "customer contact center," and an understanding that "consumer volumes may ramp very quickly, possibly faster than historic credit card launches" due to Apple's "high profile." On August 16, 2019, a presentation to Goldman's board regarding a third-party operational and readiness assessment of Apple Card advised that there were "no significant impediments to launch," but also reported that the Apple Card disputes system was "not fully ready" due to technological issues.

5. Goldman and Apple introduced Apple Card on August 20, 2019.

6. When consumers began using Apple Card and submitting disputes, Goldman's technological systems, internal processes, and representatives made widespread mistakes in responding to hundreds of thousands of disputes. These mistakes caused Goldman to fail to respond to disputes within the time periods required by Regulation Z, to fail to provide consumers with credits required by Regulation Z, to make improper adverse reports about consumers to Consumer Reporting Agencies (CRAs), and to fail to correctly investigate and resolve consumer disputes.

7. In December 2019, Goldman and Apple introduced Apple Card Monthly Installments (ACMI), which allowed Apple Card users to finance the purchase of certain Apple devices directly from Apple through the payment of interest free monthly installments, similar to a "Buy Now, Pay Later" (BNPL) product.

8. Through representations in advertisements that emphasized the ease and simplicity of Apple Card and representations in the ACMI enrollment process, Goldman and Apple misled consumers to expect that purchases of Apple devices would automatically be enrolled in ACMI.

9. Goldman also misled consumers enrolled in ACMI about the application of refunds to Apple Card accounts with both ACMI and non-ACMI balances.

## II.

## Jurisdiction

10. The Bureau has jurisdiction over this matter under sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563 and 5565; and section 108(a) of TILA, 15 U.S.C. § 1607(a).

## III.

## Stipulation

11. Respondent has executed a "Stipulation and Consent to the Issuance of a Consent Order," dated October 18, 2024 (Stipulation), which is incorporated

by reference and is accepted by the Bureau. By this Stipulation, Respondent has consented to the issuance of this Consent Order by the Bureau under sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565, without admitting or denying any of the findings of fact or conclusions of law, except that Respondent admits the facts necessary to establish the Bureau's jurisdiction over Respondent and the subject matter of this action.

## IV.

## Definitions

12. The following definitions apply to this Consent Order:

a. "Acknowledgement Notice" means a written acknowledgment sent by Respondent to a consumer who submitted a Billing Error Notice. 12 C.F.R. § 1026.13(c)(1).

b. "Adverse Report" means an adverse report to any person about a consumer's credit standing, or report that an amount or account is delinquent, because the consumer failed to pay the disputed amount or related finance or other charges. 12 C.F.R. § 1026.13(d)(2).

c. "Affected Consumers" includes Apple Card users who from August 20, 2019, through the Effective Date: (1) submitted a Billing Error Notice in response to which Respondent failed to send an Acknowledgment Notice within the Required Period or a Resolution

Letter within the Required Period; (2) submitted a Claim of Unauthorized Use in response to which Respondent failed to conduct a reasonable investigation prior to holding the consumer liable for disputed amounts; (3) submitted a Redress Dispute that Respondent determined was a Valid Dispute in response to which Respondent did not provide a provisional or final credit, or otherwise did not absolve the consumer from liability, within 90 days; (4) submitted a Redress Dispute concerning a disputed amount that was the subject of an Adverse Report by Respondent before the date on which Respondent determined whether to provide a final credit, or to remove a provisional credit, in response to a Redress Dispute; (5) submitted a Redress Dispute in response to which Respondent did not provide a credit, including if Respondent provided and then removed a provisional credit or otherwise did not absolve the consumer from liability, that Respondent Reinvestigated pursuant to this Consent Order and that Respondent determined to be a Valid Dispute; or (6) submitted a Redress Dispute received by Respondent prior to September 22, 2021, in response to which Respondent did not provide a credit, including Redress Disputes in response to which Respondent provided and then removed a provisional credit or otherwise did not

absolve the consumer from liability, excluding any Redress Disputes Respondent Reinvestigated prior to the Effective Date.

d. "Apple Card" means an Apple-branded Credit Card that operates on an Apple software user interface through which Respondent extends credit.

e. "Apple Card Monthly Installments" (ACMI) means an Apple Card program allowing users to finance the purchase of eligible Apple products through the payment of interest-free monthly installments.

f. "Billing Error" means: (1) a reflection on or with a periodic statement of an extension of credit that is not made to the consumer or to a person who has actual, implied, or apparent authority to use the consumer's credit card or open-end credit plan; (2) a reflection on or with a periodic statement of an extension of credit that is not identified in accordance with the applicable provisions of Regulation Z; or (3) a reflection on or with a periodic statement of an extension of credit for property or services not accepted by the consumer or the consumer's designee, or not delivered to the consumer or the consumer's designee as agreed. 12 C.F.R. § 1026.13(a)(1)-(3).

g. "Billing Error Notice" means a written notice from an Apple Card user that: (1) is received by Respondent at the address disclosed in a

periodic statement, annual statement, or alternative summary statement, as applicable, no later than 60 days after Respondent transmitted the first periodic statement that reflects the alleged Billing Error; (2) enables Respondent to identify the consumer's name and account number; (3) to the extent possible, indicates the user's belief and the reasons for the belief that a Billing Error exists, and the type, date, and amount of the error; and (4) that the user does not subsequently withdraw. 12 C.F.R. § 1026.13(b).

h. "Board" means Respondent's duly appointed and acting Board of Directors.

i. "Claim and Defense Dispute" means when an Apple Card user, subject to and in accordance with 12 C.F.R. § 1026.12(c), withholds payment when a person who honors an Apple Card fails to resolve satisfactorily a dispute as to property or services purchased with the Apple Card. 12 C.F.R. § 1026.12(c).

j. "Claim of Unauthorized Use" means notification from an Apple Card user concerning the use of an Apple Card by a person, other than the cardholder, who does not have actual, implied, or apparent authority for such use, and from which the cardholder receives no benefit. 12 C.F.R. § 1026.12(b)(1)(i).

k. "Clearly and Prominently" means: (1) In textual communications (e.g., printed publications or words displayed on the screen of an electronic device), the disclosure must be of a type size and location sufficiently noticeable for an ordinary consumer to read and comprehend it, in print that contrasts with the background on which it appears; (2) In communications disseminated orally or through audible means (e.g., radio or streaming audio), the disclosure must be delivered in a volume and cadence sufficient for an ordinary consumer to hear and comprehend it; (3) In communications disseminated through video means (e.g., television or streaming video), the disclosure must be in writing in a form consistent with subsection (1), and must appear on the screen for a duration sufficient for an ordinary consumer to read and comprehend it; (4) In communications made through interactive media such as the internet, online services, and software, the disclosure must be unavoidable and presented in a form consistent with subsection (1); (5) In communications that contain both audio and visual portions, the disclosure must be presented simultaneously in both the audio and visual portions of the communication; and (6) In all instances, the disclosure must be presented before the consumer incurs any financial obligation, in an

2024-CFPB-0011 Document 1 Filed 10/23/2024 Page 11 of 53

understandable language and syntax, and with nothing contrary to, inconsistent with, or in mitigation of the disclosures used in any communication with the consumer.

l. "Consumer Reporting Agency" (CRA) means any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports. 15 U.S.C. § 1681a(f).

m. "Credit Card" means any card, plate, or other single credit device that may be used from time to time to obtain credit. 12 C.F.R. § 1026.2(a)(15)(i).

n. "Effective Date" means the date on which the Consent Order is entered on the administrative docket.

o. "Enforcement Director" means the Assistant Director of the Office of Enforcement for the Consumer Financial Protection Bureau, or their delegate.

p. "Principal Officers" means the Chief Executive Officer, Chief Financial Officer, General Counsel, Chief Operating Officer, Chief

Compliance Officer, Chief Risk Officer, Controller, and Treasurer responsible for managing Respondent.

q. "Redress Dispute" means a dispute concerning an Apple Card transaction submitted to Respondent prior to the Effective Date by a consumer using a channel through which Respondent received the pertinent information about the dispute as was reasonably required in the ordinary course of business that Respondent handled through its technology system for decisioning disputes concerning Apple Card transactions.

r. "Regulatory Remediation Committee" means the body comprised of members from the duly elected, or appointed, and acting Boards of Directors of Respondent and of Goldman Sachs Group, Inc. tasked with conducting regulatory remediation.

s. "Reinvestigate" means conduct an additional investigation, which must be conducted in compliance with Respondent's policies and procedures, except that Respondent must use its policies and procedures at the time of Respondent's initial receipt of a Redress Dispute to determine whether the Redress Dispute is a Billing Error Notice.

t. "Related Consumer Action" means a private action by or on behalf of one or more consumers or an enforcement action by another governmental agency brought against Respondent based on substantially the same facts as described in Section V of this Consent Order.

u. "Relevant Period" includes from January 1, 2019, to the Effective Date.

v. "Required Period" means: (1) for Acknowledgement Notices, within 30 days of Respondent receiving a Billing Error Notice, unless the Respondent had sent a Resolution Letter within the 30-day period; and (2) for Resolution Letters and for correcting Billing Errors by crediting consumers' accounts with any disputed amount and related finance or other charges, within two complete billing cycles (but in no event later than 90 days) after Respondent receives a Billing Error Notice. 12 C.F.R. § 1026.13(c).

w. "Resolution Letter" means: (1) a correction notice if Respondent determined that a Billing Error occurred as asserted; or (2) an explanation that sets forth the reasons for Respondent's belief that a Billing Error alleged by the consumer was incorrect in whole or in part if Respondent determined no Billing Error occurred or that a

different Billing Error occurred from that asserted, 12 C.F.R. § 1026.13(e), (f).

x. "Respondent" means Goldman Sachs Bank USA, and its successors and assigns.

y. "Supervision Director" means the Assistant Director of the Office of Supervision for the Consumer Financial Protection Bureau, or their delegate.

z. "Transaction" means a purchase of goods or services using Apple Card. For avoidance of doubt, this does not include amounts refunded to Apple Card accounts.

aa. "Transaction Dispute" means any of the following concerning a Transaction made with Apple Card: a Billing Error Notice, a Claim of Unauthorized Use, or a Claim and Defense Dispute.

bb. "Valid Dispute" means a Transaction Dispute or a Redress Dispute in response to which, under Respondent's policies and procedures, Respondent should have provided a credit after conducting an investigation.

## V.

## Bureau Findings and Conclusions

The Bureau finds the following:

13. Respondent is a depository institution headquartered at 200 West Street, New York, NY 10282, and chartered in New York. As of September 2023, Respondent had $538 billion in total assets, making it an insured depository institution with assets greater than $10,000,000,000 within the meaning of 12 U.S.C. § 5515(a).

14. Respondent is a "creditor" under TILA and its implementing Regulation Z because it "regularly extends consumer credit that is subject to a finance charge" and is the person "to whom the obligation is initially payable." 12 C.F.R. § 1026.2(a)(17)(i).

15. Respondent is a "card issuer" because it "issues a credit card." 12 C.F.R. § 1026.2(a)(7).

16. Respondent is a "covered person" because it "engages in offering or providing a consumer financial product or service." 12 U.S.C. § 5481(6).

**Findings and Conclusions as to Respondent's Failure to Resolve Errors Within Required Periods**

17. When creditors receive a Billing Error Notice, Regulation Z requires them to send consumers an Acknowledgment Notice within 30 days (unless the creditor has complied with certain billing resolution procedures within the 30 days), to conduct an investigation, and then to send consumers a Resolution Letter explaining its determination within "2 complete billing

cycles (but in no event later than 90 days)." 12 C.F.R. § 1026.13(c), (e)-(f). If a creditor determines that a Billing Error did occur, the creditor must also correct the Billing Error and credit the consumer's account with any disputed amount and related finance or other charges. 12 C.F.R. § 1026.13(e).

18. Between August 2019 and at least December 2021, when consumers submitted Billing Error Notices, Respondent's technological systems, internal processes, and representatives made widespread mistakes in resolving these Billing Error Notices.

19. These mistakes caused Respondent to fail to send approximately 157,000 Acknowledgment Notices to consumers within the Required Period or to send Acknowledgment Notices at all. 12 C.F.R. § 1026.13(c)(1).

20. Respondent's failure to send Acknowledgment Notices within the Required period, or at all, left consumers without confirmation that Respondent had received their Billing Error Notices and unable to determine whether Respondent required them to pay the disputed amounts on their next monthly statements to avoid incurring interest charges.

21. Between August 2019 and at least December 2021, widespread mistakes by Respondent's technological systems, internal processes, and representatives in resolving Billing Error Notices caused Respondent to fail to send

approximately 145,000 Resolution Letters within the Required Period or to send Resolution Letters at all. 12 C.F.R. § 1026.13(c)(2).

22. The mistakes left some consumers with a provisional credit from Respondent for the disputed amount but unable to determine whether Respondent would remove the provisional credit and require consumers to pay the disputed amount on their next monthly statements to avoid incurring interest charges.

23. In response to approximately 167,000 Billing Error Notices, Respondent failed to send either an Acknowledgment Notice or a Resolution Letter within the respective Required Periods. In response to approximately 124,000 of those Billing Error Notices, Respondent failed to send both an Acknowledgment Notice and a Resolution Letter.

24. The mistakes also caused Respondent to fail to correct thousands of Billing Errors by crediting the consumers' accounts with the disputed amount and related finance or other charges within the Required Period. 12 C.F.R. § 1026.13(e).

25. By failing to send an Acknowledgment Notice to consumers within the Required Period, by failing to send a Resolution Letter to consumers within the Required Period, and by failing to correct Billing Errors by crediting

consumers' accounts within the Required Period, Respondent violated Regulation Z's error resolution requirements. 12 C.F.R. § 1026.13(c), (e)-(f).

**Findings and Conclusions as to Respondent's Adverse Reports to CRAs**

26. Regulation Z prohibits creditors from making or threatening to make Adverse Reports regarding a consumer's failure to pay a disputed amount until after the creditor resolves the Billing Error. 12 C.F.R. § 1026.13(d).

27. Due to widespread mistakes by Respondent's technological systems, internal processes, and representatives in resolving Billing Error Notices, Respondent made hundreds of Adverse Reports to CRAs regarding amounts disputed in Billing Error Notices prior to completing the requirements for Billing Error resolution.

28. These Adverse Reports affected the creditworthiness of hundreds of consumers.

29. By making these Adverse Reports to CRAs, Respondent violated Regulation Z's prohibition against Adverse Reports regarding amounts disputed in Billing Error Notices prior to completion of the requirements for Billing Error resolution. 12 C.F.R. § 1026.13(d)(2).

**Findings and Conclusions as to Respondent's Failure to Conduct Reasonable Investigations of Billing Errors**

30. Regulation Z requires creditors to conduct reasonable investigations in response to Billing Error Notices. 12 C.F.R. § 1026.13(f).

31. Due to widespread mistakes by Respondent's technological systems, internal processes, and representatives in resolving Billing Error Notices, Respondent failed to conduct reasonable investigations of Billing Errors before determining that no Billing Error occurred or that a different Billing Error occurred from that asserted.

32. Respondent's failure to conduct reasonable investigations led Respondent to incorrectly determine that a Billing Error had not occurred and to fail to correct Billing Errors by crediting consumers' accounts.

33. As a result, Respondent violated Regulation Z's requirement to conduct reasonable investigations before determining that no billing error occurred or that a different Billing Error occurred from that asserted. 12 C.F.R. § 1026.13(f).

**Findings and Conclusions as to Respondent Holding Consumers Liable for Amounts Disputed in Claims of Unauthorized Use Before Conducting a Reasonable Investigation**

34. Regulation Z prohibits card issuers from holding consumers liable for Transactions subject to Claims of Unauthorized Use without conducting a "reasonable investigation." 12 C.F.R. § 1026.12(b); 12 C.F.R. § 1026 Supp. I, Comment 12(b)-3.

35. Due to widespread mistakes by Respondent's technological systems, internal processes, and representatives in resolving Claims of Unauthorized Use Respondent failed to conduct reasonable investigations of tens of thousands of Claims of Unauthorized Use before holding consumers liable for disputed amounts.

36. By holding consumers liable for disputed amounts before conducting a reasonable investigation of Claims of Unauthorized Use, Respondent violated TILA and Regulation Z. 12 C.F.R. § 1026.12(b); 12 C.F.R. § 1026 Supp. I, Comment 12(b)-3.

**Findings and Conclusions as to Respondent's Violations of the CFPA by its Violations of TILA and Regulation Z**

37. As described above, Respondent violated TILA and Regulation Z. TILA, 15 U.S.C. §§ 1643, 1666; 12 C.F.R. § 1026.12; 12 C.F.R. Supp. I, Comment 12(b)-3; 12 C.F.R. § 1026.13.

38. Respondent's violations of TILA and Regulation Z also constitute violations of section 1036(a)(1)(A) of the CFPA, which makes it unlawful for covered persons to "offer or provide to a consumer any financial product or service not in conformity with Federal consumer financial law, or otherwise commit any act or omission in violation of a Federal consumer financial law." 12 U.S.C. § 5536(a)(1)(A).

**Findings and Conclusions as to Respondent's Handling of Disputes**

39. Respondent's technological systems, internal processes, and representatives made widespread mistakes in resolving disputes, whether or not the disputes qualified as Billing Error Notices.

40. The mistakes in resolving disputes caused substantial injuries to consumers, including consumers who submitted Valid Disputes, when Respondent: (1) failed to provide credits, including in instances in which Respondent provided and then removed provisional credits, in response to Valid Disputes within 90 days; (2) made Adverse Reports to CRAs about disputed amounts before reviewing the disputes at issue; and (3) resolved disputes incorrectly.

41. These injuries were not reasonably avoidable by consumers, who provided notice to Respondent of their disputes.

42. Respondent's delay in resolving disputes was not outweighed by countervailing benefits to consumers or to competition.

43. Section 1036(a)(1)(B) of the CFPA prohibits "unfair, deceptive, or abusive" acts or practices. 12 U.S.C. § 5536(a)(1)(B).

44. Through its delay in resolving disputes, Respondent violated the CFPA's prohibition on unfair acts or practices. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

**Findings and Conclusions as to Respondent's Representations about ACMI Enrollment**

45. Although Apple designed the advertisements and the checkout process for enrolling purchases of Apple devices on Apple's website in Apple Card Monthly Installments (ACMI), the contract between Respondent and Apple required Respondent to review the advertisements and the checkout process for compliance with applicable law before their use. Respondent did, in fact, monitor the content of the advertisements and the checkout process for ACMI.

46. The advertisements for ACMI emphasized the ease and simplicity of Apple Card and the ACMI enrollment process. For example, iPhone users who opened their "Wallet" application received an advertisement that described enrollment in monthly installments as follows: "[p]urchase a new iPhone from Apple with interest-free monthly payments." ACMI advertisements also told consumers "[i]f you have Apple Card already, there's no additional application" for ACMI, and that if consumers did not have Apple Card, they could "[e]asily apply right at checkout."

47. In fact, purchases of Apple devices with Apple Card were not automatically enrolled in ACMI. Instead, consumers had to opt into ACMI during the checkout process for purchases made online and in Apple stores.

48. Through at least July 2020, the checkout process on Apple's website presented consumers purchasing iPhones with an option to "Pay in full" or

to "Pay monthly." The checkout process did not explain that "Pay monthly" referred to ACMI, or provide further details about ACMI, until after consumers selected this option.

49. Respondent received tens of thousands of complaints related to enrollment in ACMI.

50. Respondent added interest charges to the Apple Card accounts of thousands of consumers who then complained that they believed that their purchases of Apple devices with Apple Card would be automatically enrolled in ACMI.

51. From December 2019 through at least July 2020, representations in Apple Card advertisements and in the checkout process for enrolling online purchases in monthly installments misled consumers to expect that purchases of Apple devices made with Apple Card would be automatically enrolled in ACMI.

52. Until at least August 2020, after consumers had already purchased Apple devices without enrolling in ACMI, Apple and Goldman required consumers to return the devices and repurchase before they could be enrolled in ACMI.

53. Consumers' belief that their purchases of Apple devices with Apple Card would be automatically enrolled in ACMI was reasonable under the circumstances.

54. These representations were material because they related to the costs associated with purchasing an Apple device with ACMI and were likely to mislead consumers acting reasonably.

55. Section 1036(a)(1)(B) of the CFPA prohibits "unfair, deceptive, or abusive" acts or practices. 12 U.S.C. § 5536(a)(1)(B).

56. By making material representations that reasonably misled consumers about enrollment in ACMI, Respondent violated the CFPA's prohibition on deceptive acts or practices. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

**Findings and Conclusions as to Respondent's Representations About Refund Application**

57. From the launch of ACMI in December 2019 through at least May 24, 2021, the Apple Card Customer Agreement represented that refunds would be applied to the "applicable balance," which led consumers to expect that refunds from non-ACMI Transactions would be applied only to the non-ACMI balance, even if the refund would have made their non-ACMI balance negative.

58. Instead, Respondent automatically applied over ten thousand refund amounts that exceeded consumers' current non-ACMI balances to consumers' monthly ACMI balances.

59. Consumers expectation that refunds to their non-ACMI balance would remain in their non-ACMI balance was reasonable given the express representations in the agreement.

60. Respondent's express representations were material because they affected consumers' understanding of their payment obligations.

61. By making material representations that misled consumers about the application of refunds, Respondent violated the CFPA's prohibition on deceptive acts or practices. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

## VI.

## Conduct Provisions

### Prohibited Conduct

**IT IS ORDERED**, under sections 1053 and 1055 of the CFPA, that:

62. Respondent and its officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with them who receive actual notice of this Consent Order, whether acting directly or indirectly, in connection with the offering of Apple Card, may not violate sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531 and 5536; TILA, 15 U.S.C. §§ 1643 and 1666; Regulation Z, 12 C.F.R §§1026.12 and 1026.13; and Official Interpretations, 12 C.F.R. part 1026, Supp. I, Comments 12(b), and is prohibited from:

a. Failing to send an Acknowledgement Notice within the Required Period;

b. Failing to send a Resolution Letter within the Required Period;

c. Making Adverse Reports before a Billing Error Notice is resolved under 12 C.F.R. § 1026.13(e) or (f);

d. Failing to conduct reasonable investigations of Billing Error Notices before determining that no Billing Error occurred or that a different Billing Error occurred from that asserted where required under 12 C.F.R. § 1026.13(f);

e. Failing to conduct reasonable investigations of Claims of Unauthorized Use before holding consumers liable for disputed amounts where required under 12 C.F.R. § 1026.12(b);

f. Failing to provide credits, including instances in which Respondent provides and then removes provisional credits, in response to Valid Disputes where required by 12 C.F.R. §§ 1026.12 or 1026.13;

g. Misrepresenting that purchases of Apple devices made with Apple Card are automatically enrolled in ACMI;

h. Misrepresenting that refunds from non-ACMI Transactions are applied only to the non-ACMI balance, even if the refund would have made their non-ACMI balance negative;

i. Engaging in conduct that violates the CFPA's prohibition on unfair acts or practices, 12 U.S.C. §§ 5531(a), 5536(a)(1), when investigating and resolving Transaction Disputes, providing credits in response to Valid Disputes concerning Transaction Disputes, or making Adverse Reports concerning Transaction Disputes; and

j. Making Adverse Reports concerning Transaction Disputes prior to conducting a reasonable investigation.

**Affirmative Requirements**

**IT IS ORDERED**, under sections 1053 and 1055 of the CFPA, that:

63. Respondent must take the following affirmative actions in connection with the offering of Apple Card:

a. Establish, implement, and maintain policies and procedures to ensure Respondent's compliance with sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531 and 5536; TILA, 15 U.S.C. §§ 1643 and 1666; Regulation Z, 12 C.F.R. §§ 1026.12 and 1026.13; and Official Interpretations, 12 C.F.R. part 1026, Supp. I, Comments 12(b);

b. For Adverse Reports regarding an amount disputed in a Redress Dispute that Respondent made: (1) prior to the Effective Date, and (2) prior to the date on which Respondent determined whether to provide a final credit, or to remove a provisional credit (or otherwise

determined whether the consumer was liable for the Transaction): review all information in the Adverse Report and then correct any information Respondent provided in the Adverse Report concerning a failure to pay the disputed amount or related finance or other charges;

c. Provide an additional notice (Reinvestigation Notice) to all Apple Card users who submitted Redress Disputes received by Respondent prior to September 22, 2021, in response to which Respondent did not provide a credit, including Redress Disputes in response to which Respondent provided and then removed a provisional credit or otherwise did not absolve the consumer from liability, excluding any Redress Disputes Respondent Reinvestigated prior to the Effective Date by:

1. Including in the Redress Plan required by Section IX a template notice that Clearly and Prominently informs consumers that:

   i. Respondent may have resolved their Apple Card dispute incorrectly;

   ii. Consumers may contact Respondent to have their Apple Card dispute re-evaluated; and

iii. Consumers have 120 days from the date Respondent sends the Reinvestigation Notice to contact Respondent to have their Apple Card dispute re-evaluated;

2. Providing the Reinvestigation Notice to consumers in accordance with the requirements of Section IX; and

3. For each consumer who contacts Respondent after receiving the Reinvestigation Notice, Reinvestigating the applicable Redress Disputes;

d. Establish, implement, and maintain training adequate to ensure that Respondent conducts reasonable investigations in compliance with 12 C.F.R. §§ 1026.12(b) and 1026.13(f) and Official Interpretations, 12 C.F.R. part 1026, Supp. I, Comments 12(b), including trainings specific to the systems Respondent uses to process Transaction Disputes for Apple Card;

e. Establish, implement, and maintain policies and procedures requiring Respondent to retroactively enroll a consumer's purchases of eligible Apple devices in ACMI through the Effective Date (or, if retroactive enrollment is not possible, provide a credit equal to the benefit that the consumer would have received had the purchase been enrolled in ACMI) when Respondent receives notice from a consumer within six

months of the Effective Date indicating that the consumer intended to finance eligible purchases through ACMI and providing sufficient information to identify the ACMI-eligible transaction;

f. Establish, implement, and maintain policies and procedures adequate to ensure that Respondent complies with the CFPA's prohibition on unfair acts or practices, 12 U.S.C. §§ 5531(a), 5536(a)(1)(B), when investigating and resolving Transaction Disputes, providing credits in response to Valid Disputes concerning Transaction Disputes, or making Adverse Reports concerning Transaction Disputes;

g. Establish, implement, and maintain policies and procedures and testing to ensure that when Respondent receives Billing Error Notices, Respondent: (1) sends consumers an Acknowledgment Notice within 30 days from Respondent's receipt of the Billing Error Notice (unless the creditor has sent a Resolution Letter within the 30 days), and (2) conducts a reasonable investigation and sends consumers a Resolution Letter within two complete billing cycles (but in no event later than 90 days from Respondent's receipt of the Billing Error Notice); and

h. Establish, implement, and maintain policies and procedures and testing to ensure that Respondent does not make Adverse Reports prior to conducting reasonable investigations of Transaction Disputes.

2024-CFPB-0011 Document 1 Filed 10/23/2024 Page 31 of 33

64. Goldman Sachs Bank USA must establish, implement, and maintain testing to ensure Goldman Sachs Bank USA's compliance with sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531 and 5536; TILA, 15 U.S.C. §§ 1643 and 1666; Regulation Z, 12 C.F.R. §§ 1026.12 and 1026.13; and Official Interpretations, 12 C.F.R. part 1026, Supp. I, Comments 12(b) prior to implementing a material change to the manner by which Goldman Sachs Bank USA handles Transaction Disputes.

65. Goldman Sachs Bank USA must establish, implement, and maintain policies and procedures requiring Goldman Sachs Bank USA to provide a credit equal to the total disputed amount of disputed Transactions (or otherwise ensure that the consumer is not held liable for such amount), plus any related finance charges or other charges, when a consumer submits a Billing Error Notice in response to which Goldman Sachs Bank USA fails to provide an Acknowledgment Notice within the timeframe required by 12 C.F.R. § 1026.13(c)(1).

66. At least 90 days prior to offering a new Credit Card to U.S. retail consumers that Goldman Sachs Bank USA originates and directly services, Goldman Sachs Bank USA must provide the Bureau with a comprehensive compliance plan designed to ensure such product complies with all

applicable laws that the Bureau enforces, including Federal consumer financial laws.

67. The requirements of paragraphs 64, 65, and 66 apply to Goldman Sachs Bank USA but not its successors and assigns.

## VII.

## Compliance Plan

**IT IS FURTHER ORDERED** that:

68. Within 90 days of the Effective Date, Respondent must create and implement a comprehensive compliance plan designed to ensure that Respondent's offering of Apple Card complies with all applicable laws that the Bureau enforces, including Federal consumer financial laws, and the terms of this Consent Order (Compliance Plan). The Compliance Plan must include, at a minimum:

   a. Detailed steps for addressing each action required by this Consent Order;

   b. A mechanism to ensure that the Board is kept apprised of the status of compliance actions; and

   c. Specific timeframes and deadlines for implementation of the steps described above.

Respondent will provide the Compliance Plan to the Bureau upon request.

## VIII.

## Role of the Board and Executives

**IT IS FURTHER ORDERED** that:

69. Respondent's Board has the ultimate responsibility for ensuring that Respondent complies with this Consent Order.

70. Respondent's Principal Officers and Respondent's Board must review all plans and reports required by this Consent Order, and any submissions to the Bureau prior to such submission.

71. One year after the Effective Date, Respondent must submit to the Supervision Director an accurate written compliance progress report (Compliance Report) that has been approved by the Board, the accuracy of which is sworn to under penalty of perjury, and which, at a minimum:

   a. Describes the steps that Respondent's Board and Principal Officers have taken to reasonably assess whether Respondent is complying with the Redress Plan, Compliance Plan, and each applicable paragraph and subparagraph of the Consent Order;

   b. Describes in detail whether and how Respondent has complied with the Redress Plan, Compliance Plan, and each applicable paragraph and subparagraph of the Consent Order, including the manner of verification of such compliance and any corrective actions taken to

remedy potential non-compliance with the applicable requirement, paragraph, or subparagraph; and

c. Attaches a copy of each Order Acknowledgment obtained under Section XIII, unless previously submitted to the Bureau.

72. Respondent's Board, or a committee thereof, and Principal Officers must:

a. Authorize whatever actions are necessary for Respondent to assess whether Respondent is complying with the Redress Plan, Compliance Plan, and each applicable paragraph and subparagraph of the Consent Order;

b. Authorize whatever actions, including corrective actions, are necessary for Respondent to fully comply with the Redress Plan, Compliance Plan, and each applicable paragraph and subparagraph of the Consent Order; and

c. Require timely reporting by management to Respondent's Board and Principal Officers on the status of compliance obligations.

## MONETARY PROVISIONS

## IX.

## Order to Pay Redress

**IT IS FURTHER ORDERED** that:

73. Within ten days of the Effective Date, Respondent must reserve or deposit into a segregated deposit account an amount not less than $19.8 million for the purpose of providing redress to Affected Consumers as required by this Section. Respondent may reduce this reserve or deposit by the amount of any restitution Respondent made prior to the Effective Date that complies with the requirements of this Consent Order, for the purpose of providing redress to Affected Customers as required by this Section.

74. Respondent shall ensure redress is provided to each Affected Consumer in an amount equal to the total disputed amount of the Transaction at issue in the Redress Dispute submitted by the Affected Consumer, plus any related finance charges or other charges, with the exception of Affected Consumers receiving Reinvestigation Notices whose Redress Disputes Respondent: (1) does not Reinvestigate pursuant to this Consent Order, or (2) does Reinvestigate and determines that such Redress Dispute is not a Valid Dispute.

75. Within 60 days of the Effective Date, Respondent must submit to the Enforcement Director for review and non-objection a comprehensive written plan for providing redress consistent with this Consent Order (Redress Plan). The Enforcement Director will have the discretion to make a determination of non-objection to the Redress Plan or direct Respondent to revise it. If the

Enforcement Director directs Respondent to revise the Redress Plan, Respondent must revise and resubmit the Redress Plan to the Enforcement Director within 15 days. After receiving notification that the Enforcement Director has made a determination of non-objection to the Redress Plan, Respondent must implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the Redress Plan.

76. The Redress Plan must:

a. Describe Respondent's methodology used to identify all Affected Consumers and determine the amount of redress that Respondent will provide or has provided to each Affected Consumer to comply with Paragraph 74; the methodology must provide an accounting of redress that Respondent provided prior to the Effective Date that complies with the requirements of this Consent Order;

b. Include a final list of all Affected Consumers and the amount of redress that Respondent will provide or has provided to each Affected Consumer to comply with Paragraph 74; the final list must indicate for each Affected Consumer whether Respondent has provided redress that complies with the requirements of this Consent Order prior to the Effective Date and the amount of that redress;

c. Include the form of the letter and the email communication (Redress Notice and Reinvestigation Notice) and envelope to be sent notifying Affected Consumers who are entitled to redress of their right to redress; the Redress Notice and the Reinvestigation Notice must include a statement that the payment is made in accordance with terms of this Consent Order; Respondent must not include in any envelope or email communication containing a Redress Notice or Reinvestigation Notice any materials other than the approved Redress Notice and redress checks or the Reinvestigation Notice, unless Respondent has written confirmation from the Enforcement Director that the Bureau does not object to the inclusion of such additional materials;

d. Describe the process for providing redress to Affected Consumers, and must include the following requirements:

i. Respondent must send each Affected Consumer, or their authorized representative, a redress check (Redress Check) in the amount of redress required by Paragraph 74. Respondent must send such checks by United States Postal Service first-class mail, address correction service requested, to the most recent address for the consumer;

ii. Prior to sending Redress Notices, Reinvestigation Notices, and Redress Checks, Respondent must make reasonable attempts to obtain a current address for each Affected Consumer by using, at a minimum, the National Change of Address System (NCAS), any databases maintained by Respondent's clients that are reasonably accessible by Respondent, and skip-tracing. If no updated address is obtained through such methods, Respondent may mail the Redress Notice and the Redress Check or the Reinvestigation Notice to the consumer's last known mailing address.

iii. If a Redress Check, Redress Notice, or Reinvestigation Notice is returned to Respondent as undeliverable, Respondent must make additional reasonable attempts to contact the Affected Consumer and obtain a current address using a commercially available database other than the NCAS or by obtaining from the client or confirming with the client the Affected Consumer's last known email address or phone number and contacting the Affected Consumer at their last known email address or phone number. Respondent must promptly remail all returned Redress Checks and the Redress Notice or

Reinvestigation Notices to each Affected Consumer's current addresses, if any, obtained through such reasonable attempts;

iv. If a Redress Check that Respondent has attempted to send to an Affected Consumer is returned to Respondent, Respondent must retain the redress amount of such Affected Consumer for a period of 180 days from the date the check was mailed or remailed, whichever is later, during which period such amount may be claimed by such Affected Consumer upon appropriate proof of identity; and

v. Any redress amount remaining unclaimed after 360 days from the date the check was mailed or remailed, whichever is later, will be turned over to the Bureau as set forth in Paragraph 79;

e. Set forth all procedures, deadlines, and timeframes for completing each step of the Redress Plan, consistent with the terms of this Consent Order; and

f. Identify Respondent's officers, agents, servants, employees, and attorneys responsible for executing administration of the Redress Plan.

77. Respondent must mail all Redress Checks, Redress Notices, and Reinvestigation Notices within 30 days after the Enforcement Director has made a determination of non-objection to the Redress Plan.

78. Within 30 days of completing the Redress Plan, Respondent must submit to the Bureau a Redress Report detailing the number of consumers and consumer accounts who received redress after the Effective Date, the total amount of redress paid to those consumers, and any remainder of funds to be wired to the Bureau pursuant to Paragraph 79.

79. After completing the Redress Plan, if the amount of redress provided to Affected Consumers is less than $19.8 million, within 60 days of the submission of the Redress Report, Respondent must pay to the Bureau, by wire transfer to the Bureau or to the Bureau's agent, and according to the Bureau's wiring instructions, the difference between the amount of redress provided to Affected Consumers and $19.8 million.

80. The Bureau may use these remaining funds to pay additional redress to Affected Consumers. If the Bureau determines, in its sole discretion, that additional redress is wholly or partially impracticable or otherwise inappropriate, or if funds remain after the additional redress is completed, the Bureau will deposit any remaining funds in the U.S. Treasury.

Respondent will have no right to challenge any actions that the Bureau or its representatives may take under this Section.

81. Respondent may not condition the payment of any redress to any Affected Consumer under this Consent Order on that Affected Consumer waiving any right.

## X.

## Order to Pay Civil Money Penalty

**IT IS FURTHER ORDERED** that:

82. Under section 1055(c) of the CFPA, 12 U.S.C. § 5565(c), by reason of the violations of law described in Section V of this Consent Order, Respondent must pay a civil money penalty of $45 million to the Bureau.

83. Within ten days of the Effective Date, Respondent must pay the civil money penalty by wire transfer to the Bureau or to the Bureau's agent in compliance with the Bureau's wiring instructions.

84. The civil money penalty paid under this Consent Order will be deposited in the Civil Penalty Fund of the Bureau as required by section 1017(d) of the CFPA, 12 U.S.C. § 5497(d).

85. Respondent, for all purposes, must treat the civil money penalty paid under this Consent Order as a penalty paid to the government. Regardless of how the Bureau ultimately uses those funds, Respondent may not:

a. Claim, assert, or apply for a tax deduction, tax credit, or any other tax benefit for any civil money penalty paid under this Consent Order; or

b. Seek or accept, directly or indirectly, reimbursement or indemnification from any source, including but not limited to payment made under any insurance policy, with regard to any civil money penalty paid under this Consent Order.

86. To preserve the deterrent effect of the civil money penalty in any Related Consumer Action, Respondent may not argue that Respondent is entitled to, nor may Respondent benefit by, any offset or reduction of any compensatory monetary remedies imposed in the Related Consumer Action because of the civil money penalty paid in this action or because of any payment that the Bureau makes from the Civil Penalty Fund. If the court in any Related Consumer Action offsets or otherwise reduces the amount of compensatory monetary remedies imposed against Respondent based on the civil money penalty paid in this action or based on any payment that the Bureau makes from the Civil Penalty Fund, Respondent must, within 30 days after entry of a final order granting such offset or reduction, notify the Bureau, and pay the amount of the offset or reduction to the U.S. Treasury. Such a payment will not be considered an additional civil money penalty and will not change the amount of the civil money penalty imposed in this action.

## XI.

## Additional Monetary Provisions

**IT IS FURTHER ORDERED** that:

87. In the event of any default on Respondent's obligations to make payment under this Consent Order, interest, computed under 28 U.S.C. § 1961, as amended, will accrue on any outstanding amounts not paid from the date of default to the date of payment, and will immediately become due and payable.

88. Respondent must relinquish all dominion, control, and title to the funds paid to the fullest extent permitted by law and no part of the funds may be returned to Respondent.

89. Respondent acknowledges that its Taxpayer Identification Number (Social Security Number or Employer Identification Number), which Respondent previously submitted to the Bureau, may be used for collecting and reporting on any delinquent amount arising out of this Order, in accordance with 31 U.S.C. § 7701.

90. Within 30 days of the entry of a final judgment, consent order, or settlement in a Related Consumer Action, Respondent must notify the Supervision Director of the final judgment, consent order, or settlement in writing. That notification must indicate the amount of redress, if any, that Respondent paid

or is required to pay to consumers and describe the consumers or classes of consumers to whom that redress has been or will be paid.

## COMPLIANCE PROVISIONS

## XII.

## Reporting Requirements

**IT IS FURTHER ORDERED** that:

91. Respondent must notify the Bureau of any development that may affect compliance obligations arising under this Consent Order, including but not limited to a dissolution, assignment, sale, merger, or other action that would result in the emergence of a successor company; the creation or dissolution of a subsidiary, parent, or affiliate that engages in any acts or practices subject to this Consent Order; the filing of any bankruptcy or insolvency proceeding by or against Respondent; or a change in Respondent's name or address. Respondent must provide this notice, if practicable, at least 30 days before the development, but in any case no later than 14 days after the development.

92. Within seven days of the Effective Date, Respondent must:

    a. Designate at least one telephone number and email, physical, and postal addresses as points of contact that the Bureau may use to communicate with Respondent; and

b. Designate at least one telephone number and email, physical, and postal addresses as points of contact for consumers with inquiries related to consumer relief under the Consent Order.

93. Respondent must report any change in the information required to be submitted under Paragraph 92 at least 30 days before the change or as soon as practicable after the learning about the change, whichever is sooner.

## XIII.

## Order Distribution and Acknowledgment

**IT IS FURTHER ORDERED** that:

94. Within seven days of the Effective Date, Respondent must submit to the Supervision Director an acknowledgment of receipt of this Consent Order, sworn under penalty of perjury.

95. Within 30 days of the Effective Date, Respondent must deliver a copy of this Consent Order to each of its Board members, Principal Officers, and members of the Regulatory Remediation Committee, as well as to any managers who have responsibilities related to the subject matter of the Consent Order.

96. For 5 years from the Effective Date, Respondent must deliver a copy of this Consent Order to any business entity resulting from any change in structure referred to in Section XII, any future board members and Principal Officers,

as well as to any managers who will have responsibilities related to the subject matter of the Consent Order before they assume their responsibilities.

97. Respondent must secure a signed and dated statement acknowledging receipt of a copy of this Consent Order, within 30 days of delivery, from all persons receiving a copy of this Consent Order under this Section.

98. Ninety days from the Effective Date, Respondent must submit to the Bureau a list of all persons and their titles to whom this Consent Order has been delivered under the Section of this Order titled "Order Distribution and Acknowledgment" and a copy of all signed and dated statements acknowledging receipt of this Consent Order under Paragraph 97.

## XIV.

## Recordkeeping

**IT IS FURTHER ORDERED** that:

99. Respondent must create and retain the following business records:

    a. All documents and records necessary to demonstrate full compliance with the Compliance Plan, Redress Plan, and each provision of this Consent Order, including all submissions to the Bureau;

    b. All documents and records pertaining to the Redress Plan, described in Section IX above;

c. For each individual Affected Consumer: the consumer's name, address and, if available to Respondent, phone number and email address, as well as the date of Redress Dispute submission, date of disputed Transaction, amount of disputed Transaction, date of Adverse Report as applicable, and date of redress payment as applicable; and

d. All consumer complaints (whether received directly or indirectly, such as through a third party), and any responses to those complaints, regarding Respondent's administration of Apple Card.

100. All documents and records must be maintained in their original electronic format. Data should be maintained in such a way that access, retrieval, auditing and production are not hindered.

101. Respondent must make the documents identified in Paragraph 99 available to the Bureau upon the Bureau's request.

## XV.

## Notices

**IT IS FURTHER ORDERED** that:

102. Unless otherwise directed in writing by the Bureau, Respondent must provide all submissions, requests, communications, or other documents relating to this Consent Order in writing, with the subject line, "*In re*

Goldman Sachs Bank USA, File No. 2024-CFPB-0011," and send them to the following email: Enforcement_Compliance@cfpb.gov addressed as follows: ATTN: Supervision Director
Consumer Financial Protection Bureau
Office of Supervision Policy

ATTN: Enforcement Director
Consumer Financial Protection Bureau
Office of Enforcement

**XVI.**

**Cooperation with the Bureau**

**IT IS FURTHER ORDERED** that:

103. Respondent must cooperate fully to help the Bureau determine the identity and location of, and the amount of injury sustained by, each Affected Consumer. Respondent must provide such information in its or its agents' possession or control within 14 days of receiving a written request from the Bureau.

104. Respondent must remain registered for the Bureau's Company Portal and in connection with responding to consumer complaints and inquiries on the Company Portal, must comply with the timely response requirements set forth in § 1034(b)(1)-(3) of the CFPA, 12 U.S.C. § 5534(b).

## XVII.

## Compliance Monitoring

**IT IS FURTHER ORDERED** that:

105. Within 14 days of receipt of a written request from the Bureau, Respondent must submit additional Compliance Reports or other requested information, which must be made under penalty of perjury; provide sworn testimony; or produce documents.

106. Respondent must permit Bureau representatives to interview any employee or other person affiliated with Respondent who has agreed to such an interview regarding: (a) this matter; (b) anything related to or associated with the conduct described in Section V; or (c) compliance with the Consent Order. The person interviewed may have counsel present.

107. Nothing in this Consent Order will limit the Bureau's lawful use of civil investigative demands under 12 C.F.R. § 1080.6 or other compulsory process.

## XVIII.

## Modifications to Non-Material Requirements

**IT IS FURTHER ORDERED** that:

108. Respondent may seek a modification to non-material requirements of this Consent Order (e.g., reasonable extensions of time and changes to reporting requirements) by submitting a written request to the Supervision Director.

109. The Supervision Director may, in their discretion, modify any non-material requirements of this Consent Order (e.g., reasonable extensions of time and changes to reporting requirements) if they determine good cause justifies the modification. Any such modification by the Supervision Director must be in writing.

## XIX.

## ADMINISTRATIVE PROVISIONS

**IT IS FURTHER ORDERED** that:

110. The provisions of this Consent Order do not bar, estop, or otherwise prevent the Bureau from taking any other action against Respondent, except as described in Paragraph 111. Further, for the avoidance of doubt, the provisions of this Consent Order do not bar, estop, or otherwise prevent any other person or governmental agency from taking any action against Respondent.

111. The Bureau releases and discharges Respondent from all potential liability for law violations that the Bureau has or might have asserted based on the practices described in Section V of this Consent Order, to the extent such

practices occurred before the Effective Date and the Bureau knows about them as of the Effective Date. The Bureau may use the practices described in this Consent Order in future enforcement actions against Respondent and its affiliates, including, without limitation, to establish a pattern or practice of violations or the continuation of a pattern or practice of violations or to calculate the amount of any penalty. This release does not preclude or affect any right of the Bureau to determine and ensure compliance with the Consent Order, or to seek penalties for any violations of the Consent Order.

112. This Consent Order is intended to be, and will be construed as, a final Consent Order issued under section 1053 of the CFPA, 12 U.S.C. § 5563, and expressly does not form, and may not be construed to form, a contract binding the Bureau or the United States.

113. This Consent Order will terminate on the later of 5 years from the Effective Date or 5 years from the most recent date that the Bureau initiates an action alleging any violation of the Consent Order by Respondent if such action is initiated within 5 years of the Effective Date. If such action is dismissed or the relevant adjudicative body rules that Respondent did not violate any provision of the Consent Order, and the dismissal or ruling is either not appealed or upheld on appeal, then the Consent Order will terminate as though the action had never been filed. The Consent Order will remain

effective and enforceable until such time, except to the extent that any provisions of this Consent Order have been amended, suspended, waived, or terminated in writing by the Bureau or its designated agent.

114. Calculation of time limitations will run from the Effective Date and be based on calendar days, unless otherwise noted. Deadlines that fall on a weekend or federal holiday shall carry over to the following business day.

115. Should Respondent seek to transfer or assign all or part of its operations that are subject to this Consent Order, Respondent must, as a condition of sale, obtain the written agreement of the transferee or assignee to comply with all applicable provisions of this Consent Order.

116. The provisions of this Consent Order will be enforceable by the Bureau. For any violation of this Consent Order, the Bureau may impose the maximum amount of civil money penalties allowed under section 1055(c) of the CFPA, 12 U.S.C. § 5565(c). In connection with any attempt by the Bureau to enforce this Consent Order in federal district court, the Bureau may serve Respondent wherever Respondent may be found and Respondent may not contest that court's personal jurisdiction over Respondent.

117. This Consent Order and the accompanying Stipulation contain the complete agreement between the parties. The parties have made no promises, representations, or warranties other than what is contained in this Consent

Order and the accompanying Stipulation. This Consent Order and the accompanying Stipulation supersede any prior oral or written communications, discussions, or understandings.

118. Nothing in this Consent Order or the accompanying Stipulation may be construed as allowing Respondent, its Board, its officers, or employees to violate any law, rule, or regulation.

**IT IS SO ORDERED**, this 23rd day of October, 2024.

Rohit Chopra
Director
Consumer Financial Protection Bureau

Matthew Joyce
600 Market Grove Drive #100
Wake Forest, NC 27587-7345
(919) 259-4661
m.joyce07@proton.me
Plaintiff, Pro Se

August 17, 2026

Clerk of the Court
United States District Court
Eastern District of California
501 I Street
Sacramento, CA 95814

Re: **Joyce v. ARB Gaming LLC dba Modo.US, et al.**
Case No. 2:25-cv-01868-DJC-CSK (PS)
Filing: Objections to Reply Evidence; Requests for Judicial Notice; Renewed Request for Leave to File a Supplemental Brief

Dear Clerk of the Court:

Enclosed for filing, please find the following, submitted in this order:

1. Plaintiff's Objection to Evidence Submitted for the First Time with Defendant ARB Gaming LLC's Reply (L.R. 230(m)(1));
2. Plaintiff's Renewed Request for Judicial Notice;
3. Index of Exhibits to the Renewed Request for Judicial Notice;
4. Exhibits A through E to the Renewed Request for Judicial Notice;
5. Plaintiff's Renewed Request for Leave to File a Supplemental Brief;
6. [Proposed] Order Granting Plaintiff's Renewed Request for Leave to File a Supplemental Brief;
7. Proposed Supplemental Brief, lodged as Exhibit 1 to the Renewed Request for Leave — not to be filed unless leave is granted;
8. Plaintiff's Objection to Evidence Submitted for the First Time with Defendant Goldman Sachs Bank USA's Reply (L.R. 230(m)(1));
9. Plaintiff's Request for Judicial Notice (Goldman Sachs Bank USA);
10. Index of Exhibits to the Request for Judicial Notice (Goldman Sachs Bank USA);
11. Exhibit A to the Request for Judicial Notice (Goldman Sachs Bank USA); and
12. Proof of Service.

The underlying motions are set for hearing on August 25, 2026 at 10:00 a.m. by Zoom before Magistrate Judge Chi Soo Kim. Defendants filed their replies on August 10, 2026.

A copy of the [Proposed] Order is being submitted separately in Microsoft Word format to CSKorders@caed.uscourts.gov, per Section VII.A of Judge Kim's Civil Standing Orders.

Kindly file the enclosed documents and return a file-stamped conformed copy to the courier presenting this filing. I am proceeding pro se and filing by paper, consistent with the Court's Minute Order at ECF No. 74.

Respectfully submitted,

Signed by:
Matthew Joyce
07B601B840D34AB

Matthew Joyce
Plaintiff, Pro Se

Docusign Envelope ID: 910663E7-81EF-8369-82D0-81771A304C69


Matthew Joyce
Plaintiff, Pro Se
600 Market Grove Dr #100
Wake Forest, NC 27587-7345
Phone: (919) 259-4661
Email: m.joyce07@proton.me

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**SACRAMENTO DIVISION**

| | |
|---|---|
| MATTHEW JOYCE, an individual,<br>Plaintiff,<br>v.<br>ARB GAMING LLC dba MODO.US;<br>AFFIRM, INC.; GOLDMAN SACHS BANK USA; APPLE INC.; AMAZON.COM, INC.; and DOES 1-50,<br><br>Defendants. | Case No. 2:25-cv-01868-DJC-CSK (PS)<br><br>**PROOF OF SERVICE** |

August 25, 2026, 10:00 a.m. — by Zoom — Hon. Chi Soo Kim

I, Matthew Joyce, declare:

I am the Plaintiff in this action and I appear in propria persona. My address is 600 Market Grove Drive #100, Wake Forest, North Carolina 27587-7345.

On August 17, 2026, I served true and correct copies of the following documents:

**1.** Plaintiff's Objection to Evidence Submitted for the First Time with Defendant ARB Gaming LLC's Reply (L.R. 230(m)(1));

**2.** Plaintiff's Renewed Request for Judicial Notice, with Index of Exhibits and Exhibits A through E;

**3.** Plaintiff's Renewed Request for Leave to File a Supplemental Brief, with [Proposed] Order and the Proposed Supplemental Brief lodged as Exhibit 1;

**4.** Plaintiff's Objection to Evidence Submitted for the First Time with Defendant Goldman Sachs Bank USA's Reply (L.R. 230(m)(1)); and

**5.** Plaintiff's Request for Judicial Notice (Goldman Sachs Bank USA), with Index of Exhibits and Exhibit A.

I served those documents by **electronic mail**, sent from Wake Forest, North Carolina, to each of the persons at the electronic mail addresses set forth in the Service List below. Each attorney listed is counsel of record in this action and a registered CM/ECF filing user in this District. Registration as a filing user constitutes consent to receive service electronically pursuant to Fed. R. Civ. P. 5(b)(2)(E) and waiver of the right to receive service by any other means. E.D. Cal. L.R. 135(g)(1). Counsel of record will additionally be served by the Notice of Electronic Filing generated when these documents are docketed. E.D. Cal. L.R. 135(a).

I additionally served Plaintiff-in-Interpleader Jamie Stahura by **United States Mail**, first-class postage prepaid, deposited at Wake Forest, North Carolina, addressed to 11076 Ligon Mill Road #100, Wake Forest, North Carolina 27587, and by electronic mail to the addresses shown for her on the Service List.

Defendant Amazon.com, Inc. has not appeared in this action and has no counsel of record. The service list filed by Defendant ARB Gaming LLC with its reply likewise lists no counsel for Amazon.com, Inc. (ECF 106 at 14 of 14.)

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 17, 2026, at Wake Forest, North Carolina.

Signed by:
Matthew Joyce
07B601B840D34AB...

**Matthew Joyce**

Plaintiff, Pro Se

**SERVICE LIST**

Karen L. Alexander (SBN 265926)
DUANE MORRIS LLP
750 B Street, Suite 2900
San Diego, CA 92101-4681
Tel: 619-744-2200 · Fax: 619-744-2201
KLAlexander@duanemorris.com
Sean Patterson (SBN 234565)
Daniel D. Wall (SBN 311391)
DUANE MORRIS LLP
Spear Tower, One Market Plaza, Suite 2200
San Francisco, CA 94105-1127
Tel: 415-957-3000 · Fax: 415-957-3001
CSPatterson@duanemorris.com
DWall@duanemorris.com

*Attorneys for Defendant ARB GAMING LLC dba MODO*

Kalama M. Lui-Kwan (SBN 242121)
Ryan A. Lewis (SBN 307253)
TROUTMAN PEPPER LOCKE LLP
Three Embarcadero Center, Suite 800
San Francisco, CA 94111
Tel: 415-477-5700 · Fax: 415-477-5710
kalama.lui-kwan@troutman.com
ryan.lewis@troutman.com
Gary D. Sonnenfeld
TROUTMAN PEPPER LOCKE LLP
777 South Flagler Drive, Suite 215, East Tower
West Palm Beach, FL 33401
Tel: 305-712-1572 · Fax: 561-655-8719
gary.sonnenfeld@troutman.com

*Attorneys for Defendant AFFIRM, INC.*

Arjun P. Rao (SBN 265347)
Marcos D. Sasso (SBN 228905)
MORGAN, LEWIS & BOCKIUS LLP
2049 Century Park East, Suite 700
Los Angeles, CA 90067-3109
Tel: 310-907-1063 · Fax: 310-907-1001
arjun.rao@morganlewis.com
marcos.sasso@morganlewis.com

*Attorneys for Defendant GOLDMAN SACHS BANK USA*

John Samuel Gibson
DLA PIPER LLP (US)
2000 Avenue of the Stars, North Tower, Suite 400
Los Angeles, CA 90067-4704
Tel: 310-595-3039 · Fax: 310-595-3339
john.gibson@dlapiper.com

*Attorneys for Defendant APPLE INC.*

Jamie Stahura
11076 Ligon Mill Road, #100
Wake Forest, NC 27587
Tel: 631-252-9182
Jamie.Stahura@PNFP.com
Nailbnder99@yahoo.com

*Plaintiff-in-Interpleader, Pro Se*