# EXHIBIT C

**JAMS ARBITRATION**

| | | |
|---|---|---|
| **Matthew Joyce,** | ) | |
| | ) | |
| *Claimant,* | ) | |
| | ) | |
| v. | ) | **Case No. 5100003080** |
| | ) | |
| **Arb Gaming LLC dba Modo,** | ) | |
| | ) | |
| | ) | |
| *Respondent.* | ) | |
| | ) | |

## AMENDED DEMAND FOR ARBITRATION AND AMENDED STATEMENT OF CLAIM

Claimant Matthew Joyce (claimant) submits this Amended Demand for Arbitration and Amended Statement of Claim against Respondent ARB Gaming LLC d/b/a Modo US (respondent or ARB Gaming) pursuant to the parties' arbitration agreement and the Federal Arbitration Act.

This Amended Demand is filed pursuant to the March 4, 2026 Order of Hon. Peggy A. Leen (Ret. ) (the order), which (a) held the arbitration agreement is severable, mandatory, binding, and enforceable, (b) held Arizona law governs, (c) dismissed Claimant's California law-based claims with prejudice, (d) dismissed claims against unserved entities with prejudice, and (e) dismissed Claimant's negligent and fraudulent misrepresentation claims with leave to amend, directing that any amended demand contain a plain, short, and concise statement of the factual basis for each claim and the remedy sought consistent with JAMS Comprehensive Rule 9.

Claimant seeks an award of damages and other relief as set forth below, based on Respondent's alleged breach of contract and unjust enrichment, and amended claims for negligent misrepresentation and fraudulent misrepresentation pleaded with particularity.

## PARTIES

1. Claimant Matthew Joyce is an individual and a resident of Durham County, North Carolina.
2. Respondent ARB Gaming LLC d/b/a Modo US is a Delaware limited liability company with its principal place of business in Scottsdale, Arizona.

## ARBITRATION AGREEMENT, FORUM, AND GOVERNING LAW

3. Claimant's Demand for Arbitration was filed May 9, 2025 and attached a complaint asserting claims against ARB Gaming only.
4. The parties' Terms include a mandatory arbitration agreement administered by JAMS under its Comprehensive Arbitration Rules and Procedures.
5. The arbitration agreement provides that it is governed by the Federal Arbitration Act and is a separate agreement, and further delegates disputes concerning enforceability, validity, scope, or severability of the agreement to binding arbitration.
6. The arbitration agreement contains a governing law provision selecting Arizona law for the Terms and matters arising out of or relating to the Terms.
7. The Order held that Arizona law applies and dismissed Claimant's California law-based claims with prejudice.

## STATEMENT OF FACTS

**Background and Formation of Agreement**

8. Respondent operates an online gaming and sweepstakes platform accessible at modo.us.
9. The State of Arizona issued a cease and desist order to Respondent, declaring its operations a criminal enterprise under Arizona law — the same law Arbitrator Leen ruled governs this agreement.
10. Claimant is the author of California Assembly Bill 831, which banned sweepstakes casinos statewide effective January 1, 2026. The bill passed both chambers unanimously and was signed into law by the Governor.
11. Claimant has 5,631 documented hours of platform activity on Respondent's platform, constituting one of the most comprehensive forensic records of sweepstakes casino exploitation in existence.
12. In June 2025, Respondent acquired Publishers Clearing House out of bankruptcy, demonstrating both the scale of its operations and its ability to satisfy an award.
13. On August 2, 2024, Claimant created an account on Respondent's platform and accepted Respondent's Terms of Service, thereby entering into the Modo Agreement.
14. On September 10, 2024, after Claimant won approximately $6,000, Respondent required Claimant to accept updated Terms of Service as a condition of continuing play. Claimant rejected the updated Terms three times in writing.
15. Claimant refused to sign the new Terms of Service three times in writing.

**Claimant's Personal Circumstances**

16. Claimant suffers from a gambling disorder.

17. Claimant also suffers from bipolar disorder, depression, and anxiety.
18. These conditions affect Claimant's decision-making capacity and impulse control, particularly during manic episodes.

**Respondent's Platform and Representations**

19. Respondent's platform implements casino-style games with spinning reels, card games, and variable reward schedules.
20. Respondent represents on its platform that games are "always free to play."
21. Respondent represents that its games are based entirely on chance.
22. Respondent represents that all players have equal opportunity to win.

23. Respondent represents that its platform complies with sweepstakes laws.
24. Respondent represents that withdrawals and redemptions will be processed promptly.
25. Respondent represents that it implements responsible gaming practices.

**Claimant's Usage Patterns**

26. During January 2025, Claimant's usage patterns included playing 18.5 to 21 continuous hours per day.
27. These extreme usage patterns are consistent with behavioral escalation and impaired decision-making associated with gambling disorder and bipolar disorder.
28. Claimant repeatedly canceled redemptions to continue gambling, demonstrating loss of control characteristic of gambling addiction.

**Respondent's VIP Program and Preferential Treatment**

29. After observing Claimant's substantial losses, Respondent promoted Claimant to "Black Diamond" status.
30. Respondent promoted Claimant to Black Diamond status despite Claimant's expressed concerns about platform functionality and his desire to leave the platform.
31. Upon achieving Black Diamond status, Claimant received "free" Gold Coins and Sweepstakes Coins that were not available to ordinary players.
32. Upon achieving Black Diamond status, Claimant was assigned a personal VIP Host.
33. Claimant's VIP Hosts were Timothy Cramblin and Vic LaFontaine.
34. Respondent's VIP Host explicitly stated to Claimant that he had a "monthly budget with 'wiggle room'" specifically allocated for Claimant.
35. This statement confirms that Respondent provided preferential treatment to Claimant that contradicted Respondent's representations of equal treatment for all players.
36. Respondent restricted Claimant from using general customer service chat for routine matters such as obtaining tax documents.
37. Respondent forced Claimant to communicate exclusively with his VIP Host.
38. This restriction created dependence on the VIP Host and was designed to encourage Claimant's continued gambling.

**Platform Manipulation and Return-to-Player Metrics**

39. Claimant obtained forensic statistical analysis of his gameplay on Respondent's platform.
40. The forensic analysis demonstrates that return-to-player (RTP) remained consistently below industry standards of 90-98%.

41. The forensic analysis demonstrates that RTP dropped further after January 3, 2025, during the period when Claimant suffered the most financially damaging losses.
42. The forensic analysis demonstrates that platform payout behavior shifted in a sustained way, consistent with platform-controlled volatility or promotional front-loading.
43. Claimant's win/loss patterns followed specific orchestrated timing.
44. Larger wins were strategically timed at weekend beginnings, preventing withdrawal during non-business days.
45. Respondent's redemption policies required one to two business days for processing.
46. These processing delays allowed cancellation options that Claimant would utilize during manic episodes.
47. RTP metrics gradually depleted Claimant's funds by Sunday night rather than quickly on weekdays.
48. This timing pattern maximized Claimant's gambling duration and Respondent's revenue.

**Respondent's Monitoring and Response to Warning Signs**

49. Respondent monitored Claimant's gambling patterns in extraordinary detail.
50. Respondent tracked specific win rates, spin counts, and other metrics to calibrate its exploitation of Claimant.
51. When Claimant complained about losses, Respondent immediately provided "free" virtual currency to prevent him from stopping play.
52. Respondent's representative mocked Claimant's declaration of playing "15 hours per day" as humorous rather than concerning.

53. This response demonstrates that Respondent recognized the extreme nature of Claimant's usage but chose to exploit it rather than intervene.
54. Only after approximately one year of severe addiction behaviors did Respondent make any reference to responsible gambling.
55. Even then, Respondent merely suggested that Claimant stop canceling redemptions rather than implementing mandatory cooling-off periods or spending limits.

**Withdrawal Delays and Barriers**

56. Respondent deliberately delayed withdrawal and redemption processing.
57. Respondent created unnecessary barriers to Claimant cashing out his winnings.
58. These delays and barriers are documented in Claimant's communications with Respondent.
59. The purpose of these delays was to frustrate withdrawal attempts and encourage continued gambling.

**Predatory Financing Through Affirm**

60. Claimant took out numerous high-interest loans through Affirm specifically to purchase virtual currency on Respondent's platform.
61. These loans carried annual percentage rates of 24% to 25%.
62. In January 2025 alone, Claimant took out multiple loans for "MODO GOLD COINS."
63. Transaction amounts typically ranged from $299.99 to $499.99.
64. This pattern demonstrates addiction-driven borrowing.

65. Affirm representatives acknowledged that their "system does not detect [gambling transactions] right away."

66. This system failure allowed initial gambling transactions to process despite violating Affirm's terms of service.

67. Affirm later confirmed they updated their system to block gambling transactions.

68. Affirm stated that "Affirm does not support transactions that could be considered illegal or gambling."

69. Despite this policy, Affirm continued attempting collection on gambling-related debts previously issued to Claimant.

**Claimant's Losses and Damages**

70. During a recorded call with Affirm, Claimant stated: "I lost over 200,000, 150,000 just in 2025."

71. Claimant's losses during the 2024-2025 period totaled between $150,000 and $200,000.

72. As a direct result of his gambling addiction fostered by Respondent's actions, Claimant was forced to sell his Pepperidge Farm distribution route, an asset valued in excess of $600,000, at a distressed price. The route has since appreciated significantly under new ownership, indicating Claimant's business destruction exceeds $800,000.

73. Respondent is judicially estopped from enforcing the arbitration agreement's protective provisions — including the damages cap, exclusive remedy clause, and limitation of liability — because Respondent represented to Goldman Sachs that disputes were governed by AAA arbitration in Florida, while simultaneously representing to Claimant that disputes were governed by JAMS arbitration in Scottsdale, and then actually filing

with JAMS in Las Vegas. Respondent cannot take inconsistent positions regarding the very terms it now seeks to enforce.

74. Respondent submitted evidence to Goldman Sachs in connection with chargeback disputes representing that disputes were subject to arbitration before the American Arbitration Association ("AAA") in Florida. The September 10, 2024 Terms of Service — the only version Claimant accepted — specify JAMS arbitration in Scottsdale, Arizona as the exclusive forum. Respondent's actual arbitration filing was made with JAMS in Las Vegas. Web Archive review confirms that no published version of Respondent's Terms of Service ever referenced AAA. The AAA/Florida representation submitted was fabricated.

75. A third party relied on Respondent's fabricated AAA/Florida arbitration representation when reversing 23 chargeback rulings that had previously been decided in Claimant's favor. Goldman Sachs forced Claimant to sacrifice $500 as a condition of the dispute resolution process while Claimant was losing his home.

76. Respondent thus represented three different arbitration forums to three different audiences: AAA in Florida to Goldman Sachs, JAMS in Scottsdale to customers, and JAMS in Las Vegas where it actually filed. This constitutes document fraud on the dispute process and supports judicial estoppel — Respondent took inconsistent positions to benefit itself in different proceedings at Claimant's expense.

77. Claimant incurred substantial interest payments on high-interest loans obtained to fund his gambling.

78. Claimant's credit score was damaged by numerous loan applications and potential defaults.

79. Claimant experienced emotional distress as a direct result of Respondent's conduct.

80. Claimant experienced depression as a direct result of Respondent's conduct.

81. Claimant's gambling disorder worsened as a direct result of Respondent's conduct.

82. Claimant's relationships were damaged as a result of his gambling addiction.

83. Claimant's work performance deteriorated as a result of his gambling addiction.

**Respondent's Knowledge and Intent**

84. Respondent's conduct was willful.

85. Respondent's conduct was malicious.

86. Respondent's conduct was oppressive.

87. Respondent's conduct was in conscious disregard of Claimant's rights.

88. Respondent deliberately targeted a vulnerable individual with a known gambling disability.

89. Respondent manipulated platform mechanics to maximize addiction and financial harm.

90. Respondent exploited Claimant's addiction for profit rather than implementing protective measures.

91. Respondent's CEO Patrick Fechtmeyer provided sworn testimony in his JAMS declaration that is directly contradicted by his own public statements, including testimony before the Indiana state legislature and statements published in CasinoBeats, in which he made representations about Respondent's operations that are inconsistent with his declarations in this proceeding.

92. On February 12, 2026, Fechtmeyer testified before the Indiana Senate Public PolicyCommittee regarding HB 1052, stating: “I’m here—not to defend a loophole.”

This concession that the sweepstakes model constitutes a “loophole” directly contradicts his sworn JAMS declaration that the platform is not gambling.

93. Patrick Fechtmeyer's father Kurtis Fechtmeyer was a principal at Epoch Partners, which was acquired by Goldman Sachs. This relationship explains the payment processing relationship between Respondent and Goldman Sachs, which serves as Respondent's payment processor.

94. The FY Foundation, operated by Respondent CEO Patrick Fechtmeyer's mother Alison Townley, holds itself out as a charitable organization but has no verified legitimate nonprofit status. This raises questions about Respondent's corporate governance and the flow of funds derived from its operations.

95. On February 18, 2026, Fechtmeyer stated in a published CasinoBeats interview that Respondent has “plenty of protections built in, age verification, AML, geolocation, and responsible play tools.” He also analogized his business to “DFS to sportsbook,” an admission that the product operates within the gambling ecosystem. He further estimated Respondent’s operations could generate “$20 million or more” in tax revenue for Indiana— an impossibility if the platform were merely “free entertainment.”

96. In January 2026, Fechtmeyer published a Medium post advocating a “SweepstakesModernization Act” to regulate—not ban—sweepstakes platforms, stating: “I’m not writing this to defend a loophole.” This further contradicts his sworn position that Respondent’s platform does not constitute gambling.

97. Respondent thus tells three audiences three different stories: it tells this tribunal under oath that the platform is not gambling; it tells state legislatures that the platform is a “loophole”

that needs regulation as gambling; and it tells industry publications that the platform generates tax revenue comparable to licensed gambling operations. These positions are irreconcilable.

98. Respondent issued IRS Form 1099 to Claimant for $61,000 in reported income. The issuance of a 1099 is itself an admission that real money changed hands—a fact incompatible with Respondent's sworn representation that "no money is required to play." The 1099 was generated using Respondent's own return-to-player methodology, which forensic analysis demonstrates is fraudulent.

## COUNT ONE

### Breach of Contract

### (against Respondent ARB Gaming LLC)

99. . Claimant entered into an agreement with Respondent. Claimant reserves all arguments regarding the validity and enforceability of that agreement, including that it is void ab initio under Arizona law.

100. On August 2, 2024, Claimant entered into the Modo Agreement by accepting Respondent's Terms of Service when creating his account on Respondent's platform.

101. On September 10, 2024, Claimant accepted an updated version of the Terms of Service.

102. The Modo Agreement contains express and implied terms regarding the fairness of games, equal treatment of players, and compliance with sweepstakes laws.

103. Respondent breached specific terms and conditions of the Modo Agreement.

104. Respondent breached the Modo Agreement by providing preferential treatment to Claimant through Black Diamond status, personal VIP Host services, and substantial

free credits not available to other players, in violation of representations regarding equal treatment.

105. Respondent's VIP Host explicitly stated he had a "monthly budget with 'wiggle room'" specifically allocated for Claimant, confirming preferential treatment.

106. Respondent breached the Modo Agreement by implementing practices that effectively required monetary purchases to participate in sweepstakes, by obscuring the free entry method and making it impractical compared to paid entries.

107. Respondent breached the Modo Agreement by manipulating return-to-player metrics and payout timing to maximize addiction and financial harm.

108. Forensic statistical analysis demonstrates that RTP remained consistently below industry standards of 90-98% and dropped further after January 3, 2025.

109. Respondent breached the Modo Agreement by deliberately delaying withdrawal and redemption processing to frustrate withdrawal attempts and encourage continued gambling.

110. Respondent breached the Modo Agreement by failing to implement responsible gaming measures despite clear evidence of Claimant's Gambling disorder, including 18.5 to 21 continuous hours of play per day during January 2025.

111. Respondent breached the Modo Agreement by releasing Claimant’s funds without obtaining his signature on the new Terms of Service.

112. As a direct and proximate result of Respondent's breaches, Claimant suffered damages.

113. Claimant suffered gambling losses totaling between $150,000 and $200,000 during the 2024-2025 period.

114. Claimant suffered business losses of approximately $200,000 as a result of being forced to sell stores to fund his gambling addiction.

115. Claimant suffered emotional distress, anxiety, depression, and worsening of his gambling disorder.

116. Claimant suffered damage to his credit score and incurred substantial interest payments on high-interest loans.

117. Claimant suffered damage to his relationships and work performance.

WHEREFORE, Claimant respectfully requests that the Arbitrator enter an award in favor of Claimant and against Respondent for compensatory damages, consequential damages, restitution, pre-judgment and post-judgment interest, attorney's fees and costs pursuant to Ariz. R. Civ. P. 54, and such other relief as the Arbitrator deems just and proper.

## COUNT TWO

**Unjust Enrichment**

**(against Respondent ARB Gaming LLC)**

118. Respondent received substantial benefits from Claimant.

119. Respondent received between $150,000 and $200,000 from Claimant's gambling losses and purchases during the 2024-2025 period.

120. Respondent was enriched by receiving these funds.

121. Claimant suffered corresponding impoverishment.

122. Claimant lost between $150,000 and $200,000 in gambling losses during the 2024-2025 period.

123. Claimant lost approximately $200,000 in business losses as a result of being forced to sell stores to fund his gambling addiction.

124. Claimant incurred substantial interest payments on high-interest loans obtained to fund his gambling on Respondent's platform.

125. A direct connection exists between Respondent's enrichment and Claimant's impoverishment.

126. Respondent's enrichment directly resulted from Claimant's impoverishment through the gambling transactions on Respondent's platform.

127. There is no justification for Respondent's enrichment and Claimant's impoverishment.

128. Respondent's enrichment resulted from wrongful conduct including exploitation of Claimant's gambling disorder, bipolar disorder, depression, and anxiety.

129. Respondent's enrichment resulted from manipulation of platform mechanics including RTP metrics and payout timing.

130. Respondent's enrichment resulted from predatory practices including VIP programs designed to maximize addiction, deliberate withdrawal delays, and failure to implement responsible gaming measures.

131. Respondent deliberately targeted a vulnerable individual with a known gambling disability.

132. Respondent monitored Claimant's gambling patterns in extraordinary detail and used this information to exploit Claimant's addiction.

133. When Claimant complained about losses, Respondent immediately provided "free" virtual currency to prevent him from stopping play.

134. Respondent's representative mocked Claimant's declaration of playing "15 hours per day" as humorous rather than concerning.

135. Only after approximately one year of severe addiction behaviors did Respondent make any reference to responsible gambling.

136. Claimant has no adequate legal remedy, or alternatively, the legal remedy is inadequate.

137. The Modo Agreement contains a limitation of damages provision that restricts recovery to purchases made six months prior to filing the claim.

138. This limitation is unconscionable and void as against public policy because it allows Respondent to profit from exploitation of vulnerable individuals with gambling disorders while limiting accountability.

145. The agreement is void ab initio under Arizona's illegality doctrine because Respondent operates an illegal gambling enterprise as confirmed by the State of Arizona's cease and desist order. Where a contract is formed in connection with illegal activity under Arizona law, it is void from inception and no contractual remedy exists. If the agreement is void, no contract remedy is available, and unjust enrichment is the sole path to restitution.

146. It would be unjust and inequitable for Respondent to retain the benefits it received from Claimant.

WHEREFORE, Claimant respectfully requests that the Arbitrator enter an award in favor of Claimant and against Respondent for restitution and disgorgement of all ill-gotten gains, pre-judgment and post-judgment interest, attorney's fees and costs pursuant to Ariz. R. Civ. P. 54, and such other relief as the Arbitrator deems just and proper.

## COUNT THREE

**Negligent Misrepresentation**

**(against Respondent ARB Gaming LLC)**

147. Respondent provided false information to Claimant in the course of a business transaction.

148. Respondent represented on its platform and in the Modo Agreement that its games were fair and random.

149. Respondent represented that its games were based solely on chance.

150. Respondent represented that all players had equal opportunity to win.

151. Respondent represented that return-to-player metrics were accurately represented and consistent with industry standards.

152. Respondent represented that withdrawals and redemptions would be processed promptly.

153. Respondent represented that it implemented responsible gaming practices.

154. These representations were false.

155. Forensic statistical analysis demonstrates that RTP remained consistently below industry standards of 90-98%.

156. Forensic statistical analysis demonstrates that RTP dropped further after January 3, 2025, during the period when Claimant suffered the most financially damaging losses.

157. Respondent provided preferential treatment to Claimant through Black Diamond status, personal VIP Host services with a "monthly budget with 'wiggle room'" specifically allocated for Claimant, and substantial free credits not available to other players.

158. This preferential treatment contradicted Respondent's representations that all players had equal opportunity.

159. Respondent deliberately delayed withdrawal and redemption processing and created unnecessary barriers to cashing out winnings.

160. Respondent failed to implement any meaningful responsible gaming measures despite clear evidence of Claimant's gambling disorder, including 18.5 to 21 continuous hours of play per day during January 2025.

161. Respondent intended for Claimant to rely on these representations, or knew that Claimant would reasonably rely on them.

162. Respondent made these representations to induce Claimant to continue gambling on its platform and to make purchases of virtual currency.

163. Respondent failed to exercise reasonable care in obtaining or communicating this information.

164. Respondent monitored Claimant's gambling patterns in extraordinary detail.

165. Respondent tracked specific win rates, spin counts, and other metrics.

166. Respondent knew that Claimant was playing 18.5 to 21 continuous hours per day during January 2025.

167. Respondent knew that Claimant was repeatedly canceling redemptions to continue gambling.

168. Respondent knew that Claimant was expressing concerns about platform functionality and his desire to leave the platform.

169. Despite this knowledge, Respondent continued to represent that its games were fair, that all players had equal opportunity, and that it implemented responsible gaming practices.

170. Respondent knew or should have known that these representations were false.

171. Claimant justifiably relied on Respondent's representations.

172. Claimant reasonably believed that Respondent's platform operated fairly and that he had an equal opportunity to win.

173. Claimant reasonably believed that withdrawals would be processed promptly.

174. Claimant reasonably believed that Respondent implemented responsible gaming practices that would protect vulnerable individuals.

175. Based on these beliefs, Claimant continued to use Respondent's platform and made substantial purchases of virtual currency.

176. As a direct and proximate result of Claimant's reliance on Respondent's negligent misrepresentations, Claimant suffered damages.

177. Claimant suffered gambling losses totaling between $150,000 and $200,000 during the 2024-2025 period.

178. Claimant suffered business losses of approximately $200,000 as a result of being forced to sell stores to fund his gambling addiction.

179. Claimant suffered emotional distress, anxiety, depression, and worsening of his gambling disorder.

180. Claimant suffered damage to his credit score and incurred substantial interest payments on high-interest loans.

181. Claimant suffered damage to his relationships and work performance.

WHEREFORE, Claimant respectfully requests that the Arbitrator enter an award in favor of Claimant and against Respondent for compensatory damages, consequential damages, pre-

judgment and post-judgment interest, attorney's fees and costs pursuant to Ariz. R. Civ. P. 54, and such other relief as the Arbitrator deems just and proper.

## <u>COUNT FOUR</u>

### Fraud / Intentional Misrepresentation

### (against Respondent ARB Gaming LLC)

182. This claim is pleaded with particularity as required by Ariz. R. Civ. P. 9.

183. Respondent made specific representations to Claimant.

184. Through its website at modo. Us and in the Modo Agreement, Respondent represented that its games were fair and random.

185. Through its website at modo.Us and in the Modo Agreement, Respondent represented that its games were based solely on chance.

186. Through its website at modo. Us and in the Modo Agreement, Respondent represented that all players had equal opportunity to win.

187. Through its website at modo.Us and in the Modo Agreement, Respondent represented that return-to-player metrics were accurately represented and consistent with industry standards.

188. Through its website at modo. Us and in the Modo Agreement, Respondent represented that withdrawals and redemptions would be processed promptly.

189. Through its website at modo.Us and in the Modo Agreement, Respondent represented that it implemented responsible gaming practices.

190. These representations were false.

191. Forensic statistical analysis of Claimant's gameplay demonstrates that RTP remained consistently below industry standards of 90-98%.

192. Forensic statistical analysis demonstrates that RTP dropped further after January 3, 2025, during the period when Claimant suffered the most financially damaging losses between January 3, 2025 and January 31, 2025.

193. Forensic statistical analysis demonstrates that platform payout behavior shifted in a sustained way, consistent with platform-controlled volatility or promotional front-loading.

194. Claimant's win/loss patterns followed specific orchestrated timing, with larger wins strategically timed at weekend beginnings to prevent withdrawal during non-business days.

195. Respondent provided preferential treatment to Claimant through Black Diamond status beginning in or around late 2024 or early 2025.

196. Upon achieving Black Diamond status, Claimant received "free" Gold Coins and Sweepstakes Coins that were not available to ordinary players.

197. Upon achieving Black Diamond status, Claimant was assigned personal VIP Hosts Timothy Cramblin and Vic LaFontaine.

198. Respondent's VIP Host explicitly stated to Claimant in communications during the 2024-2025 period that he had a "monthly budget with 'wiggle room'" specifically allocated for Claimant.

199. Respondent restricted Claimant from using general customer service chat and forced him to communicate exclusively with his VIP Host.

200. This preferential treatment contradicted Respondent's representations that all players had equal opportunity.

201. Respondent deliberately delayed withdrawal and redemption processing throughout the 2024-2025 period.

202. Respondent's redemption policies required one to two business days for processing.

203. Larger wins were strategically timed at weekend beginnings, preventing withdrawal during non-business days and allowing cancellation options that Claimant would utilize during manic episodes.

204. Respondent created unnecessary barriers to Claimant cashing out his winnings, including requiring updated Terms of Service acceptance on September 10, 2024 after Claimant won approximately $6,000.

205. Respondent failed to implement any meaningful responsible gaming measures despite clear evidence of Claimant's gambling disorder.

206. During January 2025, Claimant's usage patterns included playing 18.5 to 21 continuous hours per day.

207. Claimant repeatedly canceled redemptions to continue gambling.

208. When Claimant complained about losses, Respondent immediately provided "free" virtual currency to prevent him from stopping play.

209. Respondent's representative mocked Claimant's declaration of playing "15 hours per day" as humorous rather than concerning.

210. Only after approximately one year of severe addiction behaviors did Respondent make any reference to responsible gambling.

211. These representations were material.

212. The representations regarding fairness, randomness, equal opportunity, accurate RTP metrics, prompt withdrawal processing, and responsible gaming practices were material because they induced Claimant to continue gambling on Respondent's platform.

213. Claimant would not have continued gambling on Respondent's platform if he had known that games were not fair, that he did not have equal opportunity, that RTP metrics were manipulated, that withdrawals would be deliberately delayed, and that Respondent would exploit rather than protect vulnerable individuals with gambling disorders.

214. Respondent knew these representations were false at the time they were made.

215. Respondent monitored Claimant's gambling patterns in extraordinary detail, tracking specific win rates, spin counts, and other metrics.

216. Respondent knew that Claimant was playing 18.5 to 21 continuous hours per day during January 2025.

217. Respondent knew that Claimant was repeatedly canceling redemptions to continue gambling.

218. Respondent knew that Claimant was expressing concerns about platform functionality and his desire to leave the platform.

219. Respondent implemented the preferential VIP system with "monthly budget with 'wiggle room'" for Claimant and therefore knew that not all players had equal opportunity.

220. Respondent controlled RTP metrics and payout timing and therefore knew that games were not purely random or based solely on chance.

221. Respondent deliberately delayed withdrawals and created barriers to cashing out and therefore knew that withdrawals were not processed promptly.

222. Respondent failed to implement any meaningful responsible gaming measures despite clear warning signs and therefore knew that it was not implementing responsible gaming practices.

223. Respondent intended to induce Claimant's reliance on these false representations.

224. Respondent made these representations with the intent that Claimant would rely on them to continue gambling on Respondent's platform and to make purchases of virtual currency.

225. Respondent's business model depended on inducing players to continue gambling and making purchases.

226. Respondent specifically targeted Claimant through the VIP program to maximize his gambling and purchases.

227. Claimant was ignorant of the falsity of these representations.

228. Claimant did not know that games were not fair or random.

229. Claimant did not know that he did not have equal opportunity with other players.

230. Claimant did not know that RTP metrics were manipulated below industry standards.

231. Claimant did not know that withdrawals were deliberately delayed as part of a strategy to encourage continued gambling.

232. Claimant did not know that Respondent was exploiting rather than protecting vulnerable individuals with gambling disorders.

233. Claimant relied on Respondent's representations.

234. Based on Respondent's representations, Claimant continued to gamble on Respondent's platform from August 2, 2024 through at least January 31, 2025.

235. Based on Respondent's representations, Claimant made purchases of virtual currency totaling between $150,000 and $200,000 during the 2024-2025 period.

236. Based on Respondent's representations, Claimant took out numerous high-interest loans through Affirm in January 2025 specifically for "MODO GOLD COINS," with transaction amounts typically ranging from $299.99 to $499.99 and annual percentage rates of 24% to 25%.

237. Claimant had the right to rely on Respondent's representations.

238. Claimant had the right to rely on representations made by a business establishment about the fairness of its services, the equal treatment of customers, and the implementation of responsible gaming practices.

239. Claimant had the right to expect that Respondent would comply with sweepstakes laws and consumer protection laws.

240. As a direct and proximate result of Claimant's reliance on Respondent's fraudulent misrepresentations, Claimant suffered damages.

241. Claimant suffered gambling losses totaling between $150,000 and $200,000 during the 2024-2025 period.

242. Claimant suffered business losses of approximately $200,000 as a result of being forced to sell stores to fund his gambling addiction fostered by Respondent's fraudulent conduct.

243. Claimant suffered emotional distress as a direct result of Respondent's fraudulent conduct.

244. Claimant suffered anxiety as a direct result of Respondent's fraudulent conduct.

245. Claimant suffered depression as a direct result of Respondent's fraudulent conduct.

246. Claimant's gambling disorder worsened as a direct result of Respondent's fraudulent conduct.

247. Claimant suffered damage to his credit score and incurred substantial interest payments on high-interest loans obtained to fund gambling induced by Respondent's fraudulent representations.

248. Claimant suffered damage to his relationships and work performance as a direct result of the gambling addiction fostered by Respondent's fraudulent conduct.

249. Respondent's conduct was willful, malicious, oppressive, and in conscious disregard of Claimant's rights.

250. Respondent deliberately targeted a vulnerable individual with a known gambling disability.

251. Respondent manipulated platform mechanics to maximize addiction and financial harm.

252. Respondent exploited Claimant's addiction for profit rather than implementing protective measures.

253. Respondent's conduct warrants an award of punitive damages.

WHEREFORE, Claimant respectfully requests that the Arbitrator enter an award in favor of Claimant and against Respondent for compensatory damages, consequential damages, punitive damages, pre-judgment and post-judgment interest, attorney's fees and costs pursuant to Ariz. R. Civ. P. 54, and such other relief as the Arbitrator deems just and proper.

Respectfully Submitted,

By: /s/Amina M. Mack, Esq.
Amina M. Mack (NCSB No. 61390)
**THE MACK LAW FIRM, PLLC**
4242 Six Forks Road, Ste. 1550
Raleigh, NC 27609
Tel: 984-480-7147
legal@themacklaw.com
Attorney for Claimant

JAMS Access

JAMS Access - Document Upload Confirmation & Proof of Service

**Joyce, Matthew vs. Arb Gaming LLC dba Modo , JAMS Reference Number: 5100003080**

You have successfully uploaded the following document through JAMS Access:

**Document Uploaded By:** Amina Mack

**Date of Upload:** 4/1/2026

**Time of Upload:** 06:37 PM (PT)

**Document Title:** Amended Demand for Arbitration and Amended Statement of Claims

An email notification has been sent to the following individuals included on the JAMS Access Service List:

**JAMS :** Peggy Leen (pleen@jamsadr.com);Danychel Reyes (dreyes@jamsadr.com);

**Duane Morris LLP :** Karen Alexander (klalexander@duanemorris.com);Katie Wang (kwang@duanemorris.com);Walter Saurack (wasaurack@duanemorris.com);William Gantz (bgantz@duanemorris.com);

**Mack Law Firm, PLLC :** Amina Mack (legal@themacklaw.com);

Other authorized users may also receive email notification of this record.

Future registered users added to the JAMS service list will also have access to this document.